**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

My Pillow, Inc.,

Plaintiff,

v.

ACI International,

Defendant.

Case File No. 26-cv-570 (LMP/DLM)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ACI INTERNATIONAL'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE**

---

# TABLE OF CONTENTS


INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 5
- A. Sources Underlying The Motion. ..... 5
- B. The Undisputed Debt and the California Judgment. ..... 6
- C. ACI Told My Pillow in Writing, Twice, That Nothing Would Bind It Absent a Fully Signed Agreement. ..... 7
- D. My Pillow's Balance Sheet Disclosed Eleven Accounts; My Pillow Produced Statements for One. ..... 8
- E. The Subject Email Was One Communication Among Many That Day. ..... 9
- F. My Pillow's "Executed Security Agreement" Was a Counter-Document ACI Never Signed. ..... 10
- G. My Pillow Could Not Grant ACI the Priority Its Document Promised. ..... 12
- H. ACI's Forbearance Documents, and the Complaint Fifty-Three Minutes Later. ..... 13
- I. The Relief My Pillow Seeks. ..... 14

LEGAL STANDARD ..... 15

ARGUMENT ..... 16
- I. THE COURT LACKS PERSONAL JURISDICTION OVER ACI. ..... 16
  - A. ACI is not "at home" in Minnesota. ..... 17
  - B. The emails cannot create specific jurisdiction. ..... 17
  - C. The slipper sales are unrelated to this claim. ..... 20
  - D. The secondary factors cannot supply what is missing. ..... 20
- II. THE COMPLAINT FAILS TO STATE A CLAIM. ..... 20
  - A. The Subject Email Was Not an Offer. ..... 21
  - B. My Pillow did not do what ACI asked, so there was no acceptance. ..... 23
  - C. The alleged agreement is fatally indefinite. ..... 26
  - D. There was no consideration, because My Pillow could not give what it purported to give. ..... 28
  - E. My Pillow pleads no damages the alleged breach could have caused. ..... 29
  - F. Specific performance is unavailable. ..... 30

G. The declaratory count adds nothing and should be dismissed. ........ 31

III. IN THE ALTERNATIVE, THE CASE SHOULD BE TRANSFERRED TO CALIFORNIA. ........ 31

A. Transfer to the Central District of California under 28 U.S.C. § 1404(a). ........ 32

B. This Court cannot transfer the case to the Los Angeles County Superior Court; the vehicle for that result is dismissal. ........ 34

C. To the extent My Pillow seeks to restrain California execution, this Court may not grant it. ........ 34

CONCLUSION ........ 35

# INTRODUCTION

Plaintiff My Pillow, Inc. ("My Pillow") owes Defendant ACI International ("ACI") $15,408,008.84 under a California judgment it has never appealed and never paid. On January 21, 2026, ACI's president sent My Pillow's chief executive a four-sentence email stating that ACI "can lift the levy on Amazon today" and that ACI "would request" three categories of documents "get sent to us today as well" (the "Subject Email"). (Compl. ¶ 18; Declaration of Craig Hardy in Support of Defendant ACI International's Motion to Dismiss or, in the Alternative, to Transfer Venue ("Hardy Decl.") ¶ 20.) This lawsuit asks the Court to hold that the Subject Email—one of at least fifteen communications the parties exchanged that afternoon and evening—was a binding contract obligating ACI to abandon a California judgment execution remedy.

The premise fails on the documents embraced by the Complaint. Six days before the Subject Email was sent, ACI's counsel wrote the following to My Pillow's CEO, Mike Lindell: "To make sure there is no confusion, ACI's judgment collection efforts will continue forward *unless a resolution agreement is fully signed*." (Declaration of Michael Wallin in Support of Defendant ACI International's Motion to Dismiss or, in the Alternative, to Transfer Venue ("Wallin Decl.") ¶¶ 16-17 & Ex. 6.) The day before the Subject Email, ACI's counsel repeated it verbatim, in a written settlement proposal expressly made "*[c]ontingent on signing of mutually acceptable documents*." (*Id.* ¶¶ 18-21, Ex. 7.)

My Pillow's own counsel acted accordingly. ACI's argument is not that counsel's subjective impressions control; it is that her contemporaneous conduct is objective

evidence of what a reasonable person in her position understood the Subject Email to mean — and Minnesota measures formation by objective conduct. Thirty-two minutes after the Subject Email, she asked ACI, "do you have a form agreement you would like us to use for the security agreement?" Minutes later she told ACI she was "working on the last piece, the agreement," and asked ACI to tell her "how much you folks are owed." (*Id.* ¶¶ 34, 36, Ex. 10; Declaration of Anna Liau in Support of Defendant ACI International's Motion to Dismiss or, in the Alternative, to Transfer Venue ("Liau Decl.") ¶ 7.) A lawyer who believed her client had just closed a binding deal does not ask the other side for a form contract, and does not need to ask what her client owes. Those questions are inconsistent with a completed agreement and consistent only with an ongoing negotiation.

The document My Pillow sent that evening was a counteroffer, not an acceptance. My Pillow drafted its own three-page "Security Agreement," had Mr. Lindell sign it, and sent it to ACI. (Wallin Decl ¶¶ 43-44, Exs. 13-14.) ACI neither approved nor signed it. Two features defeat My Pillow's theory. First, the document imposes obligations found nowhere in the Subject Email: it would have required ACI to "immediately remove any lien or any other encumbrance from any account of My Pillow" and to "not place any lien or other encumbrance on any account of My Pillow" for three months. The Subject Email addressed one levy, at one payor, on one day. A response that materially varies the offer is a counteroffer, and a counteroffer is a rejection. Second, the document ends with a signature block for ACI — "Date: ______" and "By ______, its ______" — left blank. My Pillow itself drafted an instrument requiring ACI's signature. It cannot now sue on the theory that ACI's signature was never required.

And the parties were still papering a deal the next day. On January 22, ACI's counsel sent My Pillow's counsel three unsigned documents — a Forbearance Agreement, a Security Agreement, and a joint instruction to Amazon — noting they were "subject to ACI's review and revision." (*Id.* ¶¶ 59, 62, Ex. 19.) My Pillow's counsel did not object that the documents were unnecessary because a contract already existed. She replied: "Thank you." Fifty-three minutes later, My Pillow's chief executive emailed ACI's president a copy of this Complaint.

The Complaint should be dismissed for three reasons.

First, the Court lacks personal jurisdiction over ACI. ACI is a California corporation headquartered in Los Angeles. Every act complained of occurred in California. The only Minnesota "contacts" pleaded are emails and calls to a Minnesota plaintiff, which the Eighth Circuit has repeatedly held insufficient, because "the plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285 (2014); *accord Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 823-24 (8th Cir. 2014). My Pillow's fallback—years of unrelated slipper sales—fails because those sales have nothing to do with this claim. *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 264 (2017).

Second, the Complaint fails to state a claim because:

- There was no offer. The Subject Email said ACI "can lift the levy on Amazon today" and that ACI "would request" three items "get sent to us today as well." A statement of capability coupled with a request is not a promise, and

it was made against ACI's twice-stated written condition that nothing would bind it "unless a resolution agreement is fully signed."

- There was no acceptance, because My Pillow did not do what ACI asked. ACI asked for six months of bank statements; My Pillow's own balance sheet, prepared the day before, disclosed *eleven accounts* at *five institutions*, and My Pillow produced statements for only *one* of its accounts. ACI asked for a security agreement; My Pillow sent a document of its own drafting containing material terms ACI had never proposed and leaving ACI's signature line blank. A response that varies the offer is a counteroffer, not an acceptance. *Gresser v. Hotzler*, 604 N.W.2d 379, 382 (Minn. Ct. App. 2000).
- The alleged agreement is fatally indefinite. It fixes no duration, no scope, no termination event, no collateral, no secured obligation, no priority, and no standard for breach. An alleged contract "so vague, indefinite, and uncertain as to place the meaning and intent of the parties in the realm of speculation is void and unenforceable," and "where substantial and necessary terms are specifically left open for future negotiation, the purported contract is fatally defective." *King v. Dalton Motors, Inc.*, 260 Minn. 124, 126, 109 N.W.2d 51, 52-53 (1961).
- There was no consideration, because My Pillow could not deliver what it purported to give. The only thing My Pillow says it gave ACI was a security interest in a hypothetical government recovery. By My Pillow's own

admissions in this and other courts, that collateral was already encumbered by blanket liens senior to anything My Pillow could grant ACI.

- My Pillow pleads no cognizable injury. Even if ACI had released the levy on January 21, California law permitted ACI to levy again on January 22. "Writs may be issued successively until the money judgment is satisfied." Cal. Civ. Proc. Code § 699.510(a). A registered process server "may levy more than once under the same writ of execution." *Id.* § 699.080(g). A release "extinguishes any execution lien" on the property released and nothing more; it does not satisfy the judgment or disable the creditor. *Id.* §§ 699.060(a), 724.010. The permanent loss My Pillow describes is not a loss the alleged promise could have prevented.

Third, and in the alternative, this dispute belongs in California. ACI is a California corporation; the judgment is a California judgment; the writ is a California writ; the levy was made under California process. If the case is not dismissed, ACI asks that it be dismissed on *forum non conveniens* grounds so My Pillow may present its contentions in the Los Angeles County Superior Court action in which the judgment was entered, or transferred to the Central District of California under 28 U.S.C. § 1404(a).

## FACTUAL BACKGROUND

### A. Sources Underlying The Motion.

The facts below come from the following three sources:

On the Rule 12(b)(2) portion of this motion, the Court may and should consider the accompanying declarations and exhibits because a plaintiff's jurisdictional showing "must

be tested, not by the pleadings alone, but by [the] affidavits and exhibits" of record. *Fastpath*, 760 F.3d at 820 (citation omitted).

On the Rule 12(b)(6) portion of this motion, ACI's argument stands on (1) the Complaint, and (2) the Subject Email, which the Complaint quotes in full. The Court may also consider documents whose contents are alleged in the complaint and whose authenticity no party questions, *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) — which includes the balance of the email chain the Complaint excerpts and the "executed Security Agreement" the Complaint relies on but does not attach. (Compl. ¶ 19.) ACI does not ask the Court to resolve any disputed fact at the pleading stage. The surrounding record is set out because it is the context in which the pleaded email must be read, and because it will be before the Court on the jurisdictional motion in any event.

**B. The Undisputed Debt and the California Judgment.**

ACI manufactures and distributes footwear. (Compl. ¶ 2.) Beginning in approximately 2019 or 2020, ACI sold slippers to My Pillow. (*Id.* ¶¶ 1, 6.) Beginning in 2022, My Pillow stopped paying for goods it had ordered and received. (Id. ¶ 11 (alleging My Pillow "began to fall behind on its payments to Defendant"); Declaration of Steven Jackson in Support of Defendant ACI International's Motion to Dismiss or, in the Alternative, to Transfer Venue ("Jackson Decl.") ¶¶ 14-16.) My Pillow does not allege that it disputes the debt. My Pillow does not allege that it ever paid the debt.

On August 25, 2025, ACI sued My Pillow in the Superior Court of California, County of Los Angeles, Case No. 25STCV24839 (the "California Action"). My Pillow was served and did not answer. On December 23, 2025, that court entered judgment against My

Pillow in the amount of $15,408,008.84 (the "California Judgment"). Notice of entry was served on January 6, 2026. (Wallin Decl. ¶¶ 4-7, Exs. 1-3.)

The Complaint does not challenge the California Judgment. It does not allege that the California Judgment is void, nor that the California court lacked jurisdiction. It also does not allege that My Pillow has paid any portion of the California Judgment.

### C. ACI Told My Pillow in Writing, Twice, That Nothing Would Bind It Absent a Fully Signed Agreement.

On January 15, 2026, Mr. Lindell called ACI's counsel — the first time My Pillow had contacted ACI's counsel since the California Action was filed in August 2025. (Wallin Decl. ¶ 13.) That same day, ACI's counsel wrote to Mr. Lindell requesting "MyPillow's monthly bank statements from January 1, 2025 to the present," "MyPillow's most recent profit/loss statement," and "MyPillow's most recent balance sheet." That January 15, 2026 email closed with:

> To make sure there is no confusion, ACI's judgment collection efforts will continue forward unless a resolution agreement is fully signed.

(*Id.* ¶¶ 14-17, Ex. 6.)

On January 20, 2026 — the day before the Subject Email — ACI's counsel sent Mr. Lindell a written settlement proposal: $1,000,000 by January 23, $500,000 on each of February 15, March 15, and April 15, then $250,000 per month until paid; payment directly from Amazon and other sellers under irrevocable payment instructions; and a personal guaranty from Lindell. The proposal opened, "Contingent on signing of mutually acceptable documents, my client is willing to deem the judgment satisfied if it receives . . . ." It closed with the same sentence:

> Please let me know. To make sure there is no confusion, ACI's judgment collection efforts will continue forward unless a resolution agreement is fully signed.

(*Id.* ¶¶ 18-21, Ex. 7.) My Pillow did not accept that proposal, and made no payment.

### D. My Pillow's Balance Sheet Disclosed Eleven Accounts; My Pillow Produced Statements for One.

In response to ACI's January 15 request, My Pillow provided a balance sheet as of November 30, 2025, generated on January 20, 2026. (Wallin Decl. ¶¶ 24-25, Ex. 8.) Under "Checking/Savings," it listed the following accounts:

| **Account No.** | **Account Description** | **Balance** |
|---|---|---|
| 1007 | FNB Pasco – Checking | $34,088.76 |
| 1008 | CBB – MP Checking | $13,144.28 |
| 1017 | Bank MI – My Pillow Inc | $265,531.17 |
| 1019 | Bank MI – MJL 356 LLC | ($5,948.88) |
| 1020 | Bank MI – MP Distribution LLC | $1.00 |
| 1021 | Bank MI – Aviation | $405,916.07 |
| 1022 | Bank MI – Rev Capital | $1.00 |
| 1023 | Bank MI – Rev7 | ($11,007.70) |
| 1026 | Petty Cash | ($15,415.05) |
| 1031 | RBC (CAD) x3698 | $752.64 |
| 1035 | GBC International Bank | $16,728.92 |
| | Total Checking/Savings | $703,792.21 |

Ten of those eleven line items are deposit accounts, held at five separate financial institutions: FNB Pasco; CBB; Bank Michigan (six accounts); RBC; and GBC International Bank. (Wallin Decl. ¶ 26.)

On January 21, 2026, at 3:22 p.m. Central time, Mr. Lindell forwarded ACI six monthly statements, July through December 2025. Every one was for a single account: Bank Michigan, account ending 6968. My Pillow sent no statements from FNB Pasco,

CBB, RBC, GBC International Bank, or for any of the other five Bank Michigan accounts disclosed on its balance sheet. (Wallin Decl. ¶¶ 27-28, Ex. 9; Liau Decl. ¶ 9.)

### E. The Subject Email Was One Communication Among Many That Day.

The Complaint presents the Subject Email as a discrete offer, made and accepted. (Compl. ¶¶ 18-19.) In reality, it was one moment in a day of continuous communication, conducted simultaneously on three channels: between Mr. Lindell and ACI's principals directly; between Mr. Lindell's counsel and ACI's principals; and between counsel and counsel. The sequence, in Central time, was as follows (Wallin Decl. ¶¶ 30-43, Exs. 10-13):

| Time | Event |
|---|---|
| Morning | Mr. Lindell, ACI's president Craig Hardy, and ACI's chairman and chief executive Steven Jackson hold an hour-long telephone call. (Compl. ¶ 15; Hardy Decl. ¶ 18.) |
| 1:27 p.m. | Mr. Hardy sends Mr. Lindell and Ali Warden the Subject Email. (Wallin Decl. ¶¶ 29, 32, Ex. 10; Hardy Decl. ¶ 20.) |
| 1:47 p.m. | Mr. Lindell forwards it to Barbara Berens, My Pillow's counsel. (Wallin Decl. ¶ 33, Ex. 10.) |
| 1:59 p.m. | Ms. Berens emails ACI's principals: "I will send the requested documents. . . . Anna, do you have a form agreement you would like us to use for the security agreement?" (Wallin Decl. ¶ 34, Ex. 10.) |
| 2:05 p.m.; 2:09 p.m. | Ms. Berens emails ACI two sets of sealed District of Columbia filings, including Mr. Lindell's April 18, 2025 declaration, his personal financial statement, and My Pillow's accounts-payable aging report. (Wallin Decl. ¶ 35, Ex. 11.) |
| 2:06 p.m. | Ms. Berens emails ACI: "I am working on the last piece, the agreement, but need to know how much you folks are owed." (Wallin Decl. ¶ 36, Ex. 10.) |

| | |
|---|---|
| 2:11 p.m. | ACI's executive vice president replies: "All of this needs to be run by our attorney, Michael Wallin, so please reach out to him to discuss." (Wallin Decl. ¶ 37, Ex. 10.) |
| 3:22 p.m. | Mr. Lindell forwards the six Bank Michigan statements described above. (Wallin Decl. ¶ 38, Ex. 9.) |
| 4:23 p.m. | ACI's counsel emails Ms. Berens: "Please call me at 949-378-1406." (Wallin Decl. ¶ 39, Ex. 10.) |
| 4:30 p.m. | Ms. Berens replies, "I will in a bit," and the two counsel speak by telephone. (Wallin Decl. ¶ 40, Ex. 10.) |
| 4:57 p.m. | Ms. Berens emails ACI's counsel to argue the merits of "a three month standstill," and warns that "[i]f anyone with a prior lien on the Amazon funds, of which there are several, comes forward and slap their prior liens on Amazon, it will take about six months (or more) to get all of that resolved with Amazon." (Wallin Decl. ¶ 41, Ex. 12.) |
| Late afternoon | Mr. Lindell speaks with Mr. Jackson again, for approximately another hour, discussing among other things a meeting Mr. Lindell said he would have with the President of the United States on February 18. (Declaration of Steven Jackson in Support of Defendant ACI International's Motion to Dismiss or, in the Alternative, to Transfer Venue ("Jackson Decl.") ¶ 28.) |
| 7:27 p.m. | Ms. Warden emails ACI a document she describes as "the attached signed agreement." (Wallin Decl. ¶ 43, Ex. 13.) |

No reading of the communications that day supports the Complaint's account of a discrete offer accepted by performance at 1:27 p.m. followed by a breach later that night.

### F. My Pillow's "Executed Security Agreement" Was a Counter-Document ACI Never Signed.

The document Ms. Warden sent at 7:27 p.m. is the "executed Security Agreement" the Complaint alleges "included all of the terms set forth by Defendant's president in the Subject Email." (Compl. ¶ 19.) It did not. (Wallin Decl. ¶ 44, Ex. 14; Hardy Decl. ¶ 25.)

The document was drafted by My Pillow. It recites that the parties "agree to further memorialize the agreement they had reached earlier today." It defines "Obligations" as "$15.4 million" and "Collateral" as "all funds recovered by My Pillow by any means as a result of Arctic Frost." ***And it then imposes on ACI a set of obligations that appear nowhere in the Subject Email***, including:

- Paragraph 4(d): "ACI agreed that it will immediately remove any lien or any other encumbrance from any account of My Pillow, including, without limitation, My Pillow's Amazon account. ACI further agrees that it will not place any lien or other encumbrance on any account of My Pillow, including without limitation, Amazon, for the next three months, that is, until April 21, 2026."
- Paragraph 4(g): "ACI agrees that the Conditions were met."
- Paragraph 5: "This Agreement shall remain in effect from the date of execution until April 21, 2026 unless otherwise renegotiated by the Parties."

(Wallin Decl. ¶¶ 46-49, Ex. 14.)

The Subject Email said nothing about other liens, other accounts, future liens, a three-month term, an April 21 expiration, or renegotiation. It addressed one levy at one payor on one day.

The "executed Security Agreement" also contains, at paragraph 3(b), My Pillow's representation that "My Pillow has granted no other security interest in the Collateral."

Finally, and dispositively for the Complaint's theory, the document ends with two signature blocks. Mr. Lindell signed and dated his, "1-21-26." The second block reads:

Date: ________________ ACI International
By ______________, its __________

It is blank. ACI never signed it. (Hardy Decl. ¶ 26.) On the morning of January 22, ACI's counsel instructed ACI: "I will draft an agreement for your review. In the meantime, please don't countersign the agreement MyPillow sent yesterday." ACI's executive vice president confirmed the reason: "We need to draft agreement for them to countersign. Their agreement was insufficient." (Wallin Decl. ¶¶ 51-53, Exs. 14-15; Liau Decl. ¶ 13.)

**G. My Pillow Could Not Grant ACI the Priority Its Document Promised.**

At the same time My Pillow was representing to ACI that it "has granted no other security interest in the Collateral," at least two blanket security interests may already have encumbered all of My Pillow's personal property, as follows:

1. US Alliance Group Inc. filed a UCC-1 financing statement with the California Secretary of State on August 21, 2024, File No. U240066792330, naming My Pillow, Inc. and Mr. Lindell among the debtors, and covering "all Future Receivables," "all personal property of Seller that relates to the Future Receivables, such as accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory," and "all proceeds." (Wallin Decl. ¶ 54, Ex. 16.)

2. MJMPL LLC — an entity Mr. Lindell may have an interest in and control over — claims a Continuing Security Agreement dated December 23, 2024 granting it a security interest in substantially all of My Pillow's assets, perfected by UCC-1 financing statements filed in Minnesota and by a deposit

account control agreement with Bank Michigan. In litigation now pending, MJMPL asserts "a perfected senior security interest in all of My Pillow's assets," and represents that My Pillow warranted to MJMPL that it would "keep the Collateral free of liens, encumbrances and other security interests." (Wallin Decl. ¶ 55, Ex. 17.)

My Pillow's own counsel said as much to ACI on January 21, warning of persons "with a prior lien on the Amazon funds, of which there are several." (*Id.* ¶ 41, Ex. 12.) Amazon has separately identified MJMP Consulting LLC, MJMPL LLC, the Minnesota Department of Revenue, and the Idaho State Tax Commission as asserting interests in the funds it owes My Pillow. (*Id.* ¶ 12, Ex. 5.)

### H. ACI's Forbearance Documents, and the Complaint Fifty-Three Minutes Later.

On January 22, 2026, ACI's counsel prepared and circulated the documents on which ACI was willing to forbear. At 11:31 a.m. Pacific time (1:31 P.M. Central time), ACI's executive vice president told Ms. Berens: "Mike Wallin is working on finalizing the documents needed. He will be forwarding the documents to you shortly." At 4:35 p.m. Pacific time (6:35 p.m. Central time), ACI's counsel emailed Berens three documents — a Forbearance Agreement, a Security Agreement, and a Joint Irrevocable Instruction to Amazon — with the cover note: "The documents are attached for your review. They are subject to ACI's review and revision." (Wallin Decl. ¶¶ 57-59, Exs. 18-19; Liau Decl. ¶¶ 15-16.)

Those documents reflect the terms on which ACI was *actually* prepared to forbear, and they reflect the representations Mr. Lindell made to ACI in the preceding week. Among other things, the Forbearance Agreement conditioned effectiveness on My Pillow delivering monthly statements for June 1 through December 31, 2025 "for all deposit accounts in which Debtor or its affiliates have any interest, including without limitation, all accounts at these financial institutions: (1) FNB Pasco; (2) CBB; (3) Bank of Michigan (including accounts ending in 6332, 6919, and 6968); and (4) GBC International"; on execution of the Amazon instruction; and on execution of the Security Agreement. It required My Pillow to continue producing statements monthly, to furnish evidence by February 28, 2026 that Lindell had met with the President to discuss "Arctic Frost" and that My Pillow had submitted the necessary claim documents, and to allow no creditor to obtain a judgment against it or levy on its assets. Only if all of that occurred would ACI "forbear, refrain, and otherwise stop taking any new steps to enforce the Judgment until April 15, 2026." The accompanying Security Agreement granted a security interest in all assets, authorized UCC filings, and specified remedies and governing law. Both were unsigned, with signature blocks for both parties. (Wallin Decl. ¶¶ 60-62, Ex. 19.)

At 4:41 p.m., Ms. Berens replied: "Thank you."

At 5:34 p.m., fifty-three minutes later, Mr. Lindell emailed ACI's president a copy of the Complaint filed in this Court. (*Id.* ¶¶ 63, 65, Exs. 20-21.)

**I. The Relief My Pillow Seeks.**

Count I seeks a declaration that "the Parties' contract is valid and enforceable and that ACI must lift the levy on My Pillow's Amazon account." (Compl. ¶ 26.) Count II,

breach of contract, seeks damages for "the loss of the funds in My Pillow's Amazon account." (*Id.* ¶ 30.) Count III seeks specific performance "requiring Defendant to lift the levy." (*Id.* ¶ 35.) Each claim asks this Court to order a California judgment creditor to release a levy served under a writ of execution issued by the Los Angeles County Superior Court.

## LEGAL STANDARD

On a motion under Rule 12(b)(2), the plaintiff bears the burden of establishing a prima facie case of personal jurisdiction, and the showing "must be tested, not by the pleadings alone, but by [the] affidavits and exhibits" in the record. *Fastpath*, 760 F.3d at 820 (citation omitted).

On a motion under Rule 12(b)(6), the Court accepts well-pleaded factual allegations as true but need not accept legal conclusions, "labels and conclusions," or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court may consider documents whose contents are alleged in the complaint and whose authenticity no party questions. *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Where such a document contradicts the pleader's characterization of it, the document controls. (*Zean*, 858 F.3d at 526 ("In a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss," and that is so "even if contract documents not attached to the complaint refute

a breach-of-contract claim" (quoting *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003))); see *Gorog v. Best Buy Co.*, 760 F.3d 787, 793 (8th Cir. 2014).

Because ACI's motion is brought in part under Rule 12(b)(2) and in part under 28 U.S.C. § 1404(a), the Court may consider the accompanying declarations without converting the motion into one for summary judgment. On a challenge to personal jurisdiction, "it is permissible to consider matters outside the pleadings," and the court "may inquire, by affidavits or otherwise, into the facts as they exist." *Stevens v. Redwing*, 146 F.3d 538, 543 (8th Cir. 1998). Indeed, the plaintiff's prima facie showing "must be tested, not by the pleadings alone, but by [the] affidavits and exhibits" in the record. *Fastpath*, 760 F.3d at 820 (citation omitted). The same is true of the transfer analysis, which turns on convenience facts nowhere alleged in the Complaint. Rule 12(d) does not require otherwise: by its terms it applies only to motions "under Rule 12(b)(6) or 12(c)." Fed. R. Civ. P. 12(d). And as to the Rule 12(b)(6) branch of the motion, ACI does not ask the Court to weigh the declarants' opinions. It asks the Court to read the documents they authenticate — the Subject Email quoted at paragraph 18 of the Complaint, the "executed Security Agreement" pleaded at paragraph 19, and the balance of the same email exchange — each of which is embraced by the pleadings and may be considered for that reason. *Zean*, 858 F.3d at 526.

## ARGUMENT

### I. THE COURT LACKS PERSONAL JURISDICTION OVER ACI.

Minnesota's long-arm statute, Minn. Stat. § 543.19, extends jurisdiction to the limits of federal due process, so the two inquiries collapse into one. *Land-O-Nod Co. v.*

*Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1340 (8th Cir. 1983). The Eighth Circuit weighs five factors: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties," with the last two "of secondary importance and not determinative." *Id.*

**A. ACI is not "at home" in Minnesota.**

A corporation is subject to general jurisdiction only where it is "essentially at home" — paradigmatically its state of incorporation and its principal place of business. *Daimler AG v. Bauman*, 571 U.S. 117, 127, 139 (2014) (citations omitted). ACI is incorporated in California and headquartered in Los Angeles. (Compl. ¶ 2; Hardy Decl. ¶ 3.) A theory that a corporation is at home wherever it does "substantial, continuous, and systematic" business is "unacceptably grasping." *Daimler*, 571 U.S. at 138. "[E]ven regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). ACI is "essentially at home" in California, not Minnesota. (Hardy Decl. ¶¶ 4-11.)

**B. The emails cannot create specific jurisdiction.**

Without general jurisdiction over ACI, the inquiry shifts to specific jurisdiction. Specific jurisdiction requires that "the defendant's suit-related conduct . . . create a substantial connection with the forum State," arising from "contacts that the defendant himself creates with the forum State." *Walden*, 571 U.S. at 284 (cleaned up). The analysis looks to contacts "with the forum State itself, not the defendant's contacts with persons



4814876.v1

who reside there," and "the plaintiff cannot be the only link between the defendant and the forum." *Id.*, 571 U.S. at 285.

That disposes of My Pillow's theory. My Pillow alleges jurisdiction because ACI sent "an email into Minnesota to form the contract at issue" and entered "into the contract at issue with My Pillow, a Minnesota corporation." (Compl. ¶ 4.) The Eighth Circuit has rejected exactly that showing:

- In *Fastpath*, the defendant "directed some emails and phone calls to [the plaintiff] in Iowa, but . . . this activity was insufficient to establish personal jurisdiction." 760 F.3d at 823. "Although letters and faxes may be used to support the exercise of personal jurisdiction, they do not themselves establish jurisdiction." *Id.* at 824.
- In *Digi-Tel Holdings, Inc. v. Proteq Telecommunications (PTE), Ltd.*, 89 F.3d 519 (8th Cir. 1996)—a Minnesota case—numerous letters, faxes, and calls into Minnesota, product samples shipped there, and a Minnesota choice-of-law clause were not enough. The defendant "did not create a substantial connection between itself and Minnesota, it merely engaged in negotiations with a purchaser who happened to reside in Minnesota." *Id.* at 525.
- In *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589 (8th Cir. 2011), "scattered e-mails, phone calls, and a wire-transfer of money . . . do not constitute a 'deliberate' and 'substantial connection' with the state." *Id.* at 594.

- In *Federated Mutual Insurance Co. v. FedNat Holding Co.*, 928 F.3d 718 (8th Cir. 2019), "directing a few emails or letters to Federated Mutual in Minnesota is not enough." *Id.* at 720.
- In *Pederson v. Frost*, 951 F.3d 977 (8th Cir. 2020), hundreds of calls and emails to a Minnesota office did not suffice, because nothing "tether[ed] the effect of their actions to Minnesota." *Id.* at 980-81 (citation omitted).

"[A] contract with an out-of-state party alone" cannot "automatically establish sufficient minimum contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). Here there is less. No ACI representative traveled to Minnesota in connection with this dispute; ACI was to perform nothing in Minnesota; no money was to flow to Minnesota. (Hardy Decl. ¶ 12.) The performance My Pillow demands—release of a levy served under a California writ—would occur in California, by a direction sent to a California levying officer. Cal. Civ. Proc. Code § 699.060(a). And the record shows it was My Pillow that initiated the January contacts: Lindell called ACI's counsel on January 15, and called ACI's principals repeatedly thereafter. (Wallin Decl. ¶¶ 13, 31, 42.)

*Morningside Church, Inc. v. Rutledge*, 9 F.4th 615 (8th Cir. 2021), is closest. Out-of-state officials sent demand letters, subpoenas, and calls into the forum, and one filed an enforcement action; the Eighth Circuit still found no jurisdiction, because "when the only connection between the defendants and the forum state is the plaintiff himself, they are not enough on their own," and the communications were directed to the forum only because the plaintiffs "just happen[ed]" to reside there. *Id.*, 9 F.4th at 619-20. ACI communicated with My Pillow in Minnesota for the same reason: that is where My Pillow is.

**C. The slipper sales are unrelated to this claim.**

My Pillow also invokes years of slipper sales into Minnesota. (Compl. ¶¶ 4, 6.) But specific jurisdiction requires "a connection between the forum and the specific claims at issue," and "[w]hen there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 264-65 (2017); *see also Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021) (the "relate to" prong "incorporates real limits").

This claim does not arise out of or relate to the sale of slippers. It arises out of a post-judgment exchange about whether ACI would suspend a California execution remedy. *Land-O-Nod* is on point: the defendant there had sold mattresses into Minnesota since 1972, with more than $150,000 in Minnesota sales in a single year and sales representatives calling on Minnesota retailers — and the Eighth Circuit still ordered dismissal, because the claim was unrelated to those forum activities. 708 F.2d at 1340, 1342.

**D. The secondary factors cannot supply what is missing.**

Minnesota's interest in providing a forum for its residents "cannot make up for the absence of minimum contacts." *Digi-Tel*, 89 F.3d at 525. Convenience cuts the other way: the witnesses to ACI's decision-making, the custodians of the enforcement file, the levying officer, and the garnishee's records are all in California. The Complaint should be dismissed under Rule 12(b)(2) for lack of personal jurisdiction over ACI.

## II. THE COMPLAINT FAILS TO STATE A CLAIM.

Under Minnesota law, "[a] contract is formed when two or more parties exchange bargained-for promises, manifest mutual assent to the exchange, and support their promises

with consideration." *Med. Staff of Avera Marshall Reg'l Med. Ctr. v. Avera Marshall*, 857 N.W.2d 695, 701 (Minn. 2014). Formation "requires communication of a specific and definite offer, acceptance, and consideration," judged by "the objective conduct of the parties and not their subjective intent." *Commercial Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006); *accord Cederstrand v. Lutheran Brotherhood*, 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962). The elements of a breach claim are "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (quoting *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011)). My Pillow's Complaint fails at every step.

### A. The Subject Email Was Not an Offer.

An offer must be "specific and definite." *Commercial Assocs.*, 712 N.W.2d at 782. The Subject Email is neither. It says ACI "can lift the levy on Amazon today"—a statement of capability, not a promise—and that ACI "would request" three items "get sent to us today as well." (Compl. ¶ 18.) A request that documents be sent is not a promise to do anything, and "can" does not commit.

The third item of the Subject Email confirms that no agreement existed. ACI asked for "a security agreement"—a document not yet drafted, whose terms had not been agreed, and which by its nature would have to be negotiated and executed. (Hardy Decl. ¶ 23.) Minnesota law is settled that "no contract exists 'where two parties consider the details of a proposed agreement, perhaps settling them one by one, with the understanding during

this process that the agreement is to be embodied in a formal written document and that neither party is to be bound until he executes the document.'" *Hansen v. Phillips Beverage Co.*, 487 N.W.2d 925, 927 (Minn. Ct. App. 1992) (quoting *Northway v. Whiting*, 436 N.W.2d 796, 799 (Minn. Ct. App. 1989)).

The Minnesota Supreme Court applied that rule in *Lindgren v. Clearwater National Corp.*, 517 N.W.2d 574 (Minn. 1994), holding that a signed letter of intent providing that the parties "shall enter into a definite purchase agreement" "merely created an agreement to negotiate in good faith and . . . was not the complete and final agreement the parties contemplated." *Id.* at 574. The Eighth Circuit, applying Minnesota law, holds the same—an agreement to negotiate is "unenforceable and unremediable," because it "provide[s] neither a basis for determining the existence of a breach nor for giving an appropriate remedy." *Ohio Calculating, Inc. v. CPT Corp.*, 846 F.2d 497, 501 (8th Cir. 1988); *accord Consol. Grain & Barge Co. v. Madgett*, 928 F.2d 816, 817-18 (8th Cir. 1991) (per curiam).

Here, the parties' understanding was not merely implicit. ACI said it twice, in writing, in the six days before the Subject Email: "ACI's judgment collection efforts will continue forward unless a resolution agreement is fully signed." (Wallin Decl. ¶¶ 16-17, 20-21, Exs. 6-7.) Because formation is measured by objective conduct, that express and unretracted condition governs how a reasonable recipient would read a follow-on email in the same negotiation. *Cederstrand*, 263 Minn. at 532, 117 N.W.2d at 221 (1962) ("Expressions of mutual assent, by words or conduct, must be judged objectively, not subjectively.") My Pillow's counsel plainly did read it that way: half an hour after the Subject Email she was asking ACI for a form agreement and for the amount owed, and

hours later she was still negotiating the length of "a three month standstill." (Wallin Decl. ¶¶ 34, 36, 41, Exs. 10, 12.)

**B. My Pillow did not do what ACI asked, so there was no acceptance.**

Even taking the Subject Email as an offer, My Pillow does not plead performance of its terms. Minnesota follows the mirror-image rule: "an acceptance [must] be coextensive with the offer and not introduce additional terms or conditions." *Commercial Assocs.*, 712 N.W.2d at 782; *accord Podany v. Erickson*, 235 Minn. 36, 49 N.W.2d 193, 194 (1951). "[A]n acceptance which differs substantially and materially from the terms of the original offer does not give rise to a completed contract." *Markmann v. H.A. Bruntjen Co.*, 249 Minn. 281, 286, 81 N.W.2d 858, 862 (1957). A purported acceptance that alters the offer is a counteroffer, rejecting the prior offer, and no contract results as a matter of law. *Gresser v. Hotzler*, 604 N.W.2d 379, 382 (Minn. Ct. App. 2000) (affirming summary judgment where a buyer signed but changed two dates).

My Pillow alleges only that it sent "an executed Security Agreement which included all of the terms set forth by Defendant's president." (Compl. ¶ 19.) That is a legal conclusion dressed as a fact, and this Court need not credit it. *Iqbal*, 556 U.S. at 678. It is also wrong for several reasons.

*First*, the bank statements. ACI asked for the "[l]ast 6 months of bank statements." (Compl. ¶ 18.) My Pillow's own balance sheet, generated the previous day, disclosed ten deposit accounts at five institutions. My Pillow produced six statements, all for one account at one bank. (Wallin Decl. ¶¶ 24-28, Exs. 8-9.) A party that supplies a tenth of what was asked has not performed the condition, and ACI said so at the time. (*Id.* ¶ 60, Ex. 19.)

*Second*, the security agreement. The Subject Email set forth no terms of a security agreement. It described a hoped-for economic outcome—ACI "would be paid in full" if My Pillow "received $50 million or more" from a government settlement, "prorated" below that—and nothing else. (Compl. ¶ 18.) It identified no collateral, no secured obligation, no priority, no default terms, no remedies, no filing obligation, and no governing law. What My Pillow sent was a document of its own drafting that supplied its preferred terms and added obligations ACI had never proposed—that ACI "immediately remove any lien or any other encumbrance from any account of My Pillow"; that ACI "not place any lien or other encumbrance on any account of My Pillow . . . for the next three months, that is, until April 21, 2026"; and that "ACI agrees that the Conditions were met." (Wallin Decl. ¶¶ 46-48, Ex. 14.) The Subject Email addressed one levy at one payor on one day. My Pillow's document would have disarmed ACI entirely for a quarter of a year. That is a counteroffer under any reading. *Gresser*, 604 N.W.2d at 382.

And My Pillow's own document establishes that My Pillow did not believe a contract had already formed. It recites that the parties "agree to further memorialize the agreement," it requires ACI's representations and warranties, and it closes with a signature block for ACI. That block is blank. (Wallin Decl. ¶¶ 50-51, Ex. 14.) "No contract is formed by the signing of an instrument when one party knows the other does not intend to be bound by the document." *Hansen*, 487 N.W.2d at 927. A plaintiff cannot draft a bilateral agreement, sign one side of it, and then sue on the theory that the other side's signature was never required.

My Pillow's conduct the following day confirms the point. On January 22, 2026, ACI's counsel emailed My Pillow's counsel three unsigned documents: (1) a Forbearance Agreement, (2) a Security Agreement, and (3) a Joint Irrevocable Instruction to Amazon; and wrote that they were "subject to ACI's review and revision." (Wallin Decl. ¶¶ 59, 62, Ex. 19.) Those documents were not a restatement of the Subject Email. They conditioned any forbearance on My Pillow producing statements for every one of its deposit accounts, on continued monthly reporting through April, on proof that Mr. Lindell had met with the President of the United States, on proof that My Pillow had submitted its "Arctic Frost" claim, and on a covenant that no other creditor obtain a judgment against My Pillow or levy on its assets. (*Id.* ¶ 60, Ex. 19.) And they would have bound ACI only to forbear "from taking any new steps to enforce the Judgment until April 15, 2026."

If the Complaint were true—if the parties had struck a binding bargain the previous afternoon and My Pillow had already fully performed it—that email demanded a response. My Pillow's counsel would have written that no further documents were needed, that ACI was already obligated to lift the levy, and that ACI's new demands were a repudiation of the agreement the parties had just made. She wrote none of that. (Liau Decl. ¶ 17.) She wrote: "Thank you." (Wallin Decl. ¶ 63, Ex. 20.) Fifty-three minutes later, Mr. Lindell emailed ACI's president a copy of this Complaint. (*Id.* ¶ 65, Ex. 21.)

That two-word reply is objective conduct, and under Minnesota law objective conduct is what governs. *Cederstrand*, 117 N.W.2d at 221. "Thank you" is what a party says when it is waiting for a deal to be papered. It is not what a party says when it is handed a fresh set of conditions in place of a contract it believes it already holds. My Pillow's



4814876.v1

silence in the face of ACI's January 22 documents is irreconcilable with the agreement it now asks this Court to enforce.

Under Minnesota's Uniform Commercial Code, a security interest is enforceable "only if" three things are true: "value has been given"; "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party"; and "the debtor has signed a security agreement that provides a description of the collateral." Minn. Stat. § 336.9-203(b). The Complaint pleads none of it. Having failed to plead "performance by plaintiff of any conditions precedent to [its] right to demand performance," *Lyon Fin. Servs.*, 848 N.W.2d at 543, My Pillow has not stated a claim.

### C. The alleged agreement is fatally indefinite.

Even if an offer had been made and accepted, the resulting agreement would be unenforceable for uncertainty. "It is a fundamental rule of law that an alleged contract which is so vague, indefinite, and uncertain as to place the meaning and intent of the parties in the realm of speculation is void and unenforceable." *King v. Dalton Motors, Inc.*, 260 Minn. 124, 126, 109 N.W.2d 51, 52-53 (1961). "Consequently, where substantial and necessary terms are specifically left open for future negotiation, the purported contract is fatally defective." *Id.* Where an alleged term "provides no standard for ascertaining" the parties' obligations, it is "fatally uncertain and unenforceable in any form of action." *Id.*, 260 Minn. at 128, 109 N.W.2d at 54.

On My Pillow's theory ACI is obligated to "lift the levy." (Compl. ¶ 26.) The Subject Email answers none of the questions that obligation raises, including:

1. Scope. Was ACI restrained only as to the single Amazon levy, or as to every collection remedy against every asset? The Subject Email addresses one levy; My Pillow's own document demanded the removal of every lien on every account.

2. Duration. For how long? The Subject Email says nothing. My Pillow's document said three months; Berens argued for three months; ACI's later draft proposed forbearance until April 15, 2026. The parties were still trading numbers when My Pillow sued.

3. Termination. What event ends the restraint? The Subject Email says nothing. ACI's draft listed seven separate post-agreement obligations whose breach would end it.

4. Renewal. May ACI levy again, and if so when and on what conditions? The Subject Email says nothing; My Pillow's document would have barred any new lien for three months.

5. The Security. What collateral? Securing what obligation? At what priority, behind which of the several lienholders asserting interests in the same funds? The Subject Email says nothing.

6. Breach. What conduct by ACI would breach? If ACI remained free to pursue every other execution remedy, what did My Pillow buy?

These are not peripheral details; they are the whole substance of a forbearance. That the parties were actively negotiating each of them on January 21 and 22 is not an argument for enforcement—it is the proof that "substantial and necessary terms [were] specifically

left open for future negotiation." *King*, 260 Minn. at 126, 109 N.W.2d at 52; *accord Ohio Calculating*, 846 F.2d at 501. Because there is no standard by which to measure ACI's performance, there is no basis on which to find a breach or fashion a remedy.

### D. There was no consideration, because My Pillow could not give what it purported to give.

Consideration "requires that one party to a transaction voluntarily assume an obligation on the condition of an act or forbearance by the other." *Avera Marshall*, 857 N.W.2d at 701. The only thing My Pillow says it gave ACI in exchange for the release of a levy was a security interest in a hypothetical future recovery. (Compl. ¶ 25.)

It could not deliver it. A security interest is enforceable only if "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party." Minn. Stat. § 336.9-203(b)(2). My Pillow does not allege that any "Arctic Frost" claim exists, that it has been submitted, or that any recovery is owed — only that there might someday be "a settlement with the government." (Compl. ¶ 18.) And by My Pillow's own admissions, whatever interest it held was already fully encumbered: US Alliance Group's August 21, 2024 UCC-1 covers all of My Pillow's accounts, general intangibles, and proceeds; MJMPL claims "a perfected senior security interest in all of My Pillow's assets" under a December 23, 2024 security agreement; and My Pillow's counsel told ACI on January 21 that several persons hold "prior lien[s] on the Amazon funds." (Wallin Decl. ¶¶ 41, 54-55, Exs. 12, 16-17.) My Pillow's warranty to ACI that it "has granted no other security interest in the Collateral" was one My Pillow was in no position to make.

A promise to convey what the promisor cannot convey supplies no consideration, and it supplies no basis for the "meeting of the minds" the Complaint asserts. (Compl. ¶ 25.) This is not a matter of proof at trial; it is apparent from My Pillow's own filings in this and other courts, of which the Court may take judicial notice.

**E. My Pillow pleads no damages the alleged breach could have caused.**

"A breach of contract claim fails as a matter of law if the plaintiff cannot establish that he or she has been damaged by the alleged breach." *Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 578-79 (Minn. Ct. App. 2004) (citing *Logan v. Norwest Bank Minn., N.A.*, 603 N.W.2d 659, 663 (Minn. Ct. App. 1999)). And "there can be no recovery for damages which are remote, conjectural, or speculative." *Carpenter v. Nelson*, 257 Minn. 424, 428, 101 N.W.2d 918, 921 (1960).

My Pillow alleges that ACI's failure to lift the levy "caus[ed] the loss of the funds in My Pillow's Amazon account." (Compl. ¶ 30.) The promise My Pillow describes could not have prevented that loss.

First, a release of levy accomplishes one narrow thing. A judgment creditor releases a levy by written direction to the levying officer, which "may be transmitted electronically"; the release "extinguishes any execution lien or attachment lien in favor of the judgment creditor on the property released" — and nothing else. Cal. Civ. Proc. Code § 699.060(a), (f).

Second, the creditor may immediately levy again. "Writs may be issued successively until the money judgment is satisfied." *Id.* § 699.510(a). A registered process server "may levy more than once under the same writ of execution, provided that the writ

is still valid." *Id.* § 699.080(g). California courts have said so directly: among a judgment creditor's rights "is to levy successively upon the property," and "[i]n effect, then, the creditor can renew or extend the lien until the judgment itself is satisfied." *Oliver v. Bledsoe*, 5 Cal. App. 4th 998, 1009-10 (1992).

Third, releasing a levy neither satisfies the judgment nor extinguishes the debt. A money judgment is satisfied only "by payment of the full amount required to satisfy the judgment or by acceptance by the judgment creditor of a lesser sum in full satisfaction." *Id.* § 724.010(a). My Pillow does not allege it paid anything. The California Judgment remains enforceable for ten years and is renewable. *Id.* §§ 683.020, 683.120(b).

The consequence for the pleading is straightforward. The most My Pillow could have obtained was a release ACI could lawfully undo the next morning, leaving untouched ACI's judgment, its judgment lien, its right to a new writ, and every other execution remedy California confers. My Pillow does not allege that ACI promised not to re-levy; the Subject Email says nothing of the kind, and it was My Pillow's own rejected document—not ACI's email—that proposed a three-month bar on new liens. The permanent injuries My Pillow describes, being "forced out of business" and losing "the funds in My Pillow's Amazon account," are not injuries the alleged promise, performed as pleaded, would have avoided. (Compl. ¶¶ 30, 36.) What remains is the value of a one-day reprieve — speculative, and unpleaded.

**F. Specific performance is unavailable.**

Specific performance "is an equitable remedy addressed to the discretion of the court." *Fred O. Watson Co. v. U.S. Life Ins. Co.*, 258 N.W.2d 776, 778 (Minn. 1977).

Specific performance is unavailable where the alleged agreement is indefinite, *King*, 260 Minn. at 126, 109 N.W.2d at 52, or where no contract was formed, *Gresser*, 604 N.W.2d at 382-83. Count III fails for the reasons Counts I and II fail, and for two more: a court cannot order performance it cannot describe, and the harm alleged—delayed access to cash—is by nature compensable in money. *Minnesota Vikings Football Stadium, LLC v. Wells Fargo Bank, Nat'l Ass'n*, 193 F. Supp. 3d 1002, 1015 (D. Minn. 2016) ("one of the factors courts consider in specific performance cases is whether monetary damages provide an adequate remedy") (citations omitted).

### G. The declaratory count adds nothing and should be dismissed.

Count I seeks a declaration that a contract exists and that ACI must lift the levy. (Compl. ¶ 26.) That is the identical question presented by Count II. A declaratory count entirely commensurate with a contract claim serves no independent purpose and cannot survive the failure of the contract theory on which it rests. "Where a party's declaratory judgment claim is purely duplicative of its breach of contract claim, the declaratory judgment claim may be properly dismissed." *MidCountry Bank v. Rajchenbach*, 2016 WL 3064066, at *3 (D. Minn. May 31, 2016); *see also MASTR Asset Backed Sec. Tr. 2006-HE3 ex rel. U.S. Bank Nat'l Ass'n v. WMC Mortg., LLC*, 983 F. Supp. 2d 1104, 1116 (D. Minn. 2013) (dismissing declaratory judgment claim that was duplicative of breach of contract claim).

## III. IN THE ALTERNATIVE, THE CASE SHOULD BE TRANSFERRED TO CALIFORNIA.

If the Complaint is not dismissed, this dispute should be litigated in California,

where the judgment was entered, where the writ issued, where the levy was made, and where ACI resides.

**A. Transfer to the Central District of California under 28 U.S.C. § 1404(a).**

Section 1404(a) permits transfer "[f]or the convenience of parties and witnesses, in the interest of justice" to "any other district or division where it might have been brought." This action might have been brought in the Central District of California, where ACI resides and is "essentially at home." 28 U.S.C. §§ 84(c), 1391(b)(1), (d); *Daimler AG*, 571 U.S. at 127, 139

The Eighth Circuit weighs the convenience of the parties and witnesses, the accessibility of records, "the location where the conduct complained of occurred," the applicability of each forum's substantive law, judicial economy, the plaintiff's choice of forum, comparative costs, and "the advantages of having a local court determine questions of local law." *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 696 (8th Cir. 1997). Every substantive factor points to California, including:

1. The conduct complained of occurred in California. ACI decided to levy in California, decided not to release the levy in California, and sent its emails from California. The performance My Pillow demands—a written direction to a California levying officer—would occur in California. Cal. Civ. Proc. Code § 699.060(a). "[T]he location where the conduct complained of occurred" therefore weighs in favor of transfer. *Terra Int'l, Inc.*, 119 F.3d at 696.

2. The witnesses and records are in California. ACI's officers, ACI's enforcement counsel, and ACI's judgment-enforcement file are in Los Angeles. The Superior Court file is in Los Angeles. The levying officer's records are in California.

3. California law will drive the case. Whether ACI could re-levy, what a release of levy accomplishes, what remains of the judgment, and what remedies remain available are all questions of California enforcement law. "There is an appropriateness in holding trial in a diversity case in the venue that is at home with the state law that must govern the case." *In re Apple, Inc., 602 F.3d 909, 915 (8th Cir. 2010)* (cleaned up); *accord Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947) ("There is a local interest in having localized controversies decided at home.").

4. California has the paramount interest. A suit whose object is to restrain execution on a California judgment implicates California's interest in the integrity of its own judgments and its own enforcement machinery.

ACI acknowledges that My Pillow's choice of its home forum ordinarily merits deference. That deference "is based on an assumption that the plaintiff's choice will be a convenient one," *In re Apple*, 602 F.3d at 913, but it does not overcome a record in which every operative act, every relevant witness, every record, and the governing law lie in another district.

**B. This Court cannot transfer the case to the Los Angeles County Superior Court; the vehicle for that result is dismissal.**

ACI states plainly what the statute requires. Section 1404(a) reaches only "any other district or division" — another federal court. It "has no application" where the alternative forum is a state court. *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 60 (2013); *see Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007) (transfer applies "when a sister federal court is the more convenient place for trial").

The route to the Los Angeles County Superior Court, if that is where the Court concludes this dispute belongs, is dismissal on *forum non conveniens* grounds. *Sinochem* preserves that remedy for "rare instances where a state or territorial court serves litigational convenience best." *Id.* (citations omitted). This is such a case: the dispute is an offshoot of a post-judgment enforcement proceeding pending in that court, which retains supervisory authority over its own writ and can resolve My Pillow's contentions in a single proceeding rather than in a second forum two thousand miles away. ACI is prepared to consent to the jurisdiction of the Los Angeles County Superior Court and to waive any statute-of-limitations defense that accrued after this action was filed, so that dismissal works no prejudice.

**C. To the extent My Pillow seeks to restrain California execution, this Court may not grant it.**

Counts I and III ask this Court to order ACI to lift a levy issued under a California writ of execution and, necessarily, to refrain from executing again. The Anti-Injunction Act provides that "[a] court of the United States may not grant an injunction to stay

proceedings in a State court" except in three narrow circumstances. 28 U.S.C. § 2283. Execution is a "proceeding in a State court" for this purpose: the term "includes all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process," and "applies not only to an execution issued on a judgment, but to any proceeding supplemental or ancillary taken with a view to making the suit or judgment effective." *Hill v. Martin*, 296 U.S. 393, 403 (1935). Nor may the prohibition "be evaded by addressing the order to the parties." *Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 287 (1970). "Any doubts . . . should be resolved in favor of permitting the state courts to proceed." *Id.* at 297. None of the three exceptions applies: no Act of Congress authorizes such an injunction, this Court has no jurisdiction to be aided, and there is no federal judgment to protect.

The same principle has a longer pedigree. Property "taken and held under process" of a court "is in the custody of the law, and within the exclusive jurisdiction of the court from which the process has issued," and "the same principle protects the possession of property while thus held by process issuing from state courts[] against any disturbance under process of the courts of the United States . . . ." *Covell v. Heyman*, 111 U.S. 176, 179-80 (1884).

## **CONCLUSION**

For the foregoing reasons, ACI International respectfully requests that the Court:

1. Dismiss the Complaint with prejudice for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2);

2. Dismiss the Complaint with prejudice for failure to state a claim under Fed. R. Civ. P. 12(b)(6);

3. In the alternative, dismiss the Complaint on *forum non conveniens* grounds so that My Pillow's contentions may be presented in the Los Angeles County Superior Court action in which the California Judgment was entered; or

4. In the further alternative, transfer this action to the United States District Court for the Central District of California under 28 U.S.C. § 1404(a).

**FELHABER LARSON**

Dated: August 31, 2026

By: ______________________________

Christopher W. Boline (#393558)
220 South Sixth Street, Suite 2200
Minneapolis, MN 55402
P: (612) 339-6321
F: (612) 338-0535
cboline@felhaber.com

AND

WALLIN & RUSSELL LLP
Michael Wallin (admitted *pro hac vice*)
26000 Towne Centre Drive, Suite 130
Foothill Ranch, California 92610
(949) 652-2200
mwallin@wallinrussell.com

***Attorneys for Defendant ACI International***