**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

My Pillow, Inc.,

Plaintiff,

v.

ACI International,

Defendant.

Case File No. 26-cv-570 (LMP/DLM)

**DECLARATION OF MICHAEL WALLIN IN SUPPORT OF DEFENDANT ACI INTERNATIONAL'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER VENUE**

Pursuant to 28 U.S.C. § 1746, Michael Wallin declares as follows:

1. I am an attorney licensed to practice law in the State of California, admitted before this Court pro hac vice in this action, and one of the attorneys of record for defendant ACI International ("ACI"). I have personal knowledge of the facts stated in this declaration, except where stated on information and belief, and if called as a witness I could and would testify competently to them. I submit this declaration in support of ACI's Motion to Dismiss the Complaint or, in the Alternative, to Transfer Venue.

2. I performed all of my work on this matter from my firm's offices at 26000 Towne Centre Drive, Suite 130, Foothill Ranch, California. Every email described below that I sent, and every telephone call described below in which I participated, I sent or participated in from California. I have never traveled to Minnesota in connection with this matter.

3. Except where noted, each exhibit referenced below is a true and correct copy of a document maintained in my firm's file for this matter in the ordinary course of my firm's business, or a true and correct copy of a public record.

**A. The California Action and the California Judgment**

4. On August 25, 2025, ACI filed an action against My Pillow, Inc. ("My Pillow") in the Superior Court of the State of California, County of Los Angeles, captioned *ACI International v. My Pillow, Inc., et al.*, Case No. 25STCV24839 (the "California Action"). Attached as **Exhibit 1** is a copy of the complaint filed in the California Action.

5. My Pillow was served with the summons and complaint in the California Action and did not answer or otherwise respond. In addition to formal service, my firm emailed the California Action complaint to My Pillow's general counsel and to three of its outside counsel on August 25, 2025, and to Michael Lindell and other My Pillow personnel on August 28, 2025.

6. On December 23, 2025, the Superior Court entered judgment in the California Action in favor of ACI and against My Pillow in the amount of $15,408,008.84 (the "California Judgment"). Attached as **Exhibit 2** is a copy of the California Judgment.

7. On January 6, 2026, my firm served notice of entry of the California Judgment on My Pillow. Attached as **Exhibit 3** is a copy of the notice of entry and proof of service.

8. My Pillow has never appealed the California Judgment.

9. My Pillow has not paid the California Judgment.

**B. ACI's Judgment Enforcement**

10. After entry of the California Judgment, my firm undertook judgment enforcement steps in California, including obtaining a writ of execution issued by the Superior Court and causing Notices of Levy to be served on Amazon Payments, Inc. and Amazon.com Services LLC (collectively, the "Amazon Levy"). Attached as **Exhibit 4** is a copy of the writ of execution.

11. Every decision concerning the Amazon Levy — the decision to levy, the instructions to the levying officer, and the decision whether to release the levy — was made and communicated from California. Under California law, a judgment creditor releases a levy by written direction from its attorney of record to the levying officer. Cal. Civ. Proc. Code § 699.060(a).

12. Amazon has advised that parties other than ACI assert interests in the funds Amazon owes My Pillow, specifically MJMP Consulting LLC, MJMPL LLC, the Minnesota Department of Revenue, and the Idaho State Tax Commission. Attached as **Exhibit 5** is a copy of the confirming documentation from Amazon.

**C. ACI Advised My Pillow in Writing, Twice, That Nothing Would Bind ACI Absent a Fully Signed Agreement**

13. On January 15, 2026, Mr. Lindell telephoned me. That was the first time anyone at My Pillow contacted my firm, notwithstanding my firm's written communications to My Pillow and its counsel beginning in August 2025. During the call, Mr. Lindell stated that the Amazon Levy would cripple My Pillow, asked ACI to release it, and stated that My Pillow acknowledged the debt and intended to pay it but needed more time.

14. Later on January 15, 2026, I emailed Mr. Lindell. I requested three categories of documents, as follows:

> MyPillow's monthly bank statements from January 1, 2025 to the present"; "MyPillow's most recent profit/loss statement"; and "MyPillow's most recent balance sheet.

15. I further wrote that "ACI will not use these documents for any purpose other than collecting its judgment."

16. I closed the email as follows:

> To make sure there is no confusion, ACI's judgment collection efforts will continue forward unless a resolution agreement is fully signed.

17. Attached as **Exhibit 6** is a copy of my January 15, 2026 email.

18. On January 20, 2026, I emailed Mr. Lindell ACI's written settlement proposal. It began:

> Contingent on signing of mutually acceptable documents, my client is willing to deem the judgment satisfied if it receives . . . .

19. It then set out a payment schedule of $1,000,000 by January 23, 2026; $500,000 by each of February 15, March 15, and April 15, 2026; and $250,000 per month thereafter until the California Judgment was paid in full. It provided that ACI would receive those payments directly from Amazon and other sellers under irrevocable payment instructions, and that Mr. Lindell would personally guarantee My Pillow's obligation on the California Judgment. It further provided that "[i]f we sign mutually acceptable documents, ACI receives the initial payment, and the payment instructions are accepted by Amazon, etc., ACI [would] forbear from further enforcing the judgment so long as payments are received as set forth above."

20. It closed with the same sentence I had sent five days earlier:

> Please let me know. To make sure there is no confusion, ACI's judgment collection efforts will continue forward unless a resolution agreement is fully signed.

21. Attached as **Exhibit 7** is a copy of my January 20, 2026 email.

22. My Pillow never accepted the January 20, 2026 proposal and never made any payment under it.

23. At no time did I retract, qualify, or modify the statement that ACI's judgment collection efforts would continue unless a resolution agreement was fully signed.

**D. My Pillow's Balance Sheet Disclosed Eleven Cash Accounts; My Pillow Produced Statements for One**

24. In response to my January 15, 2026 request, My Pillow provided ACI with a balance sheet for My Pillow as of November 30, 2025. Attached as **Exhibit 8** is a copy of that balance sheet.

25. Under the heading "Checking/Savings," Exhibit 8 lists eleven line items and balances: 1007 · FNB Pasco – Checking, $34,088.76; 1008 · CBB – MP Checking, $13,144.28; 1017 · Bank MI – My Pillow Inc, $265,531.17; 1019 · Bank MI – MJL 356 LLC, ($5,948.88); 1020 · Bank MI – MP Distribution LLC, $1.00; 1021 · Bank MI – Aviation, $405,916.07; 1022 · Bank MI – Rev Capital, $1.00; 1023 · Bank MI – Rev7, ($11,007.70); 1026 · Petty Cash, ($15,415.05); 1031 · RBC (CAD) x3698, $752.64; and 1035 · GBC International Bank, $16,728.92. The stated total for Checking/Savings is $703,792.21.

26. Ten of those eleven line items are deposit accounts, held at five financial institutions: FNB Pasco; CBB; Bank Michigan (six accounts); RBC; and GBC International Bank. The eleventh line item, "Petty Cash," is not a bank account.

27. On January 21, 2026, at 3:22 p.m. Central time, Mr. Lindell forwarded to ACI's president an email from My Pillow's controller attaching six monthly bank statements for the months July 2025 through December 2025. Each of the six statements is for a single account: an account at Bank Michigan ending in 6968. Attached as **Exhibit 9** are copies of the transmittal email and the six statements.

28. My Pillow did not provide statements for the FNB Pasco account, the CBB account, the RBC account, the GBC International Bank account, or any of the other five Bank Michigan accounts identified on its own balance sheet. To my knowledge, My Pillow has never provided them.

**E. The January 21, 2026 Communications**

29. At 1:27 p.m. Central time on January 21, 2026, ACI's president Craig Hardy sent Mr. Lindell and Ali Warden of My Pillow an email with the subject line "statements" (the "Subject Email"). The Subject Email is quoted in full at paragraph 18 of the Complaint. A copy appears within **Exhibit 10**.

30. The Subject Email was one of many communications the parties exchanged on January 21, 2026. Based on my participation in those communications and my review of my firm's and ACI's files, the sequence that day, stated in Central time, was as follows:

31. In the morning, Mr. Lindell, Mr. Hardy, and ACI's chairman and chief executive officer Steven Jackson participated in a telephone call lasting approximately one hour. I did not participate in that call.

32. At 1:27 p.m., Mr. Hardy sent the Subject Email.

33. At 1:47 p.m., Mr. Lindell forwarded the Subject Email to Barbara Berens, My Pillow's outside counsel. Ex. 10.

34. At 1:59 p.m., Ms. Berens emailed Mr. Hardy, Mr. Jackson, and ACI's executive vice president Anna Liau: "Dear Craig, Steven, and Anna, I will send the requested documents. Please note that the filings in the D.C. case were made under seal so if you would keep those confidential, that would be great. Please let me know if you need additional documentation once you have review these. Anna, do you have a form agreement you would like us to use for the security agreement?" Ex. 10.

35. At approximately 2:05 p.m. and 2:09 p.m., Ms. Berens emailed ACI two sets of filings from *US Dominion, Inc. v. My Pillow, Inc.*, No. 1:21-cv-00445 (D.D.C.). Attached as **Exhibit 11** are copies of the two transmittal emails.

36. At 2:06 p.m., Ms. Berens emailed Mr. Hardy, Mr. Jackson, and Ms. Liau: "I am working on the last piece, the agreement, but need to know how much you folks are owed. Thanks, Barbara." Ex. 10.

37. At 2:11 p.m., Ms. Liau replied to Ms. Berens and copied me: "All of this needs to be run by our attorney, Michael Wallin, so please reach out to him to discuss." Ex. 10.

38. At 3:22 p.m., Mr. Lindell forwarded the six Bank Michigan statements described above. Ex. 9.

39. At 4:23 p.m., I emailed Ms. Berens: "Barbara, Please call me at 949-378-1406." Ex. 10.

40. At 4:30 p.m., Ms. Berens replied: "I will in a bit." Ms. Berens and I then spoke by telephone. I was in California during that call. Ex. 10.

41. At 4:57 p.m., Ms. Berens emailed me, copying Ms. Liau, Mr. Hardy, Mr. Jackson, Ms. Warden, and Mr. Lindell: "I thought I'd relay one more piece of information. If anyone with a prior lien on the Amazon funds, of which there are several, comes forward and slap their prior liens on Amazon, it will take about six months (or more) to get all of that resolved with Amazon. I know because I had to deal with it with Amazon with all the competing lienholders before. Amazon is extraordinarily difficult to deal with and I would think a three month standstill without an Amazon lien and a security agreement is more attractive than six months with no money from Amazon at all. I just wanted you to have that information as well." Attached as **Exhibit 12** is a copy of that email.

42. Later that afternoon, Mr. Lindell and Mr. Jackson spoke again by telephone for approximately an additional hour. I did not participate in that call.

43. At 7:27 p.m., Ms. Warden emailed me, Ms. Liau, Mr. Hardy, and Mr. Jackson, copying Mr. Lindell, stating: "Hello, Please see the attached signed agreement. Thank you, Ali Warden, Executive Assistant." Attached as **Exhibit 13** is a copy of that email.

**F. The Document My Pillow Sent on the Evening of January 21, 2026**

44. The document attached to Ms. Warden's 7:27 p.m. email is a three-page instrument titled "SECURITY AGREEMENT," dated January 21, 2026, bearing the file name "MyPillow, Inc. and ACI Security Agreement." Attached as **Exhibit 14** is a copy of that document. On information and belief, Exhibit 14 is the document the Complaint describes at paragraph 19 as "an executed Security Agreement which included all of the terms set forth by Defendant's president in his email."

45. Neither I nor anyone at my firm drafted Exhibit 14, provided a form for it, or reviewed it before Ms. Warden sent it.

46. Exhibit 14 recites that the parties "agree to further memorialize the agreement they had reached earlier today." It defines "Obligations" as "the amount of money that My Pillow owes ACI as of the date of this Agreement, specifically $15.4 million," and defines "Collateral" as "all funds recovered by My Pillow by any means as a result of Arctic Frost."

47. Exhibit 14 states, at paragraph 3(b), that "My Pillow has granted no other security interest in the Collateral."

48. Exhibit 14 states, at paragraph 4, a series of representations, warranties, and agreements by ACI, including: at 4(a), that "[t]he Agreement is a legal and binding contract between the Parties duly authorized and executed by ACI"; at 4(d), that "ACI agreed that it will immediately remove any lien or any other encumbrance from any account of My Pillow, including, without limitation, My Pillow's Amazon account," and

that "ACI further agrees that it will not place any lien or other encumbrance on any account of My Pillow, including without limitation, Amazon, for the next three months, that is, until April 21, 2026"; at 4(e), that "ACI may file any Financing Statement it deems appropriate to perfect its security interest in the Collateral"; and at 4(g), that "ACI agrees that the Conditions were met." Exhibit 14 further provides, at paragraph 5, that "[t]his Agreement shall remain in effect from the date of execution until April 21, 2026 unless otherwise renegotiated by the Parties."

49. None of the terms described in the preceding paragraph appears in the Subject Email. The Subject Email does not mention any lien other than the Amazon Levy, does not mention any account other than My Pillow's Amazon account, does not address future liens, does not state any term or expiration date, and does not provide for renegotiation.

50. Exhibit 14 concludes with two signature blocks. The first is signed by Michael J. Lindell on behalf of My Pillow and dated "1-21-26." The second reads: "Date: ______________" and "ACI International By ______________, its ______________."

51. The second block is blank. ACI did not sign Exhibit 14.

52. On the morning of January 22, 2026, I exchanged emails with Ms. Liau, Mr. Jackson, and Mr. Hardy. At 8:33 a.m. Pacific time I wrote to Ms. Liau: "When you can, please call me to talk about the agreement before I draft it." Ms. Liau and I then spoke by telephone. I was in California during that call. At 8:59 a.m., I wrote: "Anna and

I just talked. I will draft an agreement for your review. In the meantime, please don't countersign the agreement MyPillow sent yesterday."

53. At 9:14 a.m., Mr. Hardy asked: "Did we lift the levy on Amazon?" At 9:33 a.m., Ms. Liau replied: "Not yet. We need to draft agreement for them to countersign. Their agreement was insufficient." Attached as **Exhibit 15** is a copy of that exchange.

**G. Existing Financing Statements Covering My Pillow's Personal Property**

54. On August 21, 2024, US Alliance Group Inc. filed a UCC-1 financing statement with the California Secretary of State, File No. U240066792330, naming as debtors My Pillow, Inc., Michael Lindell, Mike Lindell Products LLC, Lindell Legal Offense Fund Inc., and Lindell Recovery Network. The collateral description reads in part: "(1) all Future Receivables; (2) all personal property of Seller that relates to the Future Receivables, such as accounts, chattel paper, documents, equipment, general intangibles, instruments, inventory (as those terms are defined in Article 9 of the Uniform Commercial Code ('UCC') in effect from time to time), trademarks, trade names, service marks, logos and other sources of business identifiers . . . and (3) all proceeds with respect to the items described in (1) and (2) above." Attached as **Exhibit 16** is a copy of that financing statement, obtained from the records of the California Secretary of State.

55. On April 8, 2026, MJMPL LLC filed a motion to intervene and to quash a writ for garnishment in the Circuit Court for Washtenaw County, Michigan, in a proceeding in which ACI is seeking to enforce the California Judgment. In that motion MJMPL asserts that it "has a perfected senior security interest in all of [My Pillow's]

assets" under a Continuing Security Agreement dated December 23, 2024, perfected by UCC-1 financing statements filed in Minnesota on November 14, 2023, July 18, 2024, and October 2, 2024, and by a deposit account control agreement with Bank Michigan. The motion further represents that My Pillow warranted to MJMPL that it would "keep the Collateral free of liens, encumbrances and other security interests." Attached as **Exhibit 17** is a copy of that motion and its supporting exhibits, with relevant portions highlighted.

56. I am not aware of any evidence that My Pillow has submitted a claim relating to "Arctic Frost" to any governmental agency, or that any recovery on any such claim has been made or is owed to My Pillow.

**H. ACI's Forbearance Documents and the Filing of This Action**

57. At 11:01 a.m. Pacific time on January 22, 2026, Ms. Berens emailed Ms. Liau: "Anna, just following up to see if the levy has been lifted. Thanks so much, Barbara." At 11:31 a.m., Ms. Liau replied, copying me: "Hi Barbara, Mike Wallin is working on finalizing the documents needed. He will be forwarding the documents to you shortly. Anna." Attached as **Exhibit 18** is a copy of that exchange.

58. During January 22, 2026, I prepared three documents setting out terms on which ACI was willing to forbear from enforcing the California Judgment: a Forbearance Agreement, a Security Agreement, and a Joint Irrevocable Instruction addressed to counsel for Amazon.

59. At 4:35 p.m. Pacific time on January 22, 2026, I emailed Ms. Berens, copying Ms. Liau and my colleagues, and wrote: "Barbara, The documents are attached for your review. They are subject to ACI's review and revision." Attached to that email were the three documents described in the preceding paragraph. Attached as **Exhibit 19** is a copy of my email and its attachments.

60. The Forbearance Agreement transmitted as part of Exhibit 19 conditioned its effectiveness on My Pillow, by January 23, 2026: (a) emailing to ACI's counsel all monthly bank statements from June 1, 2025 through December 31, 2025 "for all deposit accounts in which Debtor or its affiliates have any interest, including without limitation, all accounts at these financial institutions: (1) FNB Pasco; (2) CBB; (3) Bank of Michigan (including accounts ending in 6332, 6919, and 6968); and (4) GBC International"; (b) executing and delivering the Amazon instruction; and (c) executing and delivering the Security Agreement. It further required My Pillow to deliver monthly statements for January, February, and March 2026; to provide, by February 28, 2026, evidence that Mr. Lindell had met with the President of the United States between February 1 and February 28, 2026 to discuss "Arctic Frost," and evidence that My Pillow had submitted all necessary documents to the government to seek compensation relating to "Arctic Frost"; and to allow no creditor to obtain a judgment against My Pillow or to levy on My Pillow's assets. Only if all of those conditions were satisfied and maintained would ACI "forbear, refrain, and otherwise stop taking any new steps to enforce the Judgment until April 15, 2026."

61. The conditions described in the preceding paragraph reflect statements Mr. Lindell had made to me and, as I understood it, to ACI during the preceding week: that My Pillow intended to pay the California Judgment but needed more time; that My Pillow or Mr. Lindell expected to receive money from the United States government in connection with "Arctic Frost"; and that Mr. Lindell had or would have a meeting with the President of the United States to discuss that subject.

62. Each of the three documents transmitted as part of Exhibit 19 contains unexecuted signature blocks for both ACI and My Pillow. Neither party signed any of them.

63. At 4:41 p.m. Pacific time on January 22, 2026, Ms. Berens replied to my 4:35 p.m. email. Her reply read, in its entirety: "Thank you." Attached as **Exhibit 20** is a copy of that reply.

64. Ms. Berens did not state in her reply, or at any time on January 22, 2026, that the documents I had sent were unnecessary, that the parties had already formed a binding agreement on January 21, that ACI was already obligated to release the Amazon Levy, or that the conditions stated in the Forbearance Agreement were inconsistent with any agreement the parties had previously reached.

65. At 5:34 p.m. Pacific time on January 22, 2026 — fifty-three minutes after Ms. Berens's reply — Mr. Lindell emailed Mr. Hardy a copy of the Complaint filed in this action. Mr. Hardy forwarded that email to me. Attached as **Exhibit 21** is a copy of that email and Mr. Hardy's forwarding email.

66. ACI never signed any agreement to release the Amazon Levy, to forbear from enforcing the California Judgment, or to refrain from levying on My Pillow's assets.

**I. ACI's Absence of Connection to Minnesota in This Dispute**

67. Every email described in this declaration that I sent, and every telephone call described in this declaration in which I participated, I sent or participated in from California.

68. The Amazon Levy was made under a writ of execution issued by a California court, was served by or at the direction of a California levying officer, and would be released, if at all, by a written direction from me to a California levying officer.

69. My firm's judgment enforcement file for this matter is maintained in California. The records of the Superior Court in the California Action are maintained in Los Angeles County, California.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 31, 2026 at Foothill Ranch, California.

MWallin

MICHAEL WALLIN