# EXHIBIT 17

MJMPL LLC Motion to Intervene and to Quash (Washtenaw Cnty. Cir. Ct., Apr. 8, 2026), with relevant portions highlighted

**STATE OF MICHIGAN**
**IN THE WASHTENAW COUNTY CIRCUIT COURT**

| | |
|---|---|
| ACI INTERNATIONAL,<br><br>Plaintiff,<br>v.<br><br>MY PILLOW, INC., a Minnesota corporation,<br><br>Defendant. | Case No. 26-000457-CZ<br><br>Hon. Patrick J. Conlin<br><br>**MJMPL LLC'S EMERGENCY MOTION TO INTERVENE UNDER MCR 2.209(A)(3) AND TO QUASH REQUEST AND WRIT FOR GARNISHMENT**<br><br>**(Immediate consideration requested)** |

---


| | |
|---|---|
| FELHABER LARSON<br>By: Daniel R. Kelly (P82159)<br>220 South Sixth Street, Suite 2200<br>Minneapolis, MN 55402<br>(612)-339-6321<br>Attorneys for Plaintiff | THE RAVENSCROFT LAW GROUP<br>By: Noel J. Ravenscroft (P77729)<br>Jessica F. Davidova (P86743)<br>32300 Northwestern Hwy<br>Farmington Hills, Michigan 48334<br>(586) - 588-4274<br>Attorneys for Moving Intervening Party MJMPL LLC |


---

**MJMPL LLC'S EMERGENCY MOTION TO INTERVENE UNDER MCR 2.209(A)(3) AND TO QUASH REQUEST AND WRIT FOR GARNISHMENT**

MJMPL LLC ("MJMPL" or "Secured Party"), pursuant to MCR 2.209(A)(3), moves to intervene in this action to protect its senior security interest in the property that plaintiff ACI International ("ACI") is attempting to garnish through its judgment against defendant My Pillows, Inc. ("My Pillow"). Secured Party and has a perfected senior security interest in all of My Pillow's assets, including the account at Bank Michigan that ACI has requested to be seized by its Request and Writ for Garnishment in this action. Having learned that ACI seeks to intercept or otherwise interfere with Secured Party's secured collateral, Secured Party now seeks to intervene in ACI's post-judgment collection proceedings against My Pillow to protect its rights in My Pillow's assets.

In support of its motion to intervene, Secured Party relies on the accompanying brief and states as follows:

**A. Secured Party's senior security interest in My Pillow's accounts.**

1. MJMPL is a private company that makes and services business loans. MJMPL provides original loans by first engaging in a thorough underwriting review of the business applicant to ensure that the business qualifies to receive the loan. Of critical importance to MJMPL in its underwriting of loans is to ensure that its business customer is in a position to repay its loan and that there is adequate security available to MJMPL to safeguard repayment.

2. On or about December 23, 2024, My Pillow executed and delivered to MJMPL a Promissory Note. Through a series of amendments, on March 16, 2026, My Pillow executed and delivered to MJMPL a Fourth Amended and Restated Promissory Note ("Note"). A copy of the Note is attached as **Exhibit A**.



Document received by the Washtenaw County Trial Court 04/08/2026.

3. To further evidence the terms of the loan, MJMPL and My Pillow executed a loan agreement dated December 23, 2024 ("Loan Agreement"). A copy of the Loan Agreement is attached as **Exhibit B.**

4. As security for the Note, My Pillow executed and delivered to MJMPL a Continuing Security Agreement dated December 23, 2024 ("Security Agreement"), in which it granted MJMPL a security interest in the following collateral ("Collateral"):

> (a) all of [My Pillow's] Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights …, Software …
>
> (b) all present and future insurance claims relating to any of the above;
>
> (c) all Goods, Instruments …, Documents …, policies and certificates of insurance, Deposit Accounts, and money or other property … which are now or later in possession of [MJMPL], or to which [MJMPL] now or later controls possession by documents or otherwise;
>
> (d) all present and future books, records, and data of [My Pillow] relating to any of the above; and
>
> (e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights, subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by [My Pillow].

*See* Security Agreement, attached as **Exhibit C**, at ¶ 2.

5. My Pillow represented and warrantied that:

> (h) It is or will become the owner of the Collateral free from any liens, encumbrances or security interests, except for this security interest and existing liens disclosed to and accepted by [MJMPL] in writing, and will defend the Collateral against all claims and demands of all persons at any time claiming any interest in it;

> **(i) No person, other than [MJMPL], has possession or control (as defined in the UCC) of the Collateral;**
>
> **(j) It will keep the Collateral free of liens, encumbrances and other security interests ...**

*Id*. at ¶ 4(h)-(j) (emphasis added).

6. MJMPL's security interests is perfected under UCC-1 financing statements, filed with the State of Minnesota on November 14, 2023 and July 18, 2024 (which it acquired via assignment) and October 2, 20204 ("Financing Statements"), and on accounts by control through a deposit account control agreement with Bank Michigan. A copy of the Financing Statements, Amendment to Financing Statements, and the Deposit Account Control Agreement are attached as **Exhibit D**.

7. The Financing Statement identified the collateral, as described above, and included the following notice:

> ALL DEBTOR'S PRESENT AND FUTURE ACCOUNTS AND THE DIRECT AND INDIRECT PROCEEDS THEREOF. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. **THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTOUS [SIC] INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.**

See Exhibit D (emphasis added).

8. Thus, any third-party exercising dominion or control over or otherwise interfering with My Pillow's accounts after the filing of the Financing Statements was on notice that such interference with Secured Party's security interest rights would constitute tortious interference.

9. My Pillow is currently in default of the parties agreements and are attempting to workout a resolution of the obligations.



Document received by the Washtenaw County Trial Court 04/08/2026.

**B. ACI's junior interest in My Pillow's assets.**

10. Upon information and belief, ACI does not have a security interest in My Pillow's assets and has not filed a UCC-1 financing statement nor any other means of perfecting a security interest (particularly it does not have a deposit account control account with Bank Michigan) as to any of My Pillow's assets.

**C. ACI interferes with Secured Party's senior security interest in My Pillow's assets.**

11. On or about March 30, 2026, ACI opened this action to present an Affidavit and Notice of Entry of Foreign Judgment.

12. ACI proceeded with a Request and Writ for Garnishment against My Pillow's accounts at Bank Michigan, which Secured Party has a senior and perfected security interest in by control (i.e., the deposit account control agreement). Unaware of Secured Party and their perfected senior security interest in My Pillow's accounts, the Court entered the garnishment on March 30, 2026. A copy of the garnishment is attached as **Exhibit E**.

13. Bank Michigan is now holding funds in response to the garnishment.

14. ACI knew that Secured Party held a senior security interest in all of My Pillow's assets. On January 23, 2026, the undersigned counsel sent a letter to ACI's counsel informing ACI of its interest, which included an express notice stating that any interference with Secured Party's rights would constitute tortious interference. A copy of the letter is attached as **Exhibit F**.

15. Further, ACI had constructive notice that Secured Party held senior security interests in all of My Pillow's assets (including accounts) through the Financing Statements, which included an express notice stating that any interference by third parties with Secured Party's rights would constitute tortious interference.

16. Nevertheless, ACI proceeded to interfere with Secured Party's collateral, including but not limited to accounts at Bank Michigan.

17. Secured Party has just learned of these collection proceedings in Michigan and now seeks to intervene in this action to protect its interests in its collateral, which Secured Party fears soon will be released to ACI.

18. MCR 2.209(A)(3) states that a person has the right to intervene in a lawsuit:

> [W]hen the applicant claims an interest relating to the property or transaction which is the subject of the action and is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

19. "The rule for intervention should be liberally construed to allow intervention where the applicant's interests may be inadequately represented." *Neal v Neal*, 219 Mich App 490, 492 (1996).

20. Moreover, under Michigan law, a Court may allow a senior lienholder to intervene in a collection proceeding, quash plaintiff's collection actions, and enjoin plaintiff from taking further collection actions that interfere with the senior lienholder's collateral. *See System Soft Technologies, LLC v Artemis Technologies, Inc*, 301 Mich App 642, 644 (2013).

21. In *System Soft Technologies*, the Court affirmed the trial court's order granting the intervening secured creditor's motion to intervene, quashing plaintiff's writs of garnishment, and enjoining plaintiff from taking any other collection action against defendant because, as in this case, the intervening party was a perfected, secured creditor of defendant with higher priority than plaintiff. *Id*.

22. As described above, Secured Party has a perfected senior security interest in accounts, including accounts at Bank Michigan that is subject to ACI's garnishment, and Secured Party has declared My Pillow's obligations to be in default. This case, including the collection actions already executed by ACI as an unsecured creditor, will impair or impede Secured Party's senior security interest in accounts, and no party can adequately represent Secured Party's interests in this case.



Document received by the Washtenaw County Trial Court 04/08/2026.

**WHEREFORE**, Secured Party requests that the Court enter the proposed order attached as **Exhibit G** granting Secured Party's motion to intervene under MCR 2.209(A)(3), quashing ACI's collection activities, including but not limited to the garnishment directed to Bank Michigan, enjoining ACI from taking further collection actions that interfere with Secured Party's collateral, and, to the extent ACI already has intercepted any of Secured Party's collateral, ordering that such collateral be disgorged and turned over to Secured Party.

Respectfully submitted,

**THE RAVENSCROFT LAW GROUP PLC**

/s/ Noel J. Ravenscroft
By: Noel J. Ravenscroft (P77729)
Jessica F. Davidova (P86743)
32300 Northwestern Hwy
Farmington Hills, Michigan 48334
Phone: (586) 588-4274
Email: noel@ravenscroftlaw.com
Attorney for MJMPL, LLC

Dated: April 8, 2026

**STATE OF MICHIGAN**
**IN THE WASHTENAW COUNTY CIRCUIT COURT**

ACI INTERNATIONAL

Plaintiff,

v.

MY PILLOW, INC., a Minnesota corporation,

Defendant.

Case No. 26-000457-CZ

Hon. Patrick J. Conlin

**BRIEF IN SUPPORT OF MJMPL LLC'S EMERGENCY MOTION TO INTERVENE UNDER MCR 2.209(A)(3) AND TO QUASH REQUEST AND WRIT FOR GARNISHMENT**

**(Immediate consideration requested)**

---

FELHABER LARSON
By: Daniel R. Kelly (P82159)
220 South Sixth Street, Suite 2200
Minneapolis, MN 55402
612-339-6321
Attorney for Plaintiff

THE RAVENSCROFT LAW GROUP
By: Noel J. Ravenscroft (P77729)
Jessica F. Davidova (P86743)
32300 Northwestern Hwy
Farmington Hills, Michigan 48334
(586) - 588-4274
Attorneys for Moving Intervening Party MJMPL LLC

---

**BRIEF IN SUPPORT OF MJMPL LLC'S EMERGENCY MOTION TO INTERVENE UNDER MCR 2.209(A)(3) AND TO QUASH REQUEST AND WRIT FOR GARNISHMENT**

In support of its motion to intervene, MJMPL LLC relies upon MCR 2.209(A)(3) and the facts and case law cited in its motion.

WHEREFORE, MJMPL LLC requests that the Court enter the proposed order attached as **Exhibit G** granting MJMPL LLC's motion to intervene under MCR 2.209(A)(3), quashing ACI's collection actions, including but not limited to the garnishment directed to Bank Michigan, enjoining ACI from taking further collection actions that interfere with MJMPL LLC's collateral, and, to the extent ACI already has intercepted any of MJMPL LLC's, ordering that such collateral be disgorged and turned over to MJMPL LLC.

Respectfully submitted,

**THE RAVENSCROFT LAW GROUP PLC**

/s/ Noel J. Ravenscroft
By: Noel J. Ravenscroft (P77729)
Jessica F. Davidova (P86743)
32300 Northwestern Hwy
Farmington Hills, Michigan 48334
Phone: (586) 588-4274
Email: noel@ravenscroftlaw.com
Attorneys for MJMPL, LLC

Dated: April 8, 2026

# EXHIBIT A

**FOURTH AMENDED AND RESTATED PROMISSORY NOTE**
**(Term Loan)**

$779,595.71

Maturity Date: March 15, 2027 Dated: March 16, 2026

**FOR VALUE RECEIVED,** on or before the Maturity Date stated above "Maturity Date"), the undersigned ("Borrower") promises to pay to the order of MJMPL LLC (including its successors and assigns, "Lender"), at its offices located at 24751 Sussex, Oak Park, Michigan 48237, or at such other place as Lender may designate in writing, the principal sum of One Seven Hundred Seventy Nine Thousand Five Hundred Ninety Nine and 71/100 Dollars ($779,595.71), plus interest as hereinafter provided, in lawful money of the United States.

The unpaid principal balance outstanding from time to time under this Fourth Amended and Restated Promissory Note (Term Loan) (this "Note") shall bear interest at twenty two percent (22%) per annum. Interest shall be calculated on the basis of a 360 day year for the actual number of days elapsed. Interest shall be paid weekly in arrears in the amounts and on the dates set forth on Schedule A hereto.

This Note shall be repaid by consecutive weekly installments of principal in the amounts and on the dates set forth on Schedule A hereto (as may be adjusted from time to time as necessary to reflect any prepayments). The unpaid principal balance and all accrued interest thereon shall be due and payable in full on the Maturity Date (or earlier upon acceleration). Amounts repaid may not be readvanced.

This Note reflects a prepayment made by Borrower in the amount of $775,000, which reduced the principal as evidenced by this Note.

The sums advanced hereunder shall be charged to a loan account in Borrower's name on Lender's books (the "Loan Account"), and Lender shall credit to such account the amount of each repayment hereunder. Lender shall render Borrower, from time to time, a statement of account setting forth the Borrower's loan balance in said Loan Account which shall be presumed to be correct and accepted by and binding upon Borrower, unless Lender receives a written statement of exceptions within ten (10) days after such statement has been rendered to Borrower. Such statement of account shall be prima facie evidence of the loan and amounts owing to Lender by Borrower hereunder.

Any payment made by mail will be deemed tendered and received only upon actual receipt (time being of the essence), at the address of Lender designated for such payment whether or not Lender has authorized payment by mail or any other manner. Borrower hereby expressly assumes all risk of loss or liability resulting from non-delivery or delay in delivery of any payment transmitted by mail or in any other manner.

No delay or failure of Lender in exercising any right, remedy, power or privilege hereunder shall affect such right, remedy, power or privilege, nor shall any single or partial

exercise thereof preclude the exercise of any other right, remedy, power or privilege. No delay or failure of Lender at any time to demand strict adherence to the terms of this Note shall be deemed to constitute a course of conduct inconsistent with the Lender's right at any time, before or after any Event of Default (defined below), to demand strict adherence to the terms of this Note.

Unless separately agreed in writing by Lender in its sole and absolute discretion, Borrower shall not be permitted to prepay any principal or interest outstanding under this Note. Notwithstanding the foregoing, and subject to advance notice of not less than three (3) business days, Borrower may prepay in full the outstanding principal under this Note (together with all accrued interest at such time) during any period on or after the date hereof; provided that, such prepayment shall be subject to the simultaneous payment by the Borrower to the Lender of a prepayment penalty in an amount equal to the outstanding principal balance of this Note multiplied by eight percent (8%).

Nothing herein contained, nor any transaction relating thereto, or hereto, shall be construed or so operate as to require the Borrower to pay, or be charged, interest at a greater rate than the maximum allowed by the applicable law relating to this Note. Should any interest or other charges, charged, paid or payable by the Borrower in connection with this Note, or any other document delivered in connection herewith, result in the charging, compensation, payment or earning of interest in excess of the maximum allowed by the applicable law as aforesaid, then any and all such excess shall be and the same is hereby waived by the holder, and any and all such excess paid shall be automatically credited against and in reduction of the principal due under this Note.

As of the date of this Note, Borrower represents that Borrower has not made any qualified dispositions of any of Borrower's property to (a) a trust established under the Qualified Dispositions in Trust Act (codified at MCL 700.1041 et. seq.) ("Act"), or (b) any other asset protection trust.

Borrower agrees that Borrower will not make or attempt any qualified dispositions or other distribution or transfers of Borrower's property into a trust established under the Act, or any other asset protection trust, without obtaining the prior written consent of Lender. Lender's consent to any such requested distribution shall be at the sole and absolute discretion of Lender. Any consent provided by Lender described in this paragraph shall only be applicable for property identified and disclosed in writing by Borrower to Lender. Lender's consent shall not be applicable to: (x) any other property of Borrower which is not disclosed to Lender in writing as part of the qualified disposition under the Act; or (y) any other qualified disposition of property under the Act previously attempted or attempted in the future by Borrower.

Borrower acknowledges and agrees that if Lender does not provide its written consent to Borrower for a qualified or other disposition under the Act, then such disposition by Borrower shall not be valid under the Act with respect to Lender.

Borrower agrees that Borrower has an obligation to disclose immediately in writing to Lender any qualified dispositions or attempted qualified dispositions to a trust under the Act.

Borrower agrees that this Note constitutes a written agreement described in the Act between a transferor and a creditor providing for and establishing the obligations of a transferor as stated in Subsection (11) of Section 5 of the Act.

The terms used in the previous five paragraphs shall have the meaning ascribed to them in the Act, unless otherwise defined herein.

Any of the following events shall constitute an "Event of Default" under this Note: (a) Borrower shall default in the payment of any sum which is or becomes due and payable under this Note, or (b) any representation or warranty made by Borrower in this Note or in any other Loan Document or other agreement, certificate or document furnished in connection with this Note shall prove untrue in any material respect, or (c) Borrower shall fail to observe or perform any other condition, covenant or agreement of Borrower set forth in this Note or in any other Loan Document, or (d) Borrower or any guarantor of all or any portion of the indebtedness under this Note (each a "Guarantor") shall default in the performance of any of its obligations to Lender, and such default shall not be cured or remedied by Borrower or such Guarantor within any applicable period of grace or cure with respect thereto, or (e) the default in the payment of any other obligation of Borrower or any Guarantor for borrowed money, or in the observance or performance of any conditions, covenants or agreements related or given with respect to any obligations for borrowed money (including under or in respect of any Existing Indebtedness (as defined in the Letter Agreement) notwithstanding the consolidation of such Existing Indebtedness into the Term Loan (as defined in the Letter Agreement)) sufficient to permit the holder thereof to accelerate the maturity of such obligation, including, without limitation, obligations of Borrower or any Guarantor to Lender, or (f) a judgment for the payment of money in excess of the sum of Ten Thousand Dollars ($10,000) in the aggregate shall be rendered against Borrower or any Guarantor and such judgment shall remain unpaid, unvacated, unbonded or unstayed by appeal or otherwise for a period of thirty (30) consecutive days from the date of its entry and such judgment is not covered by insurance from a solvent insurer who is defending such action without reservation of rights, or (g) Borrower or any Guarantor (i) shall admit in writing the inability to pay its or his debts as they become due and payable; or (ii) shall make an assignment for the benefit of creditors; or (iii) shall be adjudicated a bankrupt; or (iv) shall file a voluntary petition in bankruptcy or effect a plan or other arrangement with creditors; or (v) shall have applied for, or permitted the appointment of, a receiver or trustee or custodian for all or substantially all of the property or assets of such Borrower or Guarantor, or a trustee, receiver or custodian shall have been appointed for all or substantially all of the property or assets of such Borrower or Guarantor who shall not have been discharged within sixty (60) days after the date of his appointment, or (h) Borrower or any Guarantor shall dissolve or merge with or into any entity not theretofore affiliated with Borrower or Guarantor, as applicable, or Borrower or any Guarantor shall dispose of all or any material portion of its assets or equity, or (i) any Guarantor shall deny its liability or obligations under its guaranty or shall notify the Lender of its intention to attempt to cancel, revoke or terminate its guaranty, or shall fail to observe or comply with any term, covenant, condition and requirement under its guaranty, or (j) any suit or proceeding is filed against Borrower or any Guarantor which, if adversely determined to Borrower or such Guarantor, would have, as determined by Lender in its sole discretion, a material adverse effect on such Borrower or Guarantor, which suit is not dismissed within sixty (60) days of its filing, or (k) Borrower or any Guarantor (if a natural person) shall die or shall be determined mentally incapacitated by a court of competent jurisdiction, or (l) any breach or default by Borrower of

any material term or condition under any swap, interest protection agreement, derivatives agreement, or similar agreements now or hereafter entered into by Borrower with Lender or any affiliate of Lender, or (m) the occurrence of any event (including any change, for any reason whatsoever, in the management, ownership or control of Borrower) which Lender determines, in its sole discretion and judgment, would have a material adverse effect upon Borrower and/or its ability to pay or perform any of its liabilities or obligations under this Note or (n) Borrower shall terminate the Consulting Engagement (as defined in the Letter Agreement) or shall otherwise breach any of its obligations with respect thereto or (o) the Key Man Life Insurance Policy (as defined in the Letter Agreement) ceases to be in full force and effect.

Upon the occurrence of an Event of Default: (a) the entire unpaid principal balance and all accrued interest shall at the sole option of Lender be immediately due and payable, without presentment, demand, protest or any further notice or any other formalities of any kind, all of which are hereby expressly and irrevocably waived, together with (to the extent permitted under applicable law) the costs, attorneys' fees, and outside consultants' fees reasonably incurred by Lender in collecting or enforcing payment, (b) Lender may proceed to protect and enforce all or any of its rights, remedies, powers and privileges under this Note by action at law, suit in equity or other appropriate proceedings, and (c) any commitment or obligation, if any, on the part of Lender to make loans or otherwise extend credit to or in favor of Borrower shall immediately terminate. Upon the occurrence and at any time during the continuance or existence of an Event of Default under subsection (g) of the preceding paragraph, then the Obligations and all indebtedness then outstanding thereunder shall automatically become immediately due and payable without any notice by Lender to Borrower and any commitment or obligation, if any, on the part of Lender to make loans or otherwise extend credit to or in favor of Borrower shall immediately terminate. Further, upon the occurrence or at any time during the continuance or existence of any Events of Default hereunder, Lender may collect, deal with and dispose of all or any part of any security in any manner permitted or authorized by the Michigan Uniform Commercial Code or other applicable law (including public or private sale), and after deducting expenses (including, without limitation, reasonable attorneys' fees and expenses), Lender may apply the proceeds thereof in part or full payment of any of the Obligations, whether due or not, in any manner or order Lender elects.

Borrower hereby grants to Lender a security interest in Lender's own indebtedness or liability to Borrower, if any, however evidenced, including a security interest in all of Borrower's bank deposits, instruments, negotiable documents and chattel paper which at any time are in the possession or control of Lender, as further security for repayment of the Obligations; and the Borrower hereby grants to Lender all rights and privileges afforded a secured party under the Michigan Uniform Commercial Code.

All payments other than scheduled payments paid hereunder shall, at the option of Lender, first be applied against any and all fees, costs and expenses (including expenses of collection), then against accrued interest, and the balance against principal in inverse order of maturity. Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount then due shall be and continue to be an Event of Default.

Borrower hereby waives presentment for payment, demand, notice of non-payment, notice of protest and protest of this Note, diligence in collection or bringing suit.

Borrower's obligations hereunder are cross-collateralized and cross-defaulted with all other indebtedness owing to Lender by Borrower.

No delay or omission of the Lender to exercise any right under this Note impairs that right nor can it be construed to waive any Event of Default or acquiesce in any Event of Default, and the making of an advance notwithstanding the existence of an Event of Default or the inability of the Borrower to satisfy the conditions precedent to such advance does not constitute a waiver or acquiescence. Any single or partial exercise of any right does not preclude any other or further exercise of it or the exercise of any other right, and no waiver, amendment or other variation of the terms of this Note is valid unless in writing signed by Borrower and Lender, and then only to the extent that such writing specifies. All remedies contained in this Note or afforded by law are cumulative and all are available to the Lender until this Note has been paid in full.

The Borrower must reimburse the Lender for any costs, internal charges and out-of-pocket expenses (including attorneys' fees and time charges of attorneys for the Lender, who may be employees of the Lender) paid or incurred by the Lender in connection with the preparation, review, execution, delivery, amendment, modification, administration, collection and enforcement of this Note. The Borrower further indemnifies the Lender, its directors, officers and employees against all losses, claims, damages, penalties, judgments, liabilities and expenses (including without limitation all expenses of litigation or preparation for litigation whether or not the Lender is a party) which any of them pay or incur arising out of or relating to this Note or the direct or indirect application or proposed application of the proceeds of this Note.

This Note, if executed by more than one Person, shall be the joint and several obligation of all of such Persons, and shall be binding upon each Borrower and its heirs, personal representatives, successors and assigns, whether expressed or not. The liability of each Borrower shall be absolute and unconditional, without regard to the liability of any other party hereto.

The terms of this Note bind and benefit the Borrower and the Lender and their respective successors and assigns, except that the Borrower shall not assign its rights or obligations under this Note. The Lender may at any time sell to one or more Persons participating interests in this Note. The Lender may at any time assign to one or more Persons all or any part of its rights and obligations under this Note, and the Borrower releases the Lender for the amount so assigned.

This Note is to be construed in accordance with the internal laws (but not the law of conflicts) of the State of Michigan. The Borrower irrevocably submits to the non-exclusive jurisdiction of any United States federal court sitting in the Eastern District of Michigan or any state court in Oakland County in the State of Michigan in any action or proceeding arising out of or relating to this Note, and the Borrower irrevocably agrees that all such claims may be heard and determined in any such court and irrevocably waives any present and future objection it may have as to the venue of any action or proceeding brought in that court, or that that court is an inconvenient forum. Any suit brought by Borrower related to this Note or the Loan Documents

may only be brought in the United States federal court sitting in the Eastern District of Michigan or in a state court in Oakland County in the State of Michigan. Nothing herein shall limit the right of the Lender to bring any action or proceeding against the Borrower in the courts of any other jurisdiction if necessary or convenient to effect the relief sought.

Lender hereby notifies Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Act"), and the Lender's policies and practices, Lender is required to obtain, verify and record certain information and documentation that identifies the Borrower, which information includes the name and address of the Borrower and such other information that will allow Lender to identify the Borrower in accordance with the Act.

**DEFINITIONS**

As used in this Note, the following terms shall have the given meaning:

"Letter Agreement" shall mean the Letter Agreement, dated as of December 23, 2024 between Borrower and Lender (as it may be amended, restated, supplemented or otherwise modified from time to time).

"Loan Documents" shall mean, collectively, this Note, any other promissory note evidencing other loans made by Lender to Borrower, the Letter Agreement, any guaranties, mortgage, security agreement, any swap agreements, other interest rate protection agreements, derivative agreements, any certificates (including, for the avoidance of doubt, the Perfection Certificate, dated as of December 23, 2024 and executed by Company and each of the Guarantors), and any other document, instrument or agreement evidencing, securing or relating to this Note, together with any and all modifications and amendments to any of the foregoing.

"Obligations" shall mean, collectively, Borrower's obligations for the payment of all sums advanced or to be advanced hereunder, together with interest on the outstanding principal balance of such sums and with any and all other sums payable by Borrower to the Lender pursuant to this Note or any other Loan Documents, along with Borrower's obligation for the payment of any letters of credit issued by Lender and payment and performance of all of the warranties, representations, covenants and agreements to be paid, fulfilled, observed and performed by Borrower under each Loan Document to which Borrower is a party.

"Person" shall mean any corporation, natural person, firm, limited liability company, joint venture, partnership, trust, unincorporated organization, enterprise, government or any department or agency of any government.

**LENDER AND BORROWER KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT EITHER OF THEM TO HAVE TO A TRIAL BY JURY IN ANY PROCEEDING (WHETHER SOUNDING IN CONTRACT OR TORT) WHICH IS IN ANY WAY CONNECTED WITH THIS NOTE, ANY RELATED AGREEMENT, OR THE RELATIONSHIP ESTABLISHED UNDER IT.**

**This Note amends, restates, supersedes and replaces that certain Four Amended and Restated Promissory Note (Term Loan) dated as of November 19, 2025 in the principal amount of $1,638,301.60 by Borrower payable to Lender ("Prior Note"); provided, however, (i) the execution and delivery by Borrower of this Note shall not, in any manner or circumstance, be deemed to be a payment of, a novation of or to have terminated, extinguished or discharged any of Borrower's indebtedness evidenced by the Prior Note, all of which indebtedness shall continue under and shall hereinafter be evidenced and governed by this Note, and (ii) all collateral and guaranties securing or supporting the Prior Note shall continue to secure and support this Note.**

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, the undersigned have executed this Note as of the date first written above.

BORROWER:

**MY PILLOW, INC.**

DocuSigned by:

By: Michael Lindell

AFAE023033F44A5...

Name: Michael Lindell
Title: Chief Executive Officer

**Schedule A**

| Date | Interest | Principal Payment |
|---|---|---|
| 3/23/26 | $3,298.29 | $13,435.07 |
| 3/30/26 | $3,241.45 | $13,491.91 |
| 4/6/26 | $3,184.37 | $13,548.99 |
| 4/13/26 | $3,127.05 | $13,606.31 |
| 4/20/26 | $3,069.48 | $13,663.87 |
| 4/27/26 | $3,011.67 | $13,721.68 |
| 5/4/26 | $2,953.62 | $13,779.74 |
| 5/11/26 | $2,895.32 | $13,838.04 |
| 5/18/26 | $2,836.77 | $13,896.58 |
| 5/25/26 | $2,777.98 | $13,955.37 |
| 6/1/26 | $2,718.94 | $14,014.42 |
| 6/8/26 | $2,659.65 | $14,073.71 |
| 6/15/26 | $2,600.10 | $14,133.25 |
| 6/22/26 | $2,540.31 | $14,193.05 |
| 6/29/26 | $2,480.26 | $14,253.09 |
| 7/6/26 | $2,419.96 | $14,313.39 |
| 7/13/26 | $2,359.40 | $14,373.95 |
| 7/20/26 | $2,298.59 | $14,434.76 |
| 7/27/26 | $2,237.52 | $14,495.83 |
| 8/3/26 | $2,176.19 | $14,557.16 |
| 8/10/26 | $2,114.60 | $14,618.75 |
| 8/17/26 | $2,052.76 | $14,680.60 |
| 8/24/26 | $1,990.65 | $14,742.71 |
| 8/31/26 | $1,928.27 | $14,805.08 |
| 9/7/26 | $1,865.64 | $14,867.72 |
| 9/14/26 | $1,802.73 | $14,930.62 |
| 9/21/26 | $1,739.57 | $14,993.79 |
| 9/28/26 | $1,676.13 | $15,057.22 |
| 10/5/26 | $1,612.43 | $15,120.93 |
| 10/12/26 | $1,548.45 | $15,184.90 |
| 10/19/26 | $1,484.21 | $15,249.14 |
| 10/26/26 | $1,419.69 | $15,313.66 |
| 11/2/26 | $1,354.91 | $15,378.45 |
| 11/9/26 | $1,289.84 | $15,443.51 |
| 11/16/26 | $1,224.50 | $15,508.85 |
| 11/23/26 | $1,158.89 | $15,574.46 |
| 11/30/26 | $1,093.00 | $15,640.36 |
| 12/7/26 | $1,026.83 | $15,706.53 |
| 12/14/26 | $960.38 | $15,772.98 |
| 12/21/26 | $893.65 | $15,839.71 |
| 12/28/26 | $826.63 | $15,906.72 |
| 1/4/27 | $759.33 | $15,974.02 |
| 1/11/27 | $691.75 | $16,041.60 |
| 1/18/27 | $623.88 | $16,109.47 |
| 1/25/27 | $555.73 | $16,177.63 |
| 2/1/27 | $487.28 | $16,246.07 |

# EXHIBIT B

December 23, 2024

My Pillow, Inc.
1550 Audubon Rd.
Chaska, MN 55318

Ladies and Gentlemen:

This letter (the "Agreement") constitutes an agreement by and between MJMPL LLC (including its successors and assigns, "Lender"), and My Pillow, Inc., a Minnesota corporation (herein called "Company"), pertaining to certain loans and other credit which Lender has made or may from time to time hereafter make available to Company. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Promissory Note (Term Loan), dated as of the date hereof, made by Company to Lender (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Term Note" and, together with any additional promissory notes evidencing future loans by Lender to Company, the "Term Notes"), in respect of the term loan made to Company on the date hereof, in an aggregate principal amount equal to $400,000 (the "Term Loan" and, together with any additional term loans made by Lender to Company, the "Term Loans").

In consideration of the Obligations and all present and future loans and credit from time to time made available by Lender to or in favor of Company, and in consideration of all present and future liabilities, obligations and indebtedness of Company to Lender, howsoever created, evidenced, existing or arising, whether direct or indirect, absolute or contingent, joint or several, now or hereafter existing or arising, or due or to become due, and all extensions and/or renewals thereof (herein collectively called the "Liabilities"), Company covenants and agrees as follows:

1. As used in this Agreement, the following terms shall have the following respective meanings set forth below:

**"Capital Expenditure"** shall mean any expenditure by a Person for (a) an asset which will be used in a year or years subsequent to the year in which the expenditure is made and which asset is properly classified in relevant financial statements of such Person as equipment, real property, a fixed asset or a similar type of capitalized asset in accordance with GAAP (as defined below), or (b) an asset relating to or acquired in connection with an acquired business, and (c) any and all acquisition costs related to (a) or (b) above.

"**Capital Securities**" shall mean shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of capital, whether now outstanding or issued or acquired after the date hereof, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership or any other equivalent of such ownership interest.

"**Consulting Engagement**" shall mean Company's engagement of MJMP Consulting LLC ("Franklin Management") as a consultant (the "Consulting Engagement") under that certain engagement letter, dated as of the date hereof, between Franklin Management and Company (or such other agreement evidencing such Consulting Engagement).

"**Corporate Guarantor**" shall mean any Guarantor that is not an Individual Guarantor. As of the date hereof, the Corporate Guarantors are Lindell Media LLC, MP Air LLC, Lindell Technologies, LLC, Lindell Properties, LLC, Lindell Publishing, LLC, Mike Lindell Products, LLC, VOCL LLC, My Pillow Canada, Inc., Lindell Services, LLC, SB Purchase, LLC, My Pillow Logistics, LLC, NJ Purchase, LLC, MyStore Studio, LLC, V-Investment, LLC, Prior Lake 40 Acres, LLC, MP International Distribution, LLC, and Rev Capital LLC, Rev22 Investments LLC.

"**Guaranty**" shall mean a guaranty in form and substance satisfactory to Lender pursuant to which a Person guaranties payment of all or any portion of the Liabilities.

"**Individual Guarantor**" shall mean each Guarantor that is a natural person. As of the date hereof, the Individual Guarantors are Michael J. Lindell and Kendra Lindell.

**"Key Man Life Insurance Policy**" shall mean a "key man life insurance policy" insuring the life of Michael Lindell, to be in the face amount of at least $400,000 (or such lesser amount as agreed by Lender in its sole discretion) to be obtained by Company and collaterally assigned to Lender within 30 days of the date hereof.

**"Loan Documents**" shall mean, collectively, this Letter Agreement, the Note, any other promissory notes evidencing other loans made by Lender to Company, any guaranties, mortgage, security agreement, any swap agreements, other interest rate protection agreements, derivative agreements, any certificates (including, for the avoidance of doubt, the Perfection Certificate, dated as of the date hereof and executed by Company and each of the Guarantors), and any other or document, instrument or agreement evidencing, securing or relating to this Agreement, together with any and all modifications and amendments to any of the foregoing.

"**Material Adverse Effect**" shall mean a material, adverse effect on (i) the business, property or condition (financial or otherwise) of Company, any subsidiary of Company or any Guarantor; (ii) Company's, any subsidiary's or any Guarantor's ability to perform its obligations hereunder or any other Loan Document to which it is a party, or (iii) the validity or enforceability of this Agreement or any other Loan Document.

"**Organizational Documents**" shall mean, with respect to any Person, its articles of incorporation, articles of organization, bylaws, operating agreement, partnership agreement, declaration of trust or other trust agreement, or such other applicable organizational documents, including all of the exhibits thereto.

2. Each loan or other extension of credit made by Lender to or otherwise in favor of Company shall be evidenced by and subject to a promissory note or other agreement or evidence of indebtedness acceptable to Lender, and executed and delivered by Company unto Lender.

3. Company represents and warrants to Lender, and such representations and warranties shall be deemed to be continuing representations and warranties during the entire life of this Agreement, and thereafter, so long as any Liabilities remain unpaid and outstanding:

(a) <u>Organization and Existence</u>.

(i) As of the date hereof, neither Company nor any Corporate Guarantor has any subsidiaries.

(ii) Company and each of its subsidiaries (i) is duly organized, validly existing and in good standing as a corporation, general partnership, limited partnership or limited liability company, as applicable, under the laws of the state in which it is incorporated, organized, or formed; (ii) has all necessary power and authority and full legal right to own its property and to carry on its businesses; and (iii) has all necessary power and authority, and full legal right, to enter into this Agreement and each of the other Loan Documents to which it is a party, and to perform, observe and comply with all of its agreements and obligations under this Agreement and the other Loan Documents;

(iii) Each Corporate Guarantor (i) is duly organized, validly existing and in good standing as a corporation, general partnership, limited partnership or limited liability company, as applicable, under the laws of the state in which it is incorporated, organized, or formed; (ii) has all necessary power and authority and full legal right to own its property and to carry on its businesses; and (iii) has all necessary power and authority, and full legal right, to enter into this Agreement and each of the other Loan Documents to which it is a party, and to perform, observe and comply with all of its agreements and obligations under this Agreement and the other Loan Documents;

(iv) Company and each Corporate Guarantor has provided Lender with true, correct and complete copies of its Organizational Documents. All of the Organizational Documents are unmodified since the date delivered to Lender and are in full force and effect;

(b) Due Authorization.

(i) The execution and delivery by Company of this Agreement and the other Loan Documents to which Company is a party, the execution and delivery by each Corporate Guarantor of each of the Loan Documents to which it is a party, the performance by Company and each Corporate Guarantor of all of its agreements and obligations under such documents and the making of the borrowings contemplated by this Agreement have been duly authorized by all necessary action on the part of Company and such Corporate Guarantor , as applicable, and do not and will not (i) contravene any provision of its Organizational Documents; (ii) conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien (other than those in favor of Lender pursuant to the Loan Documents) upon any of its property under any agreement, indenture, mortgage or other instrument to which it is a party or by which it is bound or affected; (iii) violate or contravene any provision of any law, rule or regulation (including, without limitation, the

Regulations of the Board of Governors of the Federal Reserve System) or any order, ruling or interpretation thereunder or any decree, order or judgment of any court or governmental or regulatory authority, bureau, agency or official binding on it; or (iv) require any waivers, consents or approvals by any of its creditors or trustees for its creditors.

(ii) Except as to matters which Company or a Corporate Guarantor has procured, obtained or performed prior to or concurrently with Company's execution and delivery of this Agreement, no approval, consent, order, authorization or license by, or giving notice to, or taking any other action with respect to, any governmental or regulatory authority or agency is required under any provision of any applicable law for (i) Company's execution and delivery of this Agreement and the other Loan Documents to which it is a party or Company's performance of its obligations under this Agreement and the other Loan Documents and the borrowings contemplated by this Agreement, (ii) the execution and delivery by any Guarantor of any Loan Documents to which it is a party or such Guarantor's performance of its obligations under such other Loan Documents, or (iii) the continuing legality, validity, binding effect, enforceability or admissibility in evidence of this Agreement and the other Loan Documents.

(c) Material Adverse Effect. There are no actions, suits or proceedings pending or, to the actual knowledge of Company, threatened against Company, any subsidiary or any Guarantor, which could, if determined adversely to Company, such subsidiary or such Guarantor, reasonably be expected to have a Material Adverse Effect upon Company, such subsidiary or such Guarantor.

(d) Loan Documents. Each Loan Document to which Company or any Guarantor is a party constitutes the legal, valid and binding obligation of Company and such Guarantor, enforceable against Company and such Guarantor in accordance with its terms (except as such enforceability may be limited by bankruptcy, insolvency or similar laws generally affecting the enforcement of creditor's rights).

(e) No Default. No event has occurred and is continuing, and no condition exists, which constitutes (or would, with the provision of notice or the passage of time, or both, constitute) an Event of Default. Neither Company nor any Guarantor has any right to rescind, cancel or terminate this Agreement or any other Loan Document.

(f) Financial Statements. All of the financial statements of Company, each subsidiary of Company, and each Guarantor delivered to Lender in connection with the transactions contemplated by the Loan Documents have been prepared in accordance with generally accepted accounting principles consistently applied ("GAAP"), and fairly present in all material respects the financial condition of Company, such subsidiary and such Guarantor as of the dates on which the same were prepared. There are no material liabilities or obligations, secured or

unsecured (whether accrued, absolute or actual, contingent or otherwise), not reflected in such financial statements, which, in accordance with GAAP, should have been reflected therein. From the date of the most recent financial statements provided to Lender until the date hereof, there has been no materially adverse change in the financial condition of Company, any subsidiary of Company or any Guarantor.

(g) Tax Returns. Each of Company and its subsidiaries, and each Guarantor has filed all federal, state and other tax returns required to be filed in respect of all taxing periods prior to the date of this Agreement (or has been granted extensions with respect to same), and has paid or made reasonable provision, in accordance with applicable laws for the payment of all taxes (if any) which have or may become due and payable pursuant to any such returns (or pursuant to any matters raised by audits). Each of Company, each of its subsidiaries and each Guarantor has paid or caused to be paid all real and personal property taxes and assessments and other governmental charges lawfully levied or imposed on or against Company, such subsidiary or Guarantor or its property (other than those presently payable without payment of interest or penalty and those which are subject to contests initiated in good faith and diligently prosecuted and as to which adequate reserves have been provided).

(h) Solvency. Company does not intend to, and does not believe that it will, incur debts beyond its ability to pay as they mature, taking into account the timing of and amounts of cash to be received by it and the timing of the amounts of cash to be payable on or in respect of its indebtedness. Company is solvent, and, giving effect to the closing of the transactions contemplated by this Agreement and the disbursement of the proceeds of any loans from Lender, shall remain solvent.

(i) Encumbrances. There are no security interests in, or liens, mortgages, or other encumbrances on, any of Company's or any Guarantor's property or assets, except Permitted Liens (as defined below).

4. So long as Lender shall have any commitment or obligation, if any, to make or extend loans, advances or other credit to or in favor of Company, and so long as any Liabilities remain unpaid and/or outstanding, Company covenants and agrees that it shall and it shall cause each of its subsidiaries, each Corporate Guarantor and each of its subsidiaries to:

(a) Furnish to Lender, or cause to be furnished to Lender, in each case, in form and detail and on a reporting basis satisfactory to Lender, the following:

(i) as soon as available, and in any event not later than 60 days after and as of the end of each fiscal year of Company, consolidated and consolidating financial statements of Company and its consolidated subsidiaries for and as of the end of each such fiscal year, containing the consolidated and consolidating balance sheets of Company and its consolidated subsidiaries as of the close of each such fiscal year, consolidated and consolidating statements of income and retained earnings and a statement of cash flows

of Company and its consolidated subsidiaries for each such fiscal year, and such other comments and financial details as are usually included in similar reports. Such financial statements shall be prepared in accordance with GAAP, shall be in such detail as Lender may reasonably require, and shall be audited by independent certified public accountants of recognized standing selected by Company and acceptable to Lender;

(ii) as soon as available, and in any event not later than 15 days after and as of the end of each month of each fiscal year of Company, consolidated and consolidating financial statements of Company and its consolidated subsidiaries, containing the balance sheet of Company and its consolidated subsidiaries as of the end of each such month, consolidated and consolidating statements of income and retained earning and a statement of cash flows for Company and its consolidated subsidiaries for such month and for the portion of the fiscal year of Company through the end of the month then ending, and such other comments and financial details as are usually included in similar reports. Such financial statements shall be prepared in accordance with GAAP, shall be in such detail as Lender may reasonably require, and shall be certified as to accuracy and fairness by the chief executive or chief financial officer of Company (or, if none exists, such other officer with similar duties and responsibilities and familiarity with Company's finances and operations);

(iii) simultaneous with the delivery to Lender of the respective financial statements required in sub-sections (i) and (ii) above, a compliance certificate in form and detail satisfactory to Lender, certified by the chief financial officer of such Company, certifying that, as of the date thereof, to the best of each such person's knowledge, no Default or Event of Default shall have occurred and be continuing or exist, or if any Default or Event of Default shall have occurred and be continuing or exist, specifying, in detail, the nature and period of existence thereof and any action taken or proposed to be taken by Companies in respect thereof;

(iv) as soon as available, and in any event within 15 days after and as of the end of each month, agings of Company's and its subsidiaries' accounts receivable and accounts payable and an inventory report of Company and its subsidiaries for and as of the end of each such month, each in form satisfactory to Lender, certified by a duly authorized officer of Company and its subsidiaries;

(v) (a) within 15 days after filing, the federal income tax returns for Company and each of its consolidated subsidiaries, including all schedules thereto and (b) within 15 days after filing, the federal payroll tax returns for Company and each of its consolidated subsidiaries, including all schedules thereto;

(vi) within 15 days after and as of the end of each month of each fiscal year of Company, statements for each bank account maintained by Company;

(vii) (A) as soon as available, and in any event within 30 days after each year, a personal financial statement for each Individual Guarantor as of the last day of the preceding year, in form acceptable to Lender and certified by such Individual Guarantor as to the accuracy and completeness, and (B) within 10 days of filing, a copy of each Individual Guarantor's federal income tax return, including all schedules thereto; and

(viii) promptly, at such times as Lender may reasonably require, in form and detail satisfactory to Lender, such other information and reports as may be required under the terms of any Loan Documents or as Lender may reasonably request from time to time.

(b) Promptly inform Lender of the occurrence of any Event of Default, or any condition or event which, with the giving of notice or the passage of time, or both, would constitute an Event of Default (any such condition or event, a "Default"), under any of the Liabilities or Loan Documents, and of any condition or event which has had or could have a material adverse effect upon Company's business, properties, financial condition or its ability to observe, perform or comply with its liabilities and obligations hereunder or otherwise in respect of any of the Liabilities or the Loan Documents.

(c) (i) Keep proper books of record and account in which full and correct entries shall be made of all of its financial transactions and its assets and businesses so as to permit the presentation of financial statements (including, without limitation, those financial statements to be delivered to Lender pursuant to Section 4(a) above) prepared in accordance with GAAP; provided that (x) Lender, in its sole discretion, may require Company to employ a certified public accountant acceptable to Lender to maintain such books and records and (y) within 90 days from the date of this Agreement, such books and records shall be maintained in QuickBooks Online and (ii) permit Lender, or its attorneys, accountants or other representatives, upon reasonable advance notice (unless a Default or Event of Default has occurred and is continuing, in which case such notice shall not be required), to visit all of Company's and each of its consolidated subsidiaries' offices and to make inquiries as to Company's and such subsidiary's financial matters with their respective directors, members, managers, officers, employees, and independent certified public accountants; and permit Lender, or its attorneys, accountants or other representatives, to inspect, audit and examine Company's and each of its respective consolidated subsidiaries' books, accounts, records, ledgers and assets and properties of every kind and description, wherever located (including, for the avoidance, as maintained in QuickBooks Online), at all reasonable times. Company shall reimburse Lender for all reasonable costs and expenses incurred by Lender in connection with such inspections, examinations and audits, and to pay to Lender such fees as Lender may reasonably charge in

respect of such inspections, examinations and audits, or as otherwise mutually agreed upon by Company and Lender.

(d) Maintain insurance of the type and in the manner set forth in Section 4(k) of the Continuing Security Agreement, dated as of the date hereof, between Company and Lender and the other debtors party thereto from time to time.

(e) Preserve and maintain its existence and all of its rights, franchises and privileges.

(f) Comply with all applicable laws, and will promptly notify Lender in the event that Company or any of their respective subsidiaries receives any notice, claim or demand from any governmental authority asserting the violation of any applicable legal requirement which could reasonably be expected to have a material adverse effect upon Company or any of its subsidiaries.

(g) Obtain all such approvals, consents, orders, authorizations and licenses from, give all such notices promptly to, register, enroll or file all such agreements, instruments or documents promptly with, and promptly take all such other action with respect to, any governmental authority, regulatory agency or official or any central bank or other fiscal or monetary authority, agency or official, as may be required from time to time under any provision of any applicable law:

(i) for the performance by Company, such Corporate Guarantor or such subsidiary of any of its agreements or obligations under the Term Note, this Agreement or any other Loan Document to which it is a party or for the payment by Company, such Corporate Guarantor or such subsidiary to Lender of any sums which shall become due and payable by it thereunder;

(ii) to ensure the continuing legality, validity, binding effect or enforceability of the Term Note or any other Loan Document;

(iii) to continue the proper operation of the business and operations of Company, each Corporate Guarantor and each of their respective subsidiaries.

(h) (i) Cause any newly formed or acquired direct or indirect subsidiary to (x) become a Guarantor and (y) cause Lender to have a first priority security interest in all of its assets, and take all such actions requested by Lender in order to perfect Lender's security interest therein and (ii) without limiting the foregoing clause (i), execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all further assurances reasonably requested by Lender from time to time in order to give full effect to any of the Loan Documents.

(i) Use the proceeds of any loans from Lender or the proceeds of any collateral securing the Liabilities only for (i) working capital, (ii) general corporate purposes, (iii) the payments of costs, fees and expenses in connection with this Agreement, the other Loan Documents, and the Consulting Engagement, and (iv)

the repayment or consolidation of certain indebtedness for borrowed money or other financing obligations of Company existing prior to the date of this Agreement, including but not limited to bank financings and merchant advance obligations (in each case in this clause (iv) which may have been acquired by Lender from the provider of such financing arrangement).

(j) (i) Keep its assets, whether now owned or hereafter acquired, free of any lien, charge or claim (other than the (x) liens for taxes or assessments or governmental charges or levies not yet due or delinquent, or which can thereafter be paid without penalty, or which are being contested in good faith by proceedings diligently pursued, (y) any other lien, encumbrance or charge acceptable to and approved in writing by Lender and (z) the liens and encumbrances arising under the Loan Documents (collectively, "Permitted Liens")); and (ii) not encumber its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein, permit any lien, levy, attachment or restraint to be made or filed against its assets, whether now owned or hereafter acquired, or any portion thereof or interest therein or permit any receiver or assignee for the benefit of creditors to be appointed to take possession of its assets, whether now owned or hereafter acquired, or any portion thereof.

(k) Deliver to Lender the following, each of which shall be in form and substance acceptable to Lender: (a) executed landlord waivers or other collateral access agreements with respect to all locations leased by Company or any Corporate Guarantor; and (b) executed bailee letters with respect to all locations at which Company stores any inventory or other assets.

(l) Subject to the occurrence of any Default or Event of Default, and upon the written request of Lender, use commercially reasonable efforts to make such financial adjustments (including with respect to compensation and other budgetary matters) that Lender believes in good faith will improve the overall financial stability of the Company and its subsidiaries as a whole.

(m) (i) Maintain all of its bank accounts with a bank that has entered into a control agreement with Lender with respect to such accounts in form and substance satisfactory to Lender; (ii) permit Lender to have "view access" to each of its bank accounts; and (iii) deposit all of its accounts receivable that have been subjected to an account notice by other creditors or otherwise (i.e., frozen accounts) ("Frozen A/R") into the Cash Collateral Account.

(n) (i) Utilize ADP (or such other payroll service vendor satisfactory to Lender in its sole discretion) for the purposes of managing payroll and withholding taxes, (ii) promptly upon receipt, furnish to Lender payroll reports from such payroll service vendor evidencing current payment (or deposit, as the case may be) of all employer and employee withholding taxes and assessments and (iii) take such actions as may be required by ADP (or such other satisfactory payroll service) in order to authorize Lender to have full access to all reports and other information that such vendor makes available to Company or such Corporate Guarantor.

(o) Upon request of Franklin Management, with respect to Company, hire a chief executive officer and/or chief financial officer deemed acceptable by Franklin Management, which officer shall (x) have such duties and responsibilities typical of such office and (y) receive aggregate compensation deemed reasonable by Franklin Management.

(p) With respect to Company, if requested by Lender, request inforce illustrations with respect to the Key Man Life Insurance Policy from an insurance company satisfactory to Lender, and deliver such illustrations to Lender promptly upon receipt thereof.

(q) Maintain the Key Man Life Insurance Policy in full force and effect.

(r) With respect to Company, within one business day of receipt by Company of the proceeds of the Term Loan, use a portion of the proceeds of the Term Loan as specified under the heading "Paid out of Proceeds by Company" in the Closing Statement and Authorization dated as of the date hereof (if any) and executed by Company (the "Closing Statement").

5. So long as Lender shall have any commitment or obligation, if any, to make or extend loans, advances or other credit to or in favor of Company, and so long as any Liabilities remain unpaid and/or outstanding, Company covenants and agrees that it shall not and it shall not permit any of its subsidiaries or any Corporate Guarantor or any of its subsidiaries to:

(a) Modify, amend or terminate any of its Organizational Documents, or permit any of its Organizational Documents to be modified, amended or terminated, without the prior written consent of Lender. Lender's consent to any such modification, amendment or termination shall not be unreasonably withheld, provided (a) that there shall be no Default or Event of Default at the time of Company's request for such consent, and (b) the proposed modification, amendment or termination does not (with the provision of notice or the passage of time, or both) violate any provision of any Loan Document.

(b) Directly or indirectly (i) except in the ordinary course of business, sell, transfer, lease, assign or otherwise dispose of all or any portion of its assets or any interest therein; (ii) except for Permitted Liens, encumber, hypothecate, create a security interest or create or permit any lien upon or affecting its assets or any portion thereof or interest therein; (iii) assign, transfer or encumber any interest of Company or any of its subsidiaries under this Agreement or under any other Loan Document; (iv) purchase, acquire, issue or redeem any of its Capital Securities or make any material change in its capital structure; (v) change its name, consolidate with or merge into any other Person or permit any other Person to merge into it; or (vi) enter into any sale-leaseback transaction.

(c) Directly or indirectly, become or remain obligated for any indebtedness for borrowed money, or for any indebtedness incurred in connection with the acquisition of any property, real or personal, tangible or intangible, except: (i)

indebtedness to Lender and (ii) current unsecured trade payables and accrued liabilities arising in the ordinary course of its business.

(d) Directly or indirectly, (i) make any loan, investment, advance or extension of credit to any Person, (ii) purchase, create or acquire all or substantially all of the properties or assets of any other Person or any Capital Securities of any other Person, (iii) incur any obligation as surety or guarantor, other than in the ordinary course of business, (iv) enter into any transaction with an affiliate that is not on an arms' length basis or otherwise on terms and conditions as favorable to Company as would be obtainable in a transaction with a Person that is not an affiliate or (v) subordinate any indebtedness due it from any Person to indebtedness of other creditors of such Person.

(e) Pay any dividends or make any other distributions (whether in cash, securities or other property) with respect to any of its Capital Securities, including but not limited to repayment of any loans made by any of its members or shareholders, return of capital contributions, distributions upon termination, liquidation or dissolution, or any development, property management, accounting or other fees payable to any of its members or shareholders; provided that (i) Company and any Corporate Guarantor may pay cash dividends or distributions to its shareholders, partners or members, as applicable, from time to time during a year to the extent necessary to enable such shareholders, partners, or members to pay income taxes for such year and make estimated income tax payments to satisfy their liabilities under federal and state income tax law for such year which arise solely from such shareholders', partners', members', status as a shareholder, partner, or member, as applicable, of Company and (ii) any of Company's subsidiaries or any Corporate Guarantor's subsidiaries may make any such dividends or other distributions to Company or such Corporate Guarantor, as applicable.

(f) Terminate the Consulting Engagement or otherwise breach its obligations with respect thereto.

(g) Make or incur any (i) Capital Expenditures other than in the ordinary course of business, or as Lender may otherwise agree in writing or (ii) other expenditure that is not, in the good faith judgment of Company, reasonably necessary for the purpose of carrying out its business or the business of its subsidiaries (as applicable), or that would otherwise impede Company's or any Corporate Guarantor's ability to perform its obligations hereunder or under any other Loan Document to which it is a party.

(h) Make any payment of wages, salary, bonus, distributions, or other compensation to any of Company's or any Corporate Guarantor's equityholders, officers, directors, managers, or their respective family members or affiliates in excess of $750,000 in the aggregate in any fiscal year of Company, or such greater amount as agreed in writing by Lender in its reasonable discretion.

6. Expenses; Taxes; Indemnity.

(a) Company hereby agrees to pay all stamp, document, transfer, recording, filing, registration, search, sales and excise fees and taxes and all similar impositions (excluding taxes on the overall net income or gross receipts of Lender) now or hereafter determined by Lender to be payable in connection with this Agreement or any other Loan Document or any other documents, instruments or transactions pursuant to or in connection herewith or therewith, and Company agrees to save Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such fees, taxes or impositions.

(b) Company hereby agrees to reimburse and indemnify Lender, its affiliates and their respective investors, officers, directors, employees, advisors and agents (collectively, the "Indemnified Parties") from and against any and all losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements of any kind or nature whatsoever (including, without limitation, the fees and disbursements of counsel for such Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto) that may at any time be imposed on, asserted against or incurred by such Indemnified Party as a result of, or arising out of, or in any way related to or by reason of, this Agreement or any other Loan Document or any transaction from time to time contemplated hereby or thereby, but excluding any such losses, liabilities, claims, damages, expenses, obligations, penalties, actions, judgments, suits, costs or disbursements resulting solely from the gross negligence or willful misconduct of such Indemnified Party, as finally determined by a court of competent jurisdiction.

7. Company shall pay Lender a processing fee in an aggregate principal amount equal to 2.75% of the Term Loan, which fee shall be earned, due and payable upon the making of the Term Loan, and paid to Lender by deducting such amount from the total Term Loan proceeds advanced to Company.

8. (a) Company and/or certain of its subsidiaries or affiliates have certain existing indebtedness owing to third parties (collectively, the "Third Parties") for borrowed money or other financing obligations, including but not limited to bank financings and merchant advance obligations (the "Existing Indebtedness"). Company acknowledges and agrees that: (i) the amount of the Existing Indebtedness is accurately reflected on the Closing Statement and is due and owing in full now without setoff or defenses of any kind; (ii) Lender may purchase (or may have purchased) all or any portion of the Existing Indebtedness from the Third Parties at a discount (a "Purchase Discount") and may enforce such Existing Indebtedness at par; (iii) any portion of the Existing Indebtedness purchased by Lender shall be consolidated into and shall constitute part of the Term Loan on a dollar for dollar basis (based on the par value of such Existing Indebtedness) and shall, together with any Withheld Proceeds (as defined below) reduce the cash proceeds of the Term Loan otherwise available for disbursement; (iv) Lender has no further obligations to Company with respect to the Existing Indebtedness; and (v) any portion of the Existing Indebtedness not purchased by Lender (as determined by Lender in its sole discretion) must be paid in full either: (x) upon closing of the Term Loan, in which case a portion

of the Term Loan proceeds may be disbursed directly to pay such portion of the Existing Indebtedness or (y) at such later date as Lender may determine in its sole discretion, in which case Lender may withhold proceeds of the Term Loan (the "Withheld Proceeds") in an amount equal to the par value of such Existing Indebtedness not so prepaid ("Unpaid Existing Indebtedness"). Company acknowledges and agrees that as of the date hereof, there is Existing Indebtedness owing to each of (1) Lifetime Funding, (2) Merchant Capital, (3) Cobalt Funding, (4) Riverside (Ace Recovery), and (5) ECS Capital Funding LLC, that will not be paid upon closing of the Term Loan. Company further acknowledges and agrees that $25,000 of the Term Note shall be held in reserve for legal fees and expenses relating to the Unpaid Existing Indebtedness.

(b) Company also acknowledges and agrees that Lender may have been able to (or, with respect to Unpaid Existing Indebtedness, may be able to) negotiate, on behalf of Company, with the providers of certain of the Existing Indebtedness for the repayment of such Existing Indebtedness in an amount below the par value of such Existing Indebtedness (such difference, the "Repayment Discount"). In consideration of Lender making the Term Loan, Company agrees that 100% of such Repayment Discount shall be, in such amounts as directed by Lender in its sole discretion, either (1) paid to Lender for its own account (which such payment shall not reduce the principal amount of the Term Loan or any of the Liabilities) or (2) deposited into the Cash Collateral Account for application to future regularly scheduled payments due in respect of the Term Note and the Consulting Engagement (or for other purposes acceptable to Lender in its sole discretion). The Repayment Discount shall be distributed in accordance with the preceding sentence either (i) directly out of the proceeds of the Term Loan when made or (ii) with respect to any Unpaid Existing Indebtedness, out of the Withheld Proceeds not used by Lender for the repayment of such Unpaid Existing Indebtedness.

(c) Company further acknowledges that (i) Company is in default under each of the documents evidencing or otherwise relating to all of the Existing Indebtedness ("Existing Defaults"), (ii) Lender's consolidation of such Existing Indebtedness into the Term Loan does not constitute a novation or cure any Existing Defaults and, accordingly, an Event of Default exists under the Loan Documents as of the date hereof and (iii) Lender may exercise any rights or remedies available to it under the Loan Documents or applicable law arising from the existence of any such Event of Default.

9. Without in any way whatsoever limiting or affecting Lender's right to make demand for payment of all or any part of any of the Liabilities which may, at any time, be payable upon demand, Company hereby acknowledges and agrees that, in addition to any and all other provisions set forth in any of the Loan Documents relating to any Default or Event of Default thereunder, an Event of Default shall also occur under the Liabilities and the Loan Documents in the event that there shall be any change, for any reason whatsoever, in (i) the management of Company, which could, in the sole discretion and judgment of Lender, have a material adverse effect upon Company and/or its ability to pay or perform any of its liabilities or obligations in respect of the Liabilities and the Loan Documents or (ii) the ownership or control of Company.

10. Company shall maintain a cash collateral account in the name of Lender (or such other Person as directed by Lender) (the "Cash Collateral Account"). Company hereby

authorizes Lender to apply all such amounts held in the Cash Collateral Account (including the Frozen A/R) as required under the Term Note and the Consulting Engagement when due; provided that, if requested by Company, Lender may agree in its sole discretion to permit Company to use amounts in the Cash Collateral for other purposes approved by Lender.

11. Any failure by Company to fully observe, perform or otherwise comply with any of the covenants or agreements of Company set forth in this Agreement shall constitute an Event of Default under the Liabilities and the Loan Documents, and Lender shall be entitled to exercise any and all rights and remedies available to or otherwise conferred upon Lender as a result thereof, whether by agreement, by law or otherwise.

12. **Company hereby acknowledges and agrees that Company's compliance with the terms and conditions set forth herein, and the absence of any Default or Event of Default by Company in the observance or performance of any of the covenants or agreements of Company hereunder, shall not in any way limit, restrict or otherwise affect or impair Lender's right or ability to make demand for payment of any or all of the Liabilities which may be on a demand basis at any time in Lender's sole and absolute discretion, with or without reason or cause, and the existence of any Default or Event of Default hereunder shall not be the sole reason or basis for enabling Lender to make demand for payment of all or any part of such Liabilities.**

13. All accounting terms not specifically defined in this Agreement shall be determined and construed in accordance with GAAP.

14. No forbearance on the part of Lender in enforcing any of its rights or remedies under this Agreement or any other Loan Document, nor any renewal, extension or rearrangement of any payment or covenant to be made or performed by Company hereunder or any such other Loan Document, shall constitute a waiver of any of the terms of this Agreement or such Loan Document or of any such right or remedy.

15. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Michigan. Company irrevocably submits to the non-exclusive jurisdiction of any United States federal court sitting in the Eastern District of Michigan or any state court in Oakland County in the State of Michigan in any action or proceeding arising out of or relating to this Agreement, and Company irrevocably agrees that all such claims may be heard and determined in any such court and irrevocably waives any present and future objection it may have as to the venue of any action or proceeding brought in that court, or that that court is an inconvenient forum. Any suit brought by Company related to this Agreement or the Loan Documents may only be brought in the United States federal court sitting in the Eastern District of Michigan or in a state court in Oakland County in the State of Michigan. Nothing herein shall limit the right of Lender to bring any action or proceeding against Company in the courts of any other jurisdiction if necessary or convenient to effect the relief sought.

16. Company agrees to pay to or reimburse Lender, upon demand, for all costs and expenses (including, without limitation, reasonable attorneys' fees, whether in-house or outside counsel) incurred by Lender in connection with the documentation, preparation, execution, delivery, amendment, administration and performance of this Agreement, the other Loan

Documents, and otherwise in respect of the Liabilities, and the consummation and the closing of the transactions contemplated hereby or thereby, any Default or Event of Default under or in respect of any of the Liabilities or in collecting or in attempting to collect any of the Liabilities, in perfecting, maintaining or defending any of Lender's liens or security interests (or the priority thereof), if any, in any collateral securing any part of any of the Liabilities, or otherwise in enforcing any of Lender's rights or remedies under any of the Loan Documents or otherwise in respect of any of the Liabilities. Company waives any rights to assert against Lender, any defense (legal or equitable), set-off, counterclaim, or claim which Company may now or at any time hereafter have against Lender or any other party liable to Lender or that may arise, directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Liabilities or any security therefor.

17. This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns; provided, however, that Company shall not assign or transfer any of its rights or obligations hereunder or otherwise in respect of any of the Liabilities without the prior written consent of Lender. Company acknowledges that Lender may, at any time, assign its rights under this Agreement and any other Loan Document, including without limitation Lender's rights to payment and enforcement of the Liabilities.

18. Company acknowledges that Lender, its investors, principals and/or affiliates may be (a) providing debt financing, equity capital or other services (including financial advisory or consulting services) to other companies in respect of which Company and its subsidiaries may have conflicting interests regarding the transactions described herein or otherwise or (b) engaged in a broad range of transactions (including providing merchant cash advances or merchant consumer financing) that may involve interests that differ from the interests of Company and its subsidiaries. Without limiting the foregoing, certain providers of merchant cash advances (including providers who may have provided merchant cash advances to the Company), or their principals, may be referral sources to Lender and may also be investors in Lender or an affiliate of Lender. Company further acknowledges that neither Lender, its investors, principals and/or affiliates have any obligation to disclose such interests and transactions to Company or its subsidiaries by virtue of any fiduciary, advisory or agency relationship, and Company and its subsidiaries waive, to the fullest extent permitted by law, any actual or alleged conflict of interest, and any claims they may have against, Lender, its investors, principals and/or affiliates, for breach of fiduciary duty or alleged breach of fiduciary duty, and agree that Lender, its investors, principals and or affiliates shall have no liability (whether direct or indirect) to Company and its subsidiaries in respect of such a conflict of interest or fiduciary duty claim, or to any person alleging a conflict of interest or asserting a fiduciary duty claim on behalf of or in right of Company and its subsidiaries, including any stockholders, employees or creditors. Company further acknowledges that Lender is not a fiduciary of Company or any of its subsidiaries. Company also (i) acknowledges that Lender, its investors, principals and/or affiliates may refer Company or its subsidiaries and/or affiliates to certain providers of goods or services, for which Lender, its investors, principals and/or affiliates might receive a referral or similar fee, (ii) consents to any such arrangements and (iii) waives, to the fullest extent permitted by law, any claims Company may have against Lender, its investors, principals and/or affiliates in connection with the foregoing.

19. Company and Michael Lindell (individually and on behalf of all Corporate Guarantors) hereby releases Lender, Franklin Management, their respective affiliates and subsidiaries and all of their respective officers, directors, employees, members, shareholders, agents, attorneys and representatives as well as their respective successors and assigns from any and all claims, obligations, rights, causes of action, and liabilities, of whatever kind or nature, whether known or unknown, whether foreseen or unforeseen, arising on or before the date hereof (the "Released Matters"). Without limiting the generality of the foregoing, Company hereby waives the provisions of any statute or doctrine to the effect that a general release does not extend to claims which a releasing party does not know or suspect to exist in its favor at the time of executing the release, which if known by such releasing party would have materially affected the releasing party's settlement with the party being released. Company and Michael Lindell acknowledge that the agreements in this paragraph are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Matters. If Company and/or Michal Lindell asserts or commences any claim, counter-claim, demand, obligation, liability or cause of action in derogation of the foregoing release or challenges the enforceability of the foregoing release (in each case, a "Violation"), then Company and Michael Lindell agree to pay in addition to such other damages as any party being released may sustain as a result of such Violation, all reasonable attorneys' fees and expenses (including in-house and outside counsel) incurred by such party being released as a result of such Violation. Company and Michael Lindell (individually and on behalf of all Corporate Guarantors) acknowledge and agree that they have entered into this release, this Agreement, and the other Loan Documents of their own free will and volition and were not coerced to do so nor under duress at the time of execution, and that each of parties to the Loan Documents have chosen to enter into the agreements voluntarily and knowingly.

20. COMPANY AND LENDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF ITS CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE LIABILITIES.

[Remainder of Page Intentionally Left Blank]

If the foregoing is acceptable to Company, please indicate such with the signature(s) of Company as provided below.

Very truly yours,

**MJMPL LLC**

By:_______________________________
Name: Jeffrey Cohen
Title: Authorized Representative

ACCEPTED, ACKNOWLEDGED
AND AGREED:

**MY PILLOW, INC.**

DocuSigned by:
By: Micheal J Lindell
AFAE023833F44A5
Name: Michael J. Lindell
Title: CEO

DocuSigned by:
Micheal J Lindell
AFAE023833F44A5
**Michael J. Lindell**

# EXHIBIT C

# Continuing Security Agreement

Dated as of December 23, 2024

1. **Grant of Security Interest.** Each of the undersigned (each, a "Debtor") grants to MJMPL LLC (including its successors and assigns, the "Lender"), whose address is 24751 Sussex St., Oak Park, Michigan 48237, a continuing security interest in the Collateral, as defined below, to secure the payment and performance when due, whether by stated maturity, demand, acceleration or otherwise, of all of the Liabilities (as defined below) of such Debtor and all Liabilities of My Pillow, Inc. (the "Borrower").

"Liabilities", as used in this Continuing Security Agreement (this "Agreement"), means all obligations, indebtedness and liabilities of the Debtor and/or Borrower to the Lender and/or any of the Lender's subsidiaries, affiliates or successors, now existing or later arising, including, without limitation, all loans, advances, interest, costs, overdraft indebtedness, credit card indebtedness, lease obligations, management and services fees or obligations relating to any interest rate, currency or commodity swap agreement, cap or collar agreement, and any other agreement or arrangement designated to protect against fluctuations in interest rates, currency exchange rates or commodity prices, all monetary obligations incurred or accrued during the pendency of any Bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding, and including all "Liabilities" as defined in any of the other Loan Documents, and all renewals, extensions, modifications, consolidations or substitutions of any of the foregoing in this definition, whether the Debtor or the Borrower may be liable jointly with others or individually liable as a debtor, maker, co-maker, drawer, endorser, guarantor, surety or otherwise, and whether voluntarily or involuntarily incurred, due or not due, absolute or contingent, direct or indirect, known or unknown, liquidated or unliquidated. Liabilities also include all interest, costs, expenses, and attorneys' fees accruing to, or incurred in either collecting any of the Liabilities of the Debtor or the Borrower or protecting, maintaining, or liquidating any collateral for any of the Liabilities, including the Collateral.

"Loan Documents", as used in this Agreement, means, collectively, (i) this Agreement, (ii) the "Loan Documents" (as defined in the Promissory Note (Term Loan) dated as of the date hereof, made by Borrower in favor of Lender), (iii) the "Loan Documents" (as defined in the Letter Agreement, dated as of the date hereof, between Borrower and Lender) and (iv) any guaranty, mortgage, security agreement, swap agreement, other interest rate protection agreement, derivative agreement, and any other document, instrument or agreement evidencing, securing or relating to any of the foregoing, together with any and all modifications and amendments to any of the foregoing.

"Consulting Engagement Documents", as used in this Agreement, means, collectively, (i) the Engagement Letter, dated as of the date hereof, between Borrower and MJMPL Consulting LLC ("Consultant") and (ii) any guaranty, mortgage, security agreement, and any other document, instrument or agreement evidencing, securing or relating to any of the foregoing, together with any and all modifications and amendments to any of the foregoing.

2. **Description of Collateral.** "Collateral," as used in this Agreement, means all personal property of the Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:

(a) all of the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights (whether or not given in support of Accounts), Software, as defined below (words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms as such terms are defined in the Uniform Commercial Code of the State of Michigan, as in effect from

time to time (the "UCC")), present and future, including but not limited to any items listed on Schedule 1 attached hereto, if any;

(b) all present and future insurance claims relating to any of the above;

(c) all Goods, Instruments (including, without limit, promissory notes), Documents (including, without limit, negotiable Documents), policies and certificates of insurance, Deposit Accounts, and money or other property (except real property which is not a fixture) which are now or later in possession of Lender, or as to which Lender now or later controls possession by documents or otherwise;

(d) all present and future books, records, and data of the Debtor relating to any of the above; and

(e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but not limited to stock rights, subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by the Debtor.

In the definition of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more specific or narrower type of that collateral.

Where the Collateral is in the possession of the Lender, the Debtor agrees to deliver to the Lender any property which represents an increase in the Collateral or profits or proceeds of the Collateral.

3. **Collateral Definitions.**

(a) **"Accounts"** means all of the Debtor's (i) "accounts," (including without limit "health-care insurance receivables") as defined in Article 9 of the UCC, (ii) rights to any refund of taxes paid at any time to any governmental entity, (iii) contract rights, and (iv) commercial tort claims.

(b) **"Chattel Paper"** means all of the Debtor's "chattel paper" (including without limit "electronic chattel paper" and "tangible chattel paper") as such terms are defined in Article 9 of the UCC.

(c) **"Deposit Accounts"** means all of the Debtor's "deposit accounts," as defined in Article 9 of the UCC.

(d) **"Documents"** means all of the Debtor's "documents," "documents of title" or a "warehouse receipts," as such terms are defined in the UCC.

(e) **"Equipment"** means (i) all of the Debtor's "equipment," as defined in Article 9 of the UCC, and (ii) any Documents issued with respect to any of Debtor's "equipment" (as defined in the UCC).

(f) **"Farm Products"** means all of the Debtor's "farm products," as defined in Article 9 of the UCC. The Debtor will provide the Lender with a written list of the buyers, commission merchants or selling agents to or through whom it may sell any Farm Products, in form acceptable to the Lender. The Debtor will keep this list current by notice to the Lender at least seven (7) days prior to any sale. In this paragraph the terms "buyers," "commission merchants," and "selling agents" have the meanings given to them in the Federal Food Security Act of 1985, as amended, and in the UCC, as applicable.

(g) **"Fixtures"** means all of the Debtor's "fixtures," as defined in Article 9 of the UCC.

(h) **"General Intangibles"** means (i) all of the Debtor's "general intangibles," (including without limit "payment intangibles") as such terms are defined in Article 9 of the UCC, and (ii) whether or not constituting "investment property" as defined in Article 9 of the UCC, all pledged stock, meaning, collectively, all shares of capital stock listed in Schedule I, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the capital stock of any person that may be issued or granted to, or held by, any Debtor, its successors and assigns.

(i) **"Goods"** means all of the Debtor's "goods," as defined in Article 9 of the UCC.

(j) **"Instruments"** means all of the Debtor's "instruments," as defined in Article 9 of the UCC

(k) **"Inventory"** means (i) all of the Debtor's "inventory," as defined in Article 9 of the UCC, and (ii) any Documents issued with respect to any of Debtor's "inventory" (as defined in the UCC).

(l) **"Investment Property"** means (i) all of the Debtor's "investment property," as defined in Article 9 of the UCC, including, without limit, securities, securities accounts, security entitlements, and financial assets, and (ii) whether or not constituting "investment property" as defined, (a) all pledged notes, meaning, collectively, all promissory notes listed in Schedule I, all other promissory notes issued to or held by any Debtor, its successors and assigns, and (b) all pledged stock, meaning, collectively, all shares of capital stock listed in Schedule I, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the capital stock of any person that may be issued or granted to, or held by, any Debtor, its successors and assigns.

(m) **"Letter of Credit Rights"** means all of the Debtor's "letter of credit rights," as defined in Article 9 of the UCC.

(n) **"Software"** means all of the Debtor's "software," as defined in Article 9 of the UCC.

(o) **"Supporting Obligation"** means a Letter of Credit Right or secondary obligation that supports the payment or performance of an Account, Chattel Paper, a Document, a General Intangible, an Instrument, or Investment Property.

4. **Representations, Warranties, and Covenants.** The Debtor represents and warrants to and covenants with the Lender that:

(a) Its principal residence or chief executive office is at the address set forth in the Perfection Certificate, dated as of the date hereof, executed by Debtor and the guarantors signatory thereto (the "Perfection Certificate");

(b) If the Debtor is not a natural person (i) the Debtor's name as it appears in this Agreement is identical to the name of the Debtor appearing in the Debtor's organizational documents, as amended, including any trust documents; and (ii) both the Taxpayer I.D. No. and the State Organization No., if any, set forth in the Perfection Certificate are correct;

(c) If the Debtor is not a natural person, (i) that it is duly organized, existing and in good standing pursuant to the laws under which it is organized; and (ii) that the execution and delivery of this Agreement and the performance of the obligations it imposes (A) are within its powers and have been duly authorized by all necessary action of its governing body; (B) do not contravene the terms of its articles of incorporation or articles of organization, its by-laws, or any partnership agreement, operating agreement or other agreement governing its affairs;

(d) The execution and delivery of this Agreement and the performance of the obligations it imposes do not violate any law, conflict with any agreement by which it is bound, or require the consent or approval of any governmental authority or any third party;

(e) This Agreement is a valid and binding agreement, enforceable according to its terms;

(f) All balance sheets, profit and loss statement, and other financial statements furnished to the Lender are accurate and fairly reflect the financial condition of the organizations and persons to which they apply on their effective dates, including contingent liabilities of every type, which financial condition has not changed materially and adversely since those dates;

(g) It will pay its Liabilities to the Lender;

(h) It is or will become the owner of the Collateral free from any liens, encumbrances or security interests, except for this security interest and existing liens disclosed to and accepted by the Lender in writing, and will defend the Collateral against all claims and demands of all persons at any time claiming any interest in it;

(i) No person, other than Lender or Consultant, has possession or control (as defined in the UCC) of the Collateral;

(j) It will keep the Collateral free of liens, encumbrances and other security interests (other than pursuant to this Agreement, the other Loan Documents, or the Consulting Engagement Documents), maintain it in good repair, not use it illegally, and exhibit it to the Lender on demand;

(k) It will protect the Collateral from loss, damage, or deterioration from any cause. At its own expense, the Debtor will maintain comprehensive casualty insurance and other insurance on the Collateral as may be reasonably required by Lender against such risks, in such amounts, with such deductibles and with such companies as may be satisfactory to the Lender, and provide the Lender with proof of insurance acceptable to the Lender. Each insurance policy shall contain a lender's loss payable endorsement satisfactory to the Lender and a prohibition against cancellation or amendment of the policy or removal of the Lender as loss payee without at least 30 days prior written notice to the Lender. In all events, the amounts of such insurance coverages shall conform to prudent business practices and shall be in such minimum amounts that the Debtor will not be deemed a co-insurer. The Debtor will promptly deliver to Lender, at Lender's request, evidence satisfactory to Lender that such insurance has been so procured and, with respect to casualty insurance, made payable to Lender. The Debtor hereby appoints Lender, or any employee or agent of Lender, as Debtor's attorney-in-fact, which appointment is coupled with an interest and irrevocable, and authorizes Lender, or any employee or agent of Lender, on behalf of the Debtor, to adjust and compromise any loss under said insurance and to endorse any check or draft payable to the Debtor in connection with returned or unearned premiums on said insurance or the proceeds of said insurance, and any amount so collected may be applied toward satisfaction of the Liabilities; provided, however, that Lender shall not be required hereunder so to act. If the Debtor fails to maintain satisfactory insurance, Lender has the option (but not the obligation) to do so and the Debtor agrees to repay all amounts so expended by Lender immediately upon demand, together with interest at the highest lawful default rate which could be charged by Lender on any of the Liabilities;

(l) It will not sell or offer to sell, lease, license or otherwise transfer the Collateral, nor change the location of the Collateral, without the written consent of the Lender, except for sale of Inventory in the ordinary course of business;

(m) It will pay promptly when due all taxes and assessments upon the Collateral, or for its use or operation. If the Debtor fails to pay any of these taxes, assessments, or other charges in the time provided above, Lender has the option (but not the obligation) to do so and the Debtor agrees to repay all amounts so

expended by Lender immediately upon demand, together with interest at the highest lawful default rate which could be charged by Lender on any of the Liabilities;

(n) No financing statement covering all or any part of the Collateral or any proceeds is on file in any public office, unless the Lender has approved that filing. The Debtor irrevocably authorizes Lender to file one or more financing statements in form satisfactory to the Lender and will pay the cost of filing them in all public offices where filing is deemed by the Lender to be necessary or desirable. In addition, the Debtor shall execute and deliver, or cause to be executed and delivered, such other documents as the Lender may from time to time request to perfect or to further evidence the security interest created in the Collateral by this Agreement, including, without limitation: (i) any certificates of title to the Collateral with the security interest of the Lender noted thereon or executed applications for such certificates of title in form satisfactory to the Lender; (ii) any assignments of claims under government contracts which are included as part of the Collateral, together with any notices and related documents as the Lender may from time to time request; (iii) any assignment of any specific account receivable as the Lender may from time to time request; (iv) a notice of security interest and a control agreement with respect to any Collateral, all in form and substance satisfactory to the Lender; (v) a notice to and acknowledgment from any bailee or other person in possession of any Collateral, all in form and substance satisfactory to the Lender; and (vi) any consent to the assignment of proceeds of any letter of credit, all in form and substance satisfactory to the Lender;

(o) Lender has no obligation to acquire or perfect any lien on or security interest in any asset(s), whether real property or personal property, to secure payment of the Liabilities, and the Debtor is not relying upon assets in which the Lender may have a lien or security interest for payment of the Liabilities;

(p) It will not, without the prior written consent of the Lender, change (i) the Debtor's name, (ii) the Debtor's business organization, (iii) the jurisdiction under which the Debtor's business organization is formed or organized, or (iv) the address of the Debtor's chief executive office or principal residence or of any additional places of the Debtor's business;

(q) It will (i) provide any information that Lender may reasonably request, and will permit Lender to inspect and copy its books and records and (ii) allow the Lender or the Lender's representative to enter upon all premises where Collateral is kept or may be located and inspect the Collateral, in each case, on the terms set forth in the Loan Documents;

(r) It will allow the Lender to take such actions in its own name or in the Debtor's name as Lender, in its sole discretion, deems necessary or appropriate to establish exclusive control (as defined in the UCC) over any Collateral of such nature where control perfects the Lender's security interest;

(s) The Lender shall have the right now and at any time in the future, in its sole and absolute discretion and without notice to the Debtor, to (i) prepare, file, and sign the Debtor's name on any proof of claim in bankruptcy or similar document against any owner of the Collateral and (ii) prepare, file, and sign the Debtor's name on any notice of lien, assignment or satisfaction of lien, or similar document in connection with the Collateral. The Debtor authorizes the Lender to file financing statements containing the collateral description "All of the Debtor's assets whether now owned or hereafter acquired" or such lesser amount of assets as the Lender may determine, or the Lender may, at its option, file financing statements containing any collateral description which reasonably describes the Collateral in which a security interest is granted under this Agreement;

(t) At any time and without notice, Lender may, as to any Collateral: (a) cause any or all of such Collateral to be transferred to its name or to the name of its nominees; (b) receive or collect, by legal proceedings or otherwise, all dividends, interest, principal payments and other sums and all other distributions at any time payable or receivable on account of such Collateral, and hold the same as Collateral, or apply the same to the Liabilities, the manner and distribution of the application to be in the sole discretion of Lender; (c)

enter into any extension, subordination, reorganization, deposit, merger or consolidation agreement or any other agreement relating to or affecting such Collateral, and deposit or surrender control of such Collateral, and accept other property in exchange for such Collateral and hold or apply the property or money so received pursuant to this Agreement; and (d) take such actions in its own name or in the Debtor's name as Lender, in its sole discretion, deems necessary or appropriate to establish exclusive control (as defined in the UCC) over any Collateral of such nature that perfection of the Lender's security interest may be accomplished by control; and

(u) The Debtor shall hold in trust for Lender all payments received in connection with the Collateral, and all proceeds from the sale, lease or other disposition of any Collateral, and shall deposit all such payments and proceeds into bank accounts with a bank that has entered into a control agreement with Lender with respect to such accounts in form and substance satisfactory to Lender.

5. **Accounts.**

(a) The Debtor will, in the usual course of its business and at its own cost and expense, on the Lender's behalf but not as the Lender's agent, demand and receive and use its best efforts to collect all moneys due or to become due on the Accounts. Until the Lender gives notice to the Debtor to the contrary or until the Debtor is in default, it may use the funds collected in its business. Upon notice from the Lender or upon an Event of Default, the Debtor agrees that all sums of money it receives on account of or in payment or settlement of the Accounts shall be held by it as trustee for the Lender without commingling with any of its funds, and shall immediately be delivered to the Lender with endorsement to the Lender's order of any check or similar instrument. If Lender notifies the Debtor that the Liabilities are on a remittance basis, the Debtor shall notify its account debtors that all electronic payments on any Account shall be made directly to an account at Lender designated by and under the exclusive control of Lender, and all other payments on the Accounts shall be made directly to a post office box designated by and under the exclusive control of Lender. Lender shall apply received payments in such order and manner as Lender elects, in its sole discretion. All notices required in this paragraph will be immediately effective when sent. Such notices need not be given prior to the Lender taking action. It is agreed that, at any time the Lender elects, it shall be entitled, in its own name or in the name of the Debtor or otherwise, but at the expense and cost of the Debtor, to collect, demand, receive, sue for or compromise any and all Accounts, and to give good and sufficient releases, to endorse any checks, drafts or other orders for the payment of money payable to the Debtor in payment and, in its discretion, to file any claims or take any action or proceeding which the Lender may deem necessary or advisable. It is expressly understood and agreed, however, that the Lender shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it or to present or file any claim or take any other action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b) The Debtor appoints the Lender or the Lender's designee as the Debtor's attorney-in-fact to do all things with reference to the Collateral as provided for in this section including without limitation (1) to notify the post office authorities to change the Debtor's mailing address to one designated by the Lender, (2) to receive, open and dispose of mail addressed to the Debtor, (3) to sign the Debtor's name on any invoice or bill of lading relating to any Collateral, on assignments and verifications of account and on notices to the Debtor's customers, and (4) to do all things necessary to carry out this Agreement. The Debtor ratifies and approves all acts of the Lender as attorney-in-fact.

(c) The Lender shall not be liable for any act or omission, nor any error of judgment or mistake of fact or law, for any loss or damage which the Debtor may suffer as a result of Lender's processing of items or its exercise of any other rights or remedies under this Agreement, but only for its gross negligence or willful misconduct. Except as caused by Lender's gross negligence or willful misconduct, the Debtor agrees to indemnify and hold Lender harmless from and against any third party claims, demands or actions, and all

related expenses or liabilities, including, without limitation, attorneys fees and causes of action whatsoever. This power being coupled with an interest is irrevocable until the Liabilities have been fully satisfied.

(d) Immediately upon the Debtor's receipt of any Collateral evidenced by an agreement, Instruments, Chattel Paper or Documents ("Special Collateral"), the Debtor shall mark the Special Collateral to show that it is subject to the Lender's security interest and shall deliver the original to the Lender together with appropriate endorsements and other specific evidence of assignment in form and substance satisfactory to the Lender.

(e) On each occasion on which the Debtor evidences to Lender the account balances on and the nature and extent of any Accounts, the Debtor shall be deemed to have warranted that, except as otherwise indicated: (a) each of those Accounts is valid and enforceable without performance by the Debtor of any act; (b) each of those account balances are in fact owing; (c) there are no setoffs, recoupments, credits, contra accounts, counterclaims or defenses against any of those Accounts; (d) as to any Accounts represented by a note, trade acceptance, draft or other instrument or by any chattel paper or document, the same has/have been endorsed and/or delivered by the Debtor to Lender; (e) the Debtor has not received with respect to any Account, any notice of the death of the related account debtor, nor of the dissolution, liquidation, termination of existence, insolvency, business failure, appointment of a receiver for, assignment for the benefit of creditors by, or filing of a petition in bankruptcy by or against, the account debtor; and (f) as to each Account, except as may be expressly permitted by Lender to the contrary in another document, the account debtor is not an affiliate of the Debtor, the United States of America or any department, agency or instrumentality of it, or a citizen or resident of any jurisdiction outside of the United States. The Debtor will do all acts and will execute all writings requested by Lender to perform, enforce performance of, and collect all Accounts. Debtor will deliver to Lender such documents, instruments and other writings evidencing or otherwise relating to the Accounts as Lender may reasonably request from time to time. The Debtor shall neither make nor permit any modification, compromise or substitution for any Account without the prior written consent of Lender. Lender may at any time and from time to time verify Accounts directly with account debtors or by other methods acceptable to Lender without notifying the Debtor. The Debtor agrees, at Lender's request, to arrange or cooperate with Lender in arranging for verification of Accounts.

6. **Additional Covenants.** If the Debtor is not liable for all or any part of the Liabilities (such Liabilities being referred to in this paragraph as the "Debt"), then the Debtor agrees that:

(a) If any monies become available to the Lender that it can apply to any Debt, the Lender may apply them to Debt not secured by this Agreement.

(b) Without notice to or the consent of the Debtor, the Lender may (i) take any action it chooses against the Borrower, against any collateral for the Debt, or against any other person liable for the Debt; (ii) release the Borrower or any other person liable for the Debt, release any collateral for the Debt, and neglect to perfect any interest in any such collateral; (iii) forbear or agree to forbear from exercising any rights or remedies, including any right of setoff, that it has against the Borrower, any other person liable for the Debt, or any other collateral for the Debt; (iv) extend to the Borrower additional Debt to be secured by this Agreement; or (v) renew, extend, modify or amend any Debt, and deal with the Borrower or any other person liable for the Debt as it chooses.

(c) None of the Debtor's obligations under this Agreement shall be affected by (i) any act or omission of the Lender; (ii) the voluntary or involuntary liquidation, sale or other disposition of all or substantially all of the assets of the Borrower, (iii) any receivership, insolvency, bankruptcy, reorganization or other similar proceedings affecting the Borrower or any of its assets; or (iv) any change in the composition or structure of the Borrower or any Debtor, including a merger or consolidation with any other entity.

(d) The Lender's rights under this section and this Agreement are unconditional and absolute, regardless of the unenforceability of any provision of any agreement between the Borrower and the Lender, or the existence of any defense, setoff or counterclaim that the Borrower may be able to assert against the Lender.

(e) The Debtor waives all rights of subrogation, contribution, reimbursement, indemnity, exoneration, implied contract, recourse to security, setoff and any other claim (as that term is defined in the federal Bankruptcy Code, as amended from time to time) that it may have or acquire in the future against the Borrower, any other person liable for the Debt, or any collateral for the Debt, because of the existence of this Agreement, the Debtor's performance under this Agreement, or the Lender's availing itself of any rights or remedies under this Agreement.

(f) If any payment to the Lender on any Debt is wholly or partially invalidated, set aside, declared fraudulent or required to be repaid under any bankruptcy or insolvency act or code, under any state or federal law, or under common law or equitable principles, then this Agreement shall remain in full force and effect or be reinstated, as the case may be, until payment in full to the Lender of the repaid amounts, and of the Debt. If this Agreement must be reinstated, the Debtor agrees to execute and deliver to the Lender new agreements and financing statements, if necessary, in form and substance acceptable to the Lender, covering the Collateral.

7. **Default/Remedies.**

(a) If (i) any of the Liabilities are not paid, when due, whether upon demand or at maturity, whether by acceleration or otherwise, (ii) any warranty, representation, covenant, financial statement, or other information made, given or furnished to Lender by or on behalf of Borrower, the Debtor, or any guarantor of any of the Liabilities ("Guarantor") shall be, or shall prove to have been, false or materially misleading when made, given, or furnished; (iii) any substantial loss, theft, damage or destruction to or of any Collateral, or the issuance or filing of any attachment, levy, garnishment or the commencement of any proceeding in connection with any Collateral or of any other judicial process of, upon or in respect of Borrower, the Debtor, any Guarantor, or any Collateral, (iv) there shall occur any sale or other disposition by Borrower, the Debtor, or any Guarantor of any substantial portion of its assets or property or voluntary suspension of the transaction of business by Borrower, the Debtor, or any Guarantor, or death, dissolution, termination of existence, merger, consolidation, insolvency, business failure, or assignment for the benefit of creditors of or by Borrower, the Debtor, or any Guarantor; or commencement of any proceedings under any state or federal bankruptcy or insolvency laws or laws for the relief of debtors by or against Borrower, the Debtor, or any Guarantor; or the appointment of a receiver, trustee, court appointee, sequestrator or otherwise, for all or any part of the property of Borrower, the Debtor, or any Guarantor, (v) Lender deems the margin of Collateral insufficient or itself insecure, in good faith believing that the prospect of payment of the Liabilities or performance of this Agreement is impaired or shall fear deterioration, removal, or waste of Collateral; or (vi) any default or event of default shall occur under any instrument, agreement or other document evidencing, securing or otherwise relating to any of the Liabilities (including, for the avoidance of doubt, under any of the Loan Documents) or under the Consulting Engagement Documents (the foregoing (i) through (vi), each an "Event of Default"),then Lender may at its discretion and without prior notice to the Debtor declare any or all of the Liabilities to be immediately due and payable, and shall have and may exercise any right or remedy available to it including, without limitation, any one or more of the following rights and remedies: (1) exercise all the rights and remedies upon default, in foreclosure and otherwise, available to secured parties under the provisions of the Uniform Commercial Code and other applicable law, (2) institute legal proceedings to foreclose upon the lien and security interest granted by this Agreement, to recover judgment for all amounts then due and owing as Liabilities, and to collect the same out of any Collateral or the proceeds of any sale of it, (3) institute legal proceedings for the sale, under the judgment or decree of any court of competent jurisdiction, of any or all Collateral, (4) require the Debtor to assemble the Collateral and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to both parties, (5) personally or by agents,

attorneys, or appointment of a receiver, enter upon any premises where Collateral may then be located, and take possession with or without demand and with or without process of law of all or any of it and/or render it unusable; and without being responsible for loss or damage to such Collateral, hold, operate, sell, ship, reclaim, recover, store, finish, maintain, repair, lease, or dispose of all or any Collateral at one or more public or private sales, leasings or other dispositions, at places (including, without limit, the Debtor's premises) and times and on terms and conditions as Lender may deem fit, without any previous demand or advertisement; and except as provided in this Agreement, all notice of sale, lease or other disposition, and advertisement, and other notice or demand, any right or equity of redemption, and any obligation of a prospective purchaser or lessee to inquire as to the power and authority of Lender to sell, lease, or otherwise dispose of the Collateral or as to the application by Lender of the proceeds of sale or otherwise, which would otherwise be required by, or available to the Debtor under, applicable law are expressly waived by the Debtor to the fullest extent permitted.

(b) Should an Event of Default occur, the Debtor will pay to the Lender all costs reasonably incurred by the Lender for the purpose of enforcing its rights hereunder, to the extent not prohibited by law, including, without limitation: costs of foreclosure; costs of obtaining money damages; and a reasonable fee for the services of internal and outside attorneys employed or engaged by the Lender for any purpose related to this Agreement, including, without limitation, consultation, drafting documents, sending notices or instituting, prosecuting or defending litigation or any proceeding, all such costs shall bear interest at the highest per annum rate applicable to any of the Liabilities, but not in excess of the maximum rate permitted by law.

(c) The Debtor agrees that upon an Event of Default the Lender may dispose of any of the Collateral in its then present condition, that the Lender has no duty to repair or clean the Collateral prior to sale, and that the disposal of the Collateral in its present condition or without repair or clean-up shall not affect the commercial reasonableness of such sale or disposition. The Lender's compliance with any applicable state or federal law requirements in connection with the disposition of the Collateral will not adversely affect the commercial reasonableness of any sale of the Collateral. The Lender may disclaim warranties of title, possession, quiet enjoyment, and the like, and the Debtor agrees that any such action shall not affect the commercial reasonableness of the sale. In connection with the right of the Lender to take possession of the Collateral, the Lender may take possession of any other items of property in or on the Collateral at the time of taking possession, and hold them for the Debtor without liability on the part of the Lender. The Debtor expressly agrees that Lender may enter upon the premises where the Collateral is believed to be located without any obligation of payment to the Debtor, and that the Lender may, without cost, use any and all of the Debtor's "equipment" (as defined in the UCC) in the manufacturing or processing of any "inventory" (as defined in the UCC) or in growing, raising, cultivating, caring for, harvesting, loading and transportation of any of the Collateral that constitutes "farm products" (as defined in the UCC). If there is any statutory requirement for notice, that requirement shall be met if the Lender sends notice to the Debtor at least ten (10) days prior to the date of sale, disposition, or other event giving rise to the required notice, and such notice shall be deemed commercially reasonable. The Debtor is liable for any deficiency remaining after disposition of the Collateral.

(d) The proceeds of any sale or other disposition of Collateral authorized by this Agreement shall be applied by Lender first upon all expenses authorized by the UCC and all attorneys fees and legal expenses incurred by Lender; then the balance of the proceeds of the sale or other disposition shall be applied to the payment of interest on the Liabilities, then to the payment of principal on Liabilities, then any remaining proceeds shall be paid over to the Debtor or to such other person(s) as may be entitled to it under applicable law. The Debtor shall remain liable for any deficiency, which shall be due to Lender immediately upon demand. The Debtor agrees that Lender shall be under no obligation to accept any noncash proceeds in connection with any sale or disposition of Collateral unless failure to do so would be commercially unreasonable. If Lender agrees in its sole discretion to accept noncash proceeds (unless the failure to do so would be commercially unreasonable), Lender may ascribe any commercially reasonable value to such proceeds. Without limiting the foregoing, Lender may also apply any discount factor in determining the present value of proceeds to be received in the future or may elect to apply proceeds to be received in the future only as and when such proceeds are actually received in cash by Lender.

(e) At any sale pursuant to this Section 7, whether under the power of sale, by virtue of judicial proceedings or otherwise, it shall not be necessary for Lender or a public officer under order of a court to have present physical or constructive possession of Collateral to be sold. The recitals contained in any conveyances and receipts made and given by Lender or the public officer to any purchaser at any sale made pursuant to this Agreement shall, to the extent permitted by applicable law, conclusively establish the truth and accuracy of the matters stated (including, without limit, as to the amounts of the principal of and interest on the Liabilities, the accrual and nonpayment of it and advertisement and conduct of the sale); and all prerequisites to the sale shall be presumed to have been satisfied and performed. Upon any sale of any Collateral, the receipt of the officer making the sale under judicial proceedings or of Lender shall be sufficient discharge to the purchaser for the purchase money, and the purchaser shall not be obligated to see to the application of the money. Any sale of any Collateral under this Agreement shall be a perpetual bar against the Debtor with respect to that Collateral. At any sale or other disposition of the Collateral pursuant to this Section 7, Lender disclaims all warranties which would otherwise be given under the Uniform Commercial Code, including, without limit, a disclaimer of any warranty relating to title, possession, quiet enjoyment or the like, and Lender may communicate these disclaimers to a purchaser at such disposition. This disclaimer of warranties will not render the sale commercially unreasonable. Lender may, in its discretion, bid and purchase any of the Collateral at any sale pursuant to this Section 7.

8. **Waivers.** The Debtor absolutely, unconditionally, knowingly, and expressly waives:

(a) To the extent not expressly prohibited by applicable law, any right to require Lender to (a) proceed against any person or property; (b) give notice of the terms, time and place of any public or private sale of personal property security held from the Debtor or any other person, or otherwise comply with the provisions of Section 9.504 of the Uniform Commercial Code in effect prior to July 1, 2001 or its successor provisions thereafter; or (c) pursue any other remedy in the Lender's power. The Debtor waives notice of acceptance of this Agreement and presentment, demand, protest, notice of protest, dishonor, notice of dishonor, notice of default, notice of intent to accelerate or demand payment of any Liabilities, any and all other notices to which the Debtor might otherwise be entitled, and diligence in collecting any Liabilities, and agrees that the Lender may, once or any number of times, modify the terms of any Liabilities, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Liabilities, or permit Borrower to incur additional Liabilities, all without notice to the Debtor and without affecting in any manner the unconditional obligation of the Debtor under this Agreement. The Debtor unconditionally and irrevocably waives each and every defense and setoff of any nature which, under principles of guaranty or otherwise, would operate to impair or diminish in any way the obligation of the Debtor under this Agreement, and acknowledges that such waiver is by this reference incorporated into each security agreement, collateral assignment, pledge and/or other document from the Debtor now or later securing the Liabilities, and acknowledges that as of the date of this Agreement no such defense or setoff exists. The Debtor ratifies and approves all acts of Lender acting in its capacity as the Debtor's attorney-in-fact under this Agreement. Neither Lender nor its attorney-in-fact will be liable for any acts or omissions or for any error of judgment or mistake of fact or law.

(b) Its right to require Lender to institute suit against, or to exhaust any rights and remedies which Lender has or may have against, Borrower or any third party, or against any Collateral provided by Borrower or any third party. In this regard, the Debtor is bound to the payment of all Liabilities whether now existing or hereafter accruing, as fully as if such Liabilities were directly owing to Lender by the Debtor. The Debtor waives any defense arising by reason of any disability or other defense (other than the defense that the Liabilities shall have been fully and finally performed and indefeasibly paid) of Borrower or by reason of the cessation from any cause whatsoever of the liability of Borrower in respect thereof.

(c) (i) Any rights to assert against Lender, any defense (legal or equitable), set-off, counterclaim, or claim which the Debtor may now or at any time hereafter have against the Borrower or any other party liable to Lender; (ii) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Liabilities or any security

therefor; (iii) any defense the Debtor has to performance hereunder, and any right the Debtor has to be exonerated arising by reason of: the impairment or suspension of Lender's rights or remedies against Borrower; the alteration by Lender of the Liabilities; any discharge of the Liabilities by operation of law as a result of Lender's intervention or omission; or the acceptance by Lender of anything in partial satisfaction of the Liabilities; (iv) the benefit of any statute of limitations affecting the Debtor's liability hereunder or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Liabilities shall similarly operate to defer or delay the operation of such statute of limitations applicable to the Debtor's liability hereunder.

(d) Any defense arising by reason of or deriving from (i) any claim or defense based upon an election of remedies by Lender; or (ii) any election by Lender under the Bankruptcy Code Section 1111(b) to limit the amount of, or any collateral securing, its claim against Borrower.

(e) Any and all rights (whether by subrogation, indemnity, reimbursement, or otherwise) to recover from Borrower or any other person any amounts paid or the value of any Collateral given by the Debtor pursuant to this Agreement until such time as all of the Liabilities have been fully paid.

9. **Miscellaneous.**

(a) Where the Collateral is located at, used in or attached to a facility not owned by the Debtor, the Debtor will obtain from the lessor, or other appropriate party, a consent to the granting of this security interest and a subordination of the lessor's interest in any of the Collateral, in form acceptable to the Lender.

(b) At its option the Lender may, but shall be under no duty or obligation to, discharge taxes, liens, security interests or other encumbrances at any time levied or placed on the Collateral, pay for insurance on the Collateral, and pay for the maintenance and preservation of the Collateral, and the Debtor agrees to reimburse the Lender on demand for any payment made or expense incurred by the Lender, with interest at the maximum legal rate.

(c) No delay on the part of Lender in the exercise of any right or remedy shall operate as a waiver, nothing in this Agreement is intended, nor shall it be construed, to preclude Lender from pursuing any other right or remedy provided by law or in equity, and no waiver or indulgence by the Lender of any default or Event of Default shall be effective unless in writing and signed by an authorized officer of the Lender, nor shall a waiver on one occasion be construed as a waiver of that right on any future occasion or a waiver of any other right.

(d) The Lender shall not be required to marshal any present or future collateral security (including this Agreement and the Collateral) for the Liabilities or any of them or to resort to such collateral security or other assurances of payment in any particular order. To the extent that it lawfully may, the Debtor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Lender's rights under this Agreement or under any other instrument creating or evidencing any of the Liabilities or under which any of the Liabilities is outstanding or by which any of the Liabilities is secured or payment thereof is otherwise assured, and, to the extent allowed by applicable law, the Debtor irrevocably waives the benefits of all such laws.

(e) If any provision of this Agreement is invalid, it shall be ineffective only to the extent of its invalidity, and the remaining provisions shall be valid and effective.

(f) Notice from one party to another relating to this Agreement shall be deemed effective if made in writing (including telecommunications) and delivered to the recipient's address, telex number or telecopier number set forth above by any of the following means: (i) hand delivery, (ii) registered or certified mail, postage prepaid, with return receipt requested, (iii) first class or express mail, postage prepaid, (iv) Federal Express or

like overnight courier service or (v) telecopy, telex or other wire transmission with request for assurance of receipt in a manner typical with respect to communications of that type. Notice made in accordance with this section shall be deemed delivered on receipt if delivered by hand or wire transmission, on the third business day after mailing if mailed by first class, registered or certified mail, or on the next business day after mailing or deposit with an overnight courier service if delivered by express mail or overnight courier.

(g) To the extent that any of the Liabilities is payable upon demand, nothing contained in this Agreement shall modify the terms and conditions of those Liabilities nor shall anything stated in this Agreement prevent Lender from making demand, with or without notice and with or without reason, and whether or not a default or Event of Default has occurred, for immediate payment of any or all of those Liabilities at any time.

(h) All rights of the Lender shall inure to the benefit of the Lender's successors and assigns; and all obligations of the Debtor shall bind the Debtor's heirs, executors, administrators, successors and assigns. If there is more than one Debtor, their obligations are joint and several. Debtor acknowledges that Lender may, at any time, assign its rights under this Agreement and any other Loan Document, including without limitation Lender's rights to payment and enforcement of the Liabilities.

(i) The Debtor shall pay or reimburse the Lender for all costs, fees and expenses incurred by the Lender or for which the Lender becomes obligated in connection with the enforcement of this Agreement, including attorneys' fees of counsel to the Lender, which shall also include attorneys' fees and time charges of attorneys who may be employees of the Lender of any of it subsidiaries or affiliates, plus costs and expenses of such attorneys or of the Lender; search fees, costs and expenses; and all taxes payable in connection with this Agreement. The Debtor shall pay any and all stamp and other taxes, UCC search fees, filing fees and other costs and expenses in connection with the execution and delivery of this Agreement to be delivered hereunder, and agrees to save and hold the Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses. That portion of the Liabilities consisting of costs, expenses or advances to be reimbursed by the Debtor to the Lender pursuant to this Agreement which are not paid on or prior to the date hereof shall be payable by the Debtor to the Lender on demand. If at any time or times hereafter the Lender: (i) employs counsel for advice or other representation (A) with respect to this Agreement, (B) to represent the Lender in any litigation, contest, dispute, suit or proceeding or to commence, defend, or intervene or to take any other action in or with respect to any litigation, contest, dispute, suit, or proceeding (whether instituted by the Lender, the Debtor, or any other party) in any way or respect relating to this Agreement, or (C) to enforce any rights of the Lender against the Debtor or any other party under of this Agreement; (ii) takes any action to protect, collect, sell, liquidate, or otherwise dispose of any of the Collateral; and/or (iii) attempts to or enforces any of the Lender's rights or remedies under this Agreement, the costs and expenses incurred by the Lender in any manner or way with respect to the foregoing, shall be part of the Liabilities, payable by the Debtor to the Lender on demand.

(j) A carbon, photographic or other reproduction of this Agreement is sufficient, and can be filed as a financing statement, The Lender is irrevocably appointed the Debtor's attorney-in-fact to execute any financing statement on the Debtor's behalf covering the Collateral.

(k) The terms and provisions of this security agreement shall be governed by and construed in accordance with the laws of the State of Michigan (without regard to conflict of law principles). The Debtor irrevocably submits to the non-exclusive jurisdiction of any United States federal court sitting in the Eastern District of Michigan or any state court in Oakland County in the State of Michigan in any action or proceeding arising out of or relating to this Agreement, and the Debtor irrevocably agrees that all such claims may be heard and determined in any such court and irrevocably waives any present and future objection it may have as to the venue of any action or proceeding brought in that court, or that that court is an inconvenient forum. Any suit brought by the Debtor related to this Agreement may only be brought in the United States federal court sitting in the Eastern District of Michigan or in a state court in Oakland County in the State of Michigan.

Nothing herein shall limit the right of the Lender to bring any action or proceeding against the Debtor in the courts of any other jurisdiction if necessary or convenient to effect the relief sought.

(l) The parties intend that the terms used herein which are defined in the UCC have, at all times, the broadest and most inclusive meanings possible. Accordingly, if the UCC shall in the future be amended or held by a court to define any term used herein more broadly or inclusively than the UCC in effect on the date of this Agreement, then such term, as used herein, shall be given such broadened meaning. If the Uniform Commercial Code shall in the future be amended or held by a court to define any term used herein more narrowly, or less inclusively, than the UCC in effect on the date of this Agreement, such amendment or holding shall be disregarded in defining terms used in this Agreement.

10. **Release**. The Debtor hereby releases the Lender, its affiliates and subsidiaries and all of their respective officers, directors, employees, shareholders, agents, attorneys and representatives as well as their respective successors and assigns from any and all claims, obligations, rights, causes of action, and liabilities, of whatever kind or nature, whether known or unknown, whether foreseen or unforeseen, arising on or before the date hereof (the "Released Matters"). Without limiting the generality of the foregoing, the Debtor hereby waives the provisions of any statute or doctrine to the effect that a general release does not extend to claims which a releasing party does not know or suspect to exist in its favor at the time of executing the release, which if known by such releasing party would have materially affected the releasing party's settlement with the party being released. The Debtor acknowledges that the agreements in this paragraph are intended to be in full satisfaction of all or any alleged injuries or damages arising in connection with the Released Matters. If the Debtor asserts or commences any claim, counter-claim, demand, obligation, liability or cause of action in derogation of the foregoing release or challenges the enforceability of the foregoing release (in each case, a "Violation"), then the Debtor agrees to pay in addition to such other damages as any party being released may sustain as a result of such Violation, all reasonable attorneys' fees and expenses (including in-house and outside counsel) incurred by such party being released as a result of such Violation.

11. **Information Sharing.** The Lender may provide, without any limitation whatsoever, any information or knowledge the Lender may have about the undersigned or any matter relating to this Agreement and any related documents to any of its subsidiaries or affiliates or their successors, or to any one or more purchasers or potential purchasers of this Agreement or any related documents, and the undersigned waives any right to privacy the undersigned may have with respect to such matters. The Debtor agrees that the Lender may at any time sell, assign or transfer one or more interests or participations in all or any part of its rights or obligations in this Agreement to one or more purchasers whether or not related to the Lender.

12. **WAIVER OF JURY TRIAL.** THE LENDER AND THE DEBTOR, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, KNOWINGLY AND VOLUNTARILY AND FOR THEIR MUTUAL BENEFIT WAIVE ANY RIGHT EITHER OF THEM HAVE TO A TRIAL BY JURY IN ANY PROCEEDING (WHETHER SOUNDING IN CONTRACT OR TORT) WHICH IS IN ANY WAY CONNECTED WITH THIS OR ANY RELATED AGREEMENT, OR THE RELATIONSHIP ESTABLISHED UNDER THEM. THIS PROVISION MAY ONLY BE MODIFIED IN A WRITTEN INSTRUMENT EXECUTED BY LENDER AND THE DEBTOR.

13. **Perfection of Certain Collateral**. The Lender and Debtor acknowledge that Debtor is also granting a security interest in the Collateral in favor of Consultant. In the event that the Lender takes possession of or has "control" (as such term is used in the Uniform Commercial Code as in effect in each applicable jurisdiction) over any Collateral for purposes of perfecting its lien therein, the Lender shall be deemed to be holding such Collateral on its own behalf, and as representative for Consultant solely for purposes of perfection of Consultant's lien under the Uniform Commercial Code; provided that the Lender shall not have any duty or liability to protect or preserve any rights pertaining to any of the Collateral for Consultant.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

**Debtors:**

MY PILLOW, INC.

By: Michael J Lindell
Name: Michael Lindell
Its: Chief Executive Officer

LINDELL MEDIA LLC

By: Michael J Lindell
Name: Michael Lindell
Its: Sole Member and Manager

MP AIR LLC

By: Michael J Lindell
Name: Michael Lindell
Its: Sole Member and Manager

LINDELL TECHNOLOGIES, LLC

By: Michael J Lindell
Name: Michael Lindell
Its: Sole Member and Manager

LINDELL PROPERTIES, LLC

By: Michael J Lindell
Name: Michael Lindell
Its: Sole Member and Manager

LINDELL PUBLISHING, LLC

By: Michael J Lindell
Name: Michael Lindell
Its: Sole Member and Manager

MIKE LINDELL PRODUCTS, LLC

By: Michael J Lindell
Name: Michael Lindell
Its: Sole Member and Manager

VOCL LLC

By: Michael J Lindell
Name: Michael Lindell
Its: Sole Member and Manager

MY PILLOW CANADA, INC.

By: Michael J Lindell
Name: Michael Lindell
Its: Chief Executive Officer

LINDELL SERVICES, LLC

By: Michael J Lindell
Name: Michael Lindell
Its: Sole Member and Manager

SB PURCHASE, LLC

By: Michael J Lindell
Name: Michael Lindell
Its: Sole Member and Manager

MY PILLOW LOGISTICS, LLC

By: Michael J Lindell
Name: Michael Lindell
Its: Sole Member and Manager

NJ PURCHASE, LLC

By: DocuSigned by: Michael J Lindell ____________________
Name: Michael Lindell
Its: Sole Member and Manager

MYSTORE STUDIO, LLC

By: DocuSigned by: Michael J Lindell ____________________
Name: Michael Lindell
Its: Sole Member and Manager

V-INVESTMENT, LLC

By: DocuSigned by: Michael J Lindell ____________________
Name: Michael Lindell
Its: Sole Member and Manager

PRIOR LAKE 40 ACRES, LLC

By: DocuSigned by: Michael J Lindell ____________________
Name: Michael Lindell
Its: Sole Member and Manager

MP INTERNATIONAL DISTRIBUTION, LLC

By: DocuSigned by: Michael J Lindell ____________________
Name: Michael Lindell
Its: Sole Member and Manager

REV22 INVESTMENTS LLC

By: DocuSigned by: Michael J Lindell ____________________
Name: Michael Lindell
Its: Sole Member and Manager

REV CAPITAL LLC

By: DocuSigned by: Michael J Lindell
Name: Michael Lindell
Its: Sole Member and Manager

Accepted and Agreed:

**Lender:**

MJMPL LLC

By:______________________________
Name: Jeffrey Cohen
Title: Authorized Representative

**SCHEDULE I**

PLEDGED SHARES

| Pledgor/Record & Beneficial Owner | Issuing Entity | Class of Issued Stock/Units | Certificate No. of Issued Shares/Units | Number of Shares/Units Issued | Total Shares/Units Issued in such Class |
|---|---|---|---|---|---|
| My Pillow, Inc. | My Pillow Canada, Inc. | Common stock | 1 | 100,000 | |
| Rev22 Investments LLC | FrankSpeech Network, Inc. | Common stock | | 31,505,000 | |

# EXHIBIT D

# DEPOSIT ACCOUNT CONTROL AGREEMENT

Executed and Delivered as of December 23, 2024

## PARTIES

This Agreement is among the persons signing this Agreement as the "*Secured Party*", the "*Debtor*" and the "*Bank*".

## BACKGROUND

The Debtor is the Bank's customer with respect to one or more demand deposit accounts identified by the account numbers and account names specified below (individually and collectively, as re-numbered and including any funds in the account or accounts, the "*Deposit Account*"). The Debtor has granted the Secured Party a security interest in the Deposit Account for the Secured Party's own benefit, and for the benefit of its affiliate, MJMP Consulting LLC. The Debtor is requesting that the Bank enter into this Agreement. The Bank is willing to do so upon the terms contained in this Agreement.

This Agreement includes the General Terms, the Specific Terms and the Exhibit, each as defined or referred to below.

## AGREEMENTS

A. GENERAL TERMS. This Agreement is subject to the General Terms for Deposit Account Control Agreement attached hereto as Annex A (the "*General Terms*"). The General Terms are incorporated in this Agreement by reference and without modification except as may be provided in Section 10 of the Specific Terms. Pursuant to the terms contained herein, this Agreement evidences Lender's control over the Deposit Account.

B. SPECIFIC TERMS. The following terms (the "*Specific Terms*") complete, supplement or modify the General Terms:

1. Deposit Account *(see "Background" above)*. The following account or accounts comprise the Deposit Account: 31006968

2. Business Day *(see definition of "Business Day" in Section 1 of the General Terms)*:

A day will not be considered as a "Business Day" if commercial banks in the following city or cities are closed on that day: Detroit, Michigan. If the preceding sentence is not completed, no additional days are excluded from the definition of "Business Day".

3. Outside Time *(see definition of "Outside Time" in Section 1 of the General Terms)*:

The Outside Time will be based on two Business Days (as set forth in Section 1 of the General Terms).

4. Disposition of less than all or multi-disposition of funds *(see Section 4(a)(ii)(E) of the General Terms)*:

A Disposition Instruction originated by the Secured Party that provides for a disposition of less than all of the funds in the Deposit Account and/or to multiple recipients would not, in and of itself, prevent Bank from being liable for failure to follow such Disposition Instruction.

5. Reimbursement Claim Period *(see Section 6(b) of the General Terms)*:

The number of days following the termination of the Agreement in which a reimbursement claim must be made against the Secured Party under Section 6(b) of the General Terms is thirty (30).

6. Electronic Records *(see definition of "writing" in Section 1 of the General Terms)*:

The parties permit a writing to include an electronic record and permit communications by email.

7. Governing Law *(see Section 13(a) of the General Terms)*:

The jurisdiction whose law governs this Agreement is the State of Michigan.

8. Bank's Jurisdiction for UCC Purposes *(see Section 13(b) of the General Terms)*:

The Bank's jurisdiction for purposes of part 3 of UCC Article 9 is the State of Michigan.

9. Delivery of Executed Copy *(see Part D)*:

Delivery of an executed copy of this Agreement may be made by electronic transmission in addition to a transmission by facsimile.

10. Additional Provisions *(see Section 12(b) of the General Terms)*:

The following provisions modify or supplement the General Terms: None.

C. EXHIBIT. The parties have completed and attach hereto the Exhibit to be used as the form of the Initial Instruction

D. SINGLE AGREEMENT; COUNTERPARTS. The General Terms, the Specific Terms and the Exhibit shall be read and construed together with the other provisions of this Agreement as a single

Better. Thinking. Banking.

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first written above.

**BANK:**

Bank Michigan

By: Courtney Brown 1/3/2025, 8:54:01 AM
Name:
Title:

**SECURED PARTY:**

**MJMPL LLC**

By: Jeffrey Cohen
Name: Jeffrey Cohen
Title: Authorized Representative

**DEBTOR:**

**My Pillow, Inc.**

By: DocuSigned by: Michael J Lindell AFAE023833E44A5
Name: Michael Lindell
Title: Chief Executive Officer

**Filing Number: 1525336100872**
**Date: 12/26/2024**
**Time: 3:27 PM**
**STATE OF MINNESOTA**
**Office: Office of the Minnesota Secretary of State**

# UCC3 - Assignment - UCC Financing Statement

**ORIGINAL FILING NUMBER:** 1427607900554

**ORIGINAL FILING DATE:** 11/14/2023

**RETURN ACKNOWLEDGEMENT TO:**
Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703
USA

**FILER CONTACT INFORMATION:**
Corporation Service Company
1-800-858-5294
SPRFiling@cscglobal.com

## SECURED PARTY INFORMATION

**ORGANIZATION'S NAME**
MJMPL LLC

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 32300 Northwestern Highway | Farmington Hills | MI | 48334 | USA |

## ASSIGNOR INFORMATION

**ORGANIZATION'S NAME**
REV CAPITAL LLC

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

## AUTHORIZING PARTY

**ORGANIZATION'S NAME**
REV CAPITAL LLC

**ADDITIONAL FILER REFERENCE DATA:**
(NJR 15492-196) 3006 01920

**Filing Number: 1514893100022**
**Date: 11/21/2024**
**Time: 1:26 PM**
**STATE OF MINNESOTA**
**Office: Office of the Minnesota Secretary of State**

# UCC3 - Assignment - UCC Financing Statement

**ORIGINAL FILING NUMBER:** 1427607900554

**ORIGINAL FILING DATE:** 11/14/2023

**RETURN ACKNOWLEDGEMENT TO:**
Doug Wardlow
343 E 82nd St
chaska, mn 55318

## SECURED PARTY INFORMATION

**ORGANIZATION'S NAME**
Rev Capital LLC

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1550 AUDUBON RD | CHASKA | MN | 55318 9508 | USA |

## ASSIGNOR INFORMATION

**ORGANIZATION'S NAME**
Samson Funding LLC

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

## AUTHORIZING PARTY

**ORGANIZATION'S NAME**
Samson Funding LLC

## ASSIGNED COLLATERAL

COLLATERAL: This financing statement covers the following collateral: ALL DEBTOR'S PRESENT AND FUTURE ACCOUNTS AND THE DIRECT AND INDIRECT PROCEEDS THEREOF. NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTOUS
INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCES IN THE EVENT THAT ANY ENTITY IS GRANTED A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO. THE ABOVE, THE SECURED PARTY ASSERTS A CLAIM T0 ANY PROCEEDS THEREOF RECEIVED BY SUCH ENTITY.

**ADDITIONAL FILER REFERENCE DATA:**

**Filing Number: 1525336100885**
**Date: 12/26/2024**
**Time: 3:27 PM**
**STATE OF MINNESOTA**
**Office: Office of the Minnesota Secretary of State**

# UCC3 - Assignment - UCC Financing Statement

**ORIGINAL FILING NUMBER:** 1497449700315

**ORIGINAL FILING DATE:** 10/02/2024

**RETURN ACKNOWLEDGEMENT TO:**
Corporation Service Company
801 Adlai Stevenson Drive
Springfield, IL 62703
USA

**FILER CONTACT INFORMATION:**
Corporation Service Company
1-800-858-5294
SPRFiling@cscglobal.com

## SECURED PARTY INFORMATION

**ORGANIZATION'S NAME**
MJMPL LLC

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 32300 Northwestern Highway | Farmington Hills | MI | 48334 | USA |

## ASSIGNOR INFORMATION

**ORGANIZATION'S NAME**
Franklin Capital Group, LLC

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

## AUTHORIZING PARTY

**ORGANIZATION'S NAME**
Franklin Capital Group, LLC

**ADDITIONAL FILER REFERENCE DATA:**
(NJR 15492-196) 3006 11062

**Filing Number: 1497449700315**
**Date: 10/02/2024**
**Time: 9:24 AM**
**STATE OF MINNESOTA**
**Office: Office of the Minnesota Secretary of State**

# UCC1 - Original Filing - UCC Financing Statement

| **RETURN ACKNOWLEDGEMENT TO:** | **FILER CONTACT INFORMATION:** |
|---|---|
| Corporation Service Company<br>801 Adlai Stevenson Drive<br>Springfield, IL 62703<br>USA | Corporation Service Company<br>1-800-858-5294<br>SPRFiling@cscglobal.com |

## DEBTOR INFORMATION

**ORGANIZATION'S NAME**
MY PILLOW, INC.

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1550 Audubon Road | Chaska | MN | 55318 | USA |

## SECURED PARTY INFORMATION

**ORGANIZATION'S NAME**
Franklin Capital Group, LLC

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 32300 Northwestern Hwy. | Farmington Hills | MI | 48334 | USA |

## COLLATERAL

All personal property of the Debtor including, without limitation, all of the following property Debtor now or later owns or has an interest in, wherever located:

a) all of the Debtor's Accounts, Chattel Paper, Deposit Accounts, Documents, Equipment, Farm Products, Fixtures, Goods, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights (whether or not given in support of Accounts), Software, as defined below (words and phrases used herein and not otherwise specifically defined herein shall have the respective meanings assigned to such terms as such terms are defined in the Uniform Commercial Code of the State of Michigan, as in effect from time to time (the "UCC"), present and future, including but not limited to any items listed on Schedule 1 attached hereto, if any;
b) all present and future insurance claims relating to any of the above;
c) all Goods, Instruments (including, without limit, promissory notes), Documents (including, without limit, negotiable Documents), policies and certificates of insurance, Deposit Accounts, and money or other property (except real property which is not a fixture) which are now or later in possession of Secured Party, or as to which Secured Party now or later controls possession by documents or otherwise;
d) all present and future books, records, and data of the Debtor relating to any of the above; and e) all present and future accessions, additions and attachments to, proceeds, parts, products, replacement, substitutions, Supporting Obligations and rights arising out of, any of the above, including but
not limited to stock rights, subscription rights, interest, distributions, dividends, stock dividends, stock splits, or liquidating dividends, renewals, all cash and Accounts, insurance policies and proceeds, arising from the sale, rent, lease, casualty loss or other disposition of any of the above and cash and other property which were proceeds of any of the above and are recovered by a bankruptcy trustee or otherwise as a preferential transfer by the Debtor.

In this description of Collateral, a reference to a type of collateral shall not be limited by a separate reference to a more specific or narrower type of that collateral.

**Filing Number: 1497449700315**

UNDER AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY, DEBTOR HAS AGREED NOT TO SELL, ASSIGN, PLEDGE OR OTHERWISE ENCUMBER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT, WHICH INCLUDES ALL AFTER ACQUIRED PROPERTY, INCLUDING ALL OF DEBTOR'S ACCOUNTS, FUTURE ACCOUNTS, CONTRACT RIGHTS, FUTURE SALES, RECEIPTS AND OTHER OBLIGATIONS. THE SALE, ASSIGNMENT, PLEDGE OR ENCUMBERING OF ANY SUCH COLLATERAL WOULD CONSTITUTE TORTIOUS INTERFERENCE WITH SECURED PARTY'S CONTRACTUAL RELATIONSHIP WITH DEBTOR. IN THE EVENT THAT ANY
THIRD PARTY PURCHASES, TAKES AN ASSIGNMENT OR PLEDGE OF, AND/OR IS GRANTED A SECURITY INTEREST IN ANY OF THE ASSETS DESCRIBED IN THIS FINANCING STATMENT, SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEREOF RECEIVED BY SUCH THIRD PARTY. DEBTOR HAS ALSO AGREED TO HOLD IN TRUST FOR SECURED PARTY ALL PAYMENTS RECEIVED IN CONNECTION WITH SECURED PARTY'S COLLATERAL, AND FROM THE SALE, LEASE OR OTHER DISPOSITION OF SUCH COLLATERAL ANY ATTEMPT BY A THIRD PARTY TO EXERCISE DOMINION OR CONTROL OVER THE COLLATERAL DESCRIBED IN THIS FINANCING STATEMENT WOULD CONSTITUTE CONVERSION OF SECURED PARTY'S COLLATERAL.

## ADDITIONAL INFORMATION(IF ANY)

**TRUST DESIGNATION:** No Alternative

**ADDITIONAL FILER REFERENCE DATA:**
(NJR 15492-196) 2939 98891

# EXHIBIT E

Approved, SCAO

Original - Garnishee (Part 1)
1st copy - Court (Part 2)
2nd copy - Defendant (Part 2)

3rd copy - Return (proof of service) (Part 2)
4th copy - Plaintiff/Attorney (proof) (Part 2)

| STATE OF MICHIGAN | REQUEST AND WRIT FOR GARNISHMENT (NONPERIODIC) | CASE NUMBER |
|---|---|---|
| _____ JUDICIAL DISTRICT<br>22nd JUDICIAL CIRCUIT | | 26-000457-CZ |

Court address: 101 E. Huron, Ann Arbor, MI
Zip Code: 48104
Court telephone number: (734) 222-3001

Plaintiff's name and address (judgment creditor)
ACI INTERNATIONAL
844 Moraga Drive, Los Angeles, California 90049
P: (310) 889-2400

v

Defendant's name and address (judgment debtor)
MY PILLOW, INC.
1550 Audubon Road, Chaska, Minnesota 55318
P: 1-800-308-1299

[redacted]

Plaintiff's attorney, bar number, and address
Daniel R. Kelly (P82159)
Felhaber Larson, 220 South Sixth Street, Suite 2200,
Minneapolis, MN 55402
Telephone number
(612) 339-6321

Garnishee name and address
Bank Michigan Financial Corporation
305 E. Eisenhower Parkway, Suite 300
Ann Arbor, MI 48108

**REQUEST**

1. Plaintiff received judgment against defendant for $ 15,408,008.04 on December 23, 2025.
2. The total amount of judgment interest accrued to date is $ 409,473.91. The total amount of postjudgment costs accrued to date is $ 180.25. The total amount of postjudgment payments made and credits to date is $ ________.
   **The amount of the unsatisfied judgment now due (including interest and costs) is • $** 15,817,662.20.
3. Plaintiff knows or with good reason believes the garnishee is indebted to or possesses or controls property belonging to defendant.
4. **Plaintiff requests** a writ of nonperiodic garnishment be paid to ☑ plaintiff, ☐ plaintiff's attorney, ☐ the court, and mailed to ☐ plaintiff. ☑ plaintiff's attorney. ☐ the court.

I declare under the penalties of perjury that this request has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

March 30, 2026
Date

/s/ Daniel R. Kelly
Plaintiff/Agent/Attorney signature

**WRIT OF GARNISHMENT** To be completed by the court.

**TO THE PLAINTIFF:** You must provide all copies of the disclosure form (MC 14), two copies of this writ for serving on the garnishee, and a $1.00 disclosure fee for serving on the garnishee. You are responsible for having these documents served on the garnishee within 182 days. If the disclosure states that the garnishee holds property **other than money** belonging to the defendant, you must motion the court within 56 days after the disclosure is filed for an order to apply the property toward the judgment. **NOTE:** The social security number field is blacked out for security reasons on all parts except the garnishee copy.

**TO THE DEFENDANT:**

1. Do not dispose of any negotiable instrument representing a debt of the garnishee or any negotiable instrument of title representing property in which you claim an interest held in the possession or control of the garnishee.
2. You have **14 days** after this writ is mailed or delivered to you to file objections with the court. If you do not take this action within this time, without further notice, the property or debt held under this writ may be applied to the judgment **28 days** after this writ was mailed or delivered to the garnishee.

**TO THE GARNISHEE:**

1. Within **7 days** after you are served with this writ, you must deliver a copy of this writ to the defendant in person or mail a copy to his or her last-known address by first-class mail.
2. Deliver no tangible or intangible property and pay no obligation to the defendant unless allowed by statute or court rule.
3. Within **14 days** after you are served with this writ, you must deliver or mail copies of your verified disclosure (MC 14) to the court, plaintiff/attorney, and defendant. A default may be entered against you for failure to comply with this order.
4. If indebted to the defendant, you must withhold an amount not to exceed the amount of the judgment stated in item 2 of the request. Payment of withheld funds must be made **28 days** after you are served with this writ unless notified that an objection has been filed.
5. Make all payments withheld under this writ payable and mailed as specified in the request.
6. If you hold property other than money belonging to the defendant, do not transfer it until further order of the court.

3/30/2026
Date of issue

9/28/2026
Expiration date for service

/s/ Lawrence Kestenbaum
Deputy court clerk

# EXHIBIT F

**Ravenscroft Law Group, PLC**

***Legal Insight. Business Instinct.***

*Sent Via Email (mwallin@wallinrussell.com)*

January 23, 2025

ACI International
c/o Wallin & Russell LLP
Attn: Michael Wallin
26000 Towne Centre Drive, Suite 130
Foothill Ranch, CA 92610

**RE: NOTICE OF SENIOR SECURITY INTEREST OF MJMPL LLC WITH RESPECT TO MY PILLOW, INC. ("MY PILLOW")**

Michael:

I understand that you or your firm represents ACI International. Please be advised that this firm represents MJMPL LLC ("Secured Party") with respect to My Pillow.

I understand that ACI International may have received a judgment against My Pillow. As I believe you are aware, Secured Party has as a senior priority security interest in all assets of My Pillow, including without limitation, accounts receivable. Secured Party filed a UCC-1 financing statement with the Minnesota Secretary of State on November 14, 2023.

Secured Party's perfected security interest in My Pillow's assets is senior to any judgment that ACI International may have obtained. Nevertheless, it has come to our attention that ACI International is attempted to exercise dominion or control over the assets in which Secured Lender maintains a superior perfected security interest.

Please immediately retract any and all notices, levies, garnishments, or the like (collectively, "Levies") that ACI International issued, including, without limitation, the levy sent to Amazon.

Be advised that any attempt to exercise dominion, control, or any efforts to enforce an inferior interest over the assets of My Pillow, in which Secured Party maintains a superior perfected security interest, is tantamount to tortious inference and conversion. Please accept this correspondence as further notice of Secured Party's senior secured status in My Pillow's assets.

If ACI International does not immediately retract all Levies, Secured Party will pursue all legal remedies to recover damages resulting from any such interference and conversion. Please confirm receipt and acknowledge that ACI Internation is taking the steps necessary to retract all Levies and will standstill until My Pillow's obligations to Secured Party are satisfied.

Secured Party reserves all of its rights and remedies.

Best Regards,

*/s/ Noel J. Ravenscroft*

Noel J. Ravenscroft, Esq.
Phone: (586) 588-4274
Email: noel@ravenscroftlaw.com

NR **Noel Ravenscroft** Sent - Google January 23, 2026 at 2:01 PM

Re: Amazon Hold - MyPillow / ACI

To: mwallin@wallinrussell.com, alexrivera@dwt.com, Cc: Barbara Berens, Eli Golshteyn Details

Please see the attached.

Noel J. Ravenscroft
Phone: (586) 588-4274
Email: noel@ravenscroftlaw.com

Ravenscroft Law Group, PLC
Legal Insight. Business Instinct.

**Ravenscroft Law Group, PLC**

***Legal Insight. Business Instinct.***

***Sent Via Email (mwallin@wallinrussell.com)***

January 23, 2025

ACI International
c/o Wallin & Russell LLP
Attn: Michael Wallin
26000 Towne Centre Drive, Suite 130
Foothill Ranch, CA 92610

**RE: NOTICE OF SENIOR SECURITY INTEREST OF MJMPL LLC WITH RESPECT TO MY PILLOW, INC. ("MY PILLOW")**

Michael:

I understand that you or your firm represents ACI International. Please be advised that this firm represents MJMPL LLC ("Secured Party") with respect to My Pillow.

I understand that ACI International may have received a judgment against My Pillow. As I believe you are aware, Secured Party has as a senior priority security interest in all assets of My Pillow, including without limitation, accounts receivable. Secured Party filed a UCC-1 financing statement with the Minnesota Secretary of State on November 14, 2023.

Secured Party's perfected security interest in My Pillow's assets is senior to any judgment that ACI International may have obtained. Nevertheless, it has come to our attention that ACI International is attempted to exercise dominion or control over the assets in which Secured Lender maintains a superior perfected security interest.

Please immediately retract any and all notices, levies, garnishments, or the like (collectively, "Levies") that ACI International issued, including, without limitation, the levy sent to Amazon.

Be advised that any attempt to exercise dominion, control, or any efforts to enforce an inferior interest over the assets of My Pillow, in which Secured Party maintains a superior perfected security interest, is tantamount to tortious inference and conversion. Please accept this correspondence as further notice of Secured Party's senior secured status in My Pillow's assets.

If ACI International does not immediately retract all Levies, Secured Party will pursue all legal remedies to recover damages resulting from any such interference and conversion. Please confirm receipt and acknowledge that ACI Internation is taking the steps necessary to retract all Levies and will standstill until My Pillow's obligations to Secured Party are satisfied.

Secured Party reserves all of its rights and remedies.

Best Regards,

*/s/ Noel J. Ravenscroft*

Noel J. Ravenscroft, Esq.
Phone: (586) 588-4274

# EXHIBIT G

**STATE OF MICHIGAN**
**IN THE WASHTENAW COUNTY CIRCUIT COURT**

ACI INTERNATIONAL,

Plaintiff,

v.

MY PILLOW, INC., a Minnesota corporation,

Defendant.

Case No. 26-000457-CZ

Hon. Patrick J. Conlin

**ORDER GRANTING MJMPL LLC'S EMERGENCY MOTION TO INTERVENE UNDER MCR 2.209(A)(3) AND TO QUASH REQUEST AND WRIT FOR GARNISHMENT**

---

FELHABER LARSON
By: Daniel R. Kelly (P82159)
220 South Sixth Street, Suite 2200
Minneapolis, MN 55402
612-339-6321
Attorneys for Plaintiff

THE RAVENSCROFT LAW GROUP
By: Noel J. Ravenscroft (P77729)
Jessica F. Davidova (P86743)
32300 Northwestern Hwy
Farmington Hills, Michigan 48334
(586) - 588-4274
Attorneys for Moving Intervening Party MJMPL LLC

---

**ORDER GRANTING MJMPL LLC'S**
**EMERGENCY MOTION TO INTERVENE UNDER MCR 2.209(A)(3)**
**AND TO QUASH REQUEST AND WRIT FOR GARNISHMENT**

At a session of said Court, held in the
Washtenaw County Circuit Court, State of Michigan

on ________________________

PRESENT: Hon. ___________________________
Circuit Court Judge

This matter comes before the Court on moving intervening party MJMPL LLC's ( "Secured Party") emergency motion to intervene under MCR 2.209(A)(3) and to quash request and writ for garnishment directed at Bank Michigan. Having reviewed the motion and otherwise been advised on the premises;

NOW, THEREFORE, IT IS HEREBY ORDERED that Secured Party's motion is granted for the reasons stated on the record and in Secured Party's motion.

IT IS FURTHER ORDERED that MJMPL LLC may file an appearance in this case as an intervening party under MCR 2.209(A)(3).

IT IS FURTHER ORDERED that the collection actions of plaintiff ACI including but not limited to the request and writ for garnishment directed at Bank Michigan to seize My Pillow's accounts are quashed.

IT IS FURTHER ORDERED that ACI is enjoined from taking further collection actions that interfere with MJMPL LLC's collateral, and, to the extent ACI already has intercepted any of MJMPL LLC collateral, such collateral shall be disgorged and turned over to MJMPL LLC within 7 days of the date of this order.

This order does not resolve the last pending claim or otherwise close the case.

IT IS SO ORDERED.

___________________________________

Hon. Circuit Court Judge